Melanie L. Cyganowski
Richard G. Haddad
OTTERBOURG P.C.
230 Park Avenue
New York, New York 10169
Telephone: (212) 661-9100
Facsimile: (212) 682-6104

*Counsel to the Official Committee of*
*Unsecured Creditors*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SAMMY EL JAMAL,<br><br>Debtor. | Chapter 11<br><br>Case No. 15-22872 (RDD) |

**APPLICATION OF OTTERBOURG P.C. AS COUNSEL TO THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS FOR THE FIRST INTERIM**
**ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND**
**REIMBURSEMENT OF EXPENSES INCURRED FROM**
**JULY 16, 2015 THROUGH AND INCLUDING OCTOBER 15, 2015**

| | |
|---|---|
| Name of Applicant: | Otterbourg P.C. |
| Authorized to Provide Professional Services to: | Official Committee of Unsecured Creditors |
| Date of Retention: | July 16, 2015 |
| Period for Which Compensation and Reimbursements Were Incurred: | July 16, 2015 through and including October 15, 2015 |

| | |
|---|---|
| Amount of Compensation Sought as Actual, Reasonable, and Necessary: | $356,921.00 |
| Amount of Expense Reimbursement Sought as Actual, Reasonable, and Necessary: | $4,423.16 |
| Holdback Amount (20% of Fees): | ($71,384.20) |
| Aggregate Amounts Paid from July 16, 2015 Through October 15, 2015: | $0.00 |
| **Fees (80%) and Expenses:** | **$289,959.96** |
| This is a: | First Interim Fee Application |

Melanie L. Cyganowski
Richard G. Haddad
OTTERBOURG P.C.
230 Park Avenue
New York, New York 10169
Telephone: (212) 661-9100
Facsimile: (212) 682-6104

*Counsel to the Official Committee of
Unsecured Creditors*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SAMMY EL JAMAL,<br><br>Debtor. | Chapter 11<br><br>Case No. 15-22872 (RDD) |

**APPLICATION OF OTTERBOURG P.C. AS COUNSEL TO THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS FOR THE FIRST INTERIM
ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND
REIMBURSEMENT OF EXPENSES INCURRED FROM
JULY 16, 2015 THROUGH AND INCLUDING OCTOBER 15, 2015**

TO: THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Otterbourg P.C. ("**Otterbourg**" or "**Applicant**"), attorneys for the official committee of unsecured creditors in the above-captioned case (the "**Committee**"), in support of its application (the "**Application**") for the first interim allowance of compensation for professional services rendered and reimbursement of expenses incurred from July 16, 2015 through and including October 15, 2015 (the "**First Interim Application Period**"), respectfully represents:

**PRELIMINARY STATEMENT**

1. Applicant's services in this case have been substantial, necessary, and beneficial to the Committee, the general unsecured creditors, the Debtor and his estate, and other parties in interest. This is not a typical individual debtor case. The Debtor lists thirty-three (33) businesses

in which he has an interest, is a party to thirty-two (32) pending legal proceedings, including a matrimonial action, and has an interest in three related bankruptcy cases of businesses in which the Debtor has a purported interest. This Debtor's multiple litigations and business interests, contradictory testimony between himself and his father as to ownership of substantial assets, the lack of transparency with respect to the Debtor's financial affairs, and surreptitious attempts to transfer his assets outside of his estate, has made Applicant's tasks of reviewing and analyzing the Debtor's financial affairs, and to otherwise fulfill the Committee's fiduciary duties, challenging.

2. By this Application and pursuant to sections 330 and 331 of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rule 2016-1 of the Local Bankruptcy Rules for the Southern District of New York incorporating the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York (the "**Local Rules**"), and the various guidelines promulgated by the Office of the United States Trustee and the United States Trustee for Region 2, Southern District of New York (the "**U.S. Trustee**") (collectively the "**U.S. Trustee Guidelines**"), Applicant requests that this Court authorize the first interim allowance of compensation for professional services rendered and reimbursement of expenses incurred during the First Interim Application Period in the amount of $361,344.16 (the "**Application Amount**").

3. As set forth in further detail below, the Application Amount includes: (a) $356,921.00, representing the fees that Applicant incurred and recorded during the First Interim Application Period; and (b) $4,423.16, representing the actual and necessary expenses Applicant incurred in connection with its rendition of professional services during the First Interim Application Period.

4. By this Application, Applicant respectfully requests that the Court enter an order: (a) awarding interim allowance of the Application Amount; and (b) authorizing and directing the Debtor to pay to Applicant, $289,959.96, representing: (i) 80% of fees for services rendered during the First Interim Application Period; and (ii) 100% of expenses associated with such services. For the reasons discussed in further detail below, Applicant submits that the requested relief is appropriate and reasonable.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the Application pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.). Venue of this case and the Application is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are Bankruptcy Code sections 330 and 331, Bankruptcy Rule 2016, Local Bankruptcy Rule 2016-1 and the U.S. Trustee Guidelines.

## BACKGROUND

6. Applicant is a professional corporation of attorneys organized and existing under the laws of the State of New York. Its office is located at 230 Park Avenue, New York, New York 10169. Among Applicant's expertise is the representation of creditors, creditors' committees and trustees in all facets of insolvency related proceedings, including particular expertise and experience in fraud and complex corporate structures.

7. On June 18, 2015 (the "**Petition Date**"), the Debtor filed a voluntary petition for reorganization under Chapter 11 the Bankruptcy Code. No trustee or examiner has been appointed in this case.

8. On July 16, 2015, the U.S. Trustee appointed a three member Committee pursuant to Bankruptcy Code section 1102(a). The Committee consists of the following three members:

(i) Brent Coscia ("**Coscia**"); (ii) JMM Fuelco, LLC ("**JMM Fuelco**"); and (iii) Gas Land Petroleum, Inc. Upon the recommendation of the Office of the United States Trustee and approval by the Committee, Leon Silverman ("**Silverman**"), a creditor of the Debtor, was added as an *ex officio* member of the Committee.

9. The Committee retained: (a) Applicant as its counsel by order entered on August 10, 2015 [Docket No. 57]; and (b) Development Specialists, Inc. ("**DSI**") as its financial advisors by order entered on August 11, 2015 [Docket No. 58]. Both retention orders were effective as of July 16, 2015, the date on which Applicant and DSI commenced providing services for the Committee. Coscia, represented by Oxman Tulis Kirkpatrick Whyatt & Geiger LLP, was selected as the Committee's Chairperson.

10. The Debtor's bankruptcy filing was precipitated by a judgment being entered against him and in favor of Coscia in the amount of $4,785,000, resulting from a jury finding that the Debtor was liable to Coscia for abuse of process and malicious prosecution stemming from a fraudulent police report and the systematic harassment of Coscia. As a result of the Debtor's false police report, Coscia was arrested and forced to stand trial. Ultimately, only after Coscia's life had been turned upside down, were the Debtor's claims shown to be meritless and Coscia found not guilty.

11. Coscia then sued the Debtor for abuse of process and malicious prosecution and on June 13, 2014, the $4,785,000 judgment against the Debtor was entered in favor of Coscia. On April 7, 2015, pursuant to a motion by Coscia, an Order was entered in Coscia's state court action against the Debtor appointing a Receiver.

12. A plan and disclosure statement have not yet been filed.

**APPLICANT'S FEES AND EXPENSES**

13. Throughout the First Interim Application Period, the variety and complexity of the issues involved in this case and the need to address those issues on an expedited basis have required Applicant, in the discharge of its professional responsibilities, to devote substantial time by professionals on a daily basis.

14. In accordance with the Local Rules and the U.S. Trustee Guidelines, certain information must be provided in each application to the extent that it is known or can be reasonably ascertained by the applicant. Accordingly, Applicant makes the following disclosures:

- The Committee's Chairperson has been given an opportunity to review this Application and has approved the amounts requested herein.

- To the best of Applicant's knowledge, all quarterly fees have been paid to the U.S. Trustee and all required monthly operating reports though September have been filed.

- To the best of Applicant's knowledge, the Debtor directly or through related entities is paying undisputed administrative expenses in the ordinary course of business.

**THE FEE APPLICATION**

15. As set forth in the Affidavit of Melanie L. Cyganowski pursuant to Bankruptcy Code Section 504 and Bankruptcy Rule 2016 annexed hereto as Exhibit A (the "**Cyganowski Affidavit**"), no agreement or understanding exists between Applicant and any other person or entity for the sharing of compensation to be received for services rendered in, or in connection with, this case.

16. Applicant maintains written records of the time invested by attorneys and paraprofessionals in performing services to the Committee. Such time records are made contemporaneously with the performance of services by the person rendering such services. A

copy of Applicant's daily time records for the First Interim Application Period broken down by matter and listing the name of the attorney or paraprofessional who performed the services, the date on which the services were performed and the amount of time spent in performing the services is annexed hereto as <u>Exhibit B</u>. Annexed hereto as <u>Exhibit C</u> is a list of the matters for which services were rendered and the aggregate amount of hours and fees invested in each for the First Interim Application Period.

17. For the convenience of the Court and parties in interest, annexed hereto as <u>Exhibit D</u> is a list of the attorneys and paraprofessionals who have worked on this case during the First Interim Application Period, the aggregate time invested by each individual, the applicable hourly billing rate and the amount of fees attributable to each individual. The attorneys that worked on the case were necessary for their specific expertise in cases of this type, involving allegations of fraud and hiding of assets. Accordingly, this case required the involvement of a senior partner with bankruptcy expertise and a senior partner with litigation and fraud expertise.

18. Applicant also maintains records of all actual and necessary out-of-pocket expenses incurred in connection with the rendition of professional services. A copy of Applicant's disbursement records for the First Interim Application Period is annexed hereto as <u>Exhibit E</u>. A schedule setting forth the categories of expenses and amounts for which reimbursement is requested for the First Interim Application Period is annexed hereto as <u>Exhibit F</u>.

## SUMMARY OF SERVICES RENDERED

19. The recitation of each and every professional service Applicant performed for the Committee during the First Interim Application Period would unduly burden the Court. Hence, the following summary highlights the major areas to which Applicant devoted substantial time and attention during the First Interim Application Period. *See* <u>Exhibit B</u>.

### A. Investigation/Asset Analysis & Recovery and Review of Financial Information/Business Operations

20. The Debtor's initial Schedules listed assets of approximately $22 million. Of this amount, $20 million was attributed to the Debtor's business interests. There was no basis provided for the Debtor's asserted interest in these businesses, nor the basis for the aggregate value ascribed to these businesses. Less than one month later, following Applicant's questioning at his initial 341 meeting, the Debtor amended his Schedules and listed assets in excess of $33 million, of which $30 million was attributed to his business interests. Again, there was no explanation for this valuation or the reason for the sudden $10 million (50%) increase in the Debtor's valuation of his business interests. In view of the fact that any recovery to unsecured creditors will likely come from the Debtor's business interests, it was critical that the Committee seek to understand the Debtor's interest in his listed businesses.

21. Applicant worked in coordination with DSI in the review of pertinent financial information concerning the Debtor's business interests. Applicant obtained preliminary documents from the Debtor pursuant to a Rule 2004 request, as well as operating agreements and similar organizational documents from members of the Committee. Applicant spent time analyzing these organizational documents in an effort to understand the Debtor's interest and value that may be available for creditors. Further, Applicant was required to spend time attempting to ascertain the basis for the Debtor's $10 million unexplained increase in the valuation of his business interests.

22. Similarly, the Debtor's monthly operating reports raised more questions than they provided answers. The monthly operating reports were replete with discrepancies and missing information. Applicant, with DSI's assistance, reviewed the monthly operating reports, assembled a list of questions, and presented these questions to the Debtor, and engaged in a subsequent conference call with Debtor's counsel and the Debtor's personal paralegal to discuss

the deficiencies in the monthly operating reports. The Debtor amended his monthly operating reports, but information was still missing, which Applicant outlined in an e-mail to Debtor's counsel.

23. One of the issues that make analysis of the Debtor's financial condition particularly problematic is that the majority of the Debtor's liabilities are paid by a business in which the Debtor purportedly has an interest, Centralized Management Services, and in some cases by family members. As a result, the full extent of the Debtor's expenditures is not transparent. Moreover, the Debtor utilizes Centralized Management Services to pay substantially all of his bills, yet the financial affairs of Centralized Management Services, which is listed as an asset of the Debtor, is not transparent, raising the concern of the Committee that this asset could be diminishing or shielding assets of the estate from the Debtor's creditors.

24. Issues with the Debtor's Schedules and monthly operating reports are emblematic of the problems that Applicant has encountered in attempting to understand the Debtor's financial condition and to ascertain the full scope of the Debtor's assets. To assist in the Committee's investigative process, during the First Interim Application Period Applicant moved for authority to issue several Rule 2004 subpoenas, the purposes of which are to uncover assets of the Debtor's estate, value such assets, and to identify transfers that could be the subject of fraudulent conveyance actions. In addition to preparing a Joinder in support of the Rule 2004 Motion of Silverman directed to the Debtor, Applicant prepared and filed Rule 2004 motions seeking authorization to issue subpoenas to the following:

    a. Haifa Eljamal (the Debtor's wife)

    b. Greyrock Accounting (the Debtor's accountant)

    c. Musa Eljamal (the Debtor's father)

    d. Rey Eljamal (the Debtor's brother)

e.  Coldwell Banker Real Estate LLC and Coldwell Banker Residential Brokerage (the Debtor's broker for the sale of his home)

25. Applicant reviewed preliminary documents provided by the Debtor, his wife and the Debtor's accountant, including tax returns, operating agreements, and prenuptial agreements. Further, Applicant reviewed objections filed by the Debtor and the Debtor's wife to the Rule 2004 motions and engaged in multiple conference calls with the parties to whom subpoenas were issued to resolve potential discovery disputes and discuss the documents Applicant expected to be produced. Among those calls were conference calls with counsel for the Debtor and counsel for the Debtor's wife to resolve outstanding production issues. Applicant drafted and filed a protective order to establish procedures for maintaining the confidentiality of documents produced by the Debtor and the Debtor's wife. Applicant is still engaged in ongoing discussions regarding the production of documents and is coordinating dates for depositions.

26. Because the Committee believes that there may have been significant transfers of assets prior to the Petition Date (and potentially subsequent to the filing), obtaining all financial records and documents from family members, as well as deposing such family members, is critical to identifying potential estate assets and seeking their return to the Debtor's estate.

27. Of particular and imminent concern to the Committee at the time of its formation was the Debtor's attempt to transfer assets to his wife through a pending matrimonial proceeding. The Debtor's bankruptcy filing was precipitated by a judgment being entered against him and in favor of Committee member Coscia in the amount of almost $5 million, resulting from a jury finding that the Debtor was liable to Coscia for abuse of process and malicious prosecution stemming from a fraudulent police report and systematic harassment of Coscia.

28. Following entry of the judgment against the Debtor, Coscia moved for the appointment of a receiver, but before the motion was granted, an action was commenced ostensibly by the Debtor's wife in Westchester Supreme, Index No. 003747/2014 (the "Matrimonial Proceeding"), seeking a divorce from the Debtor. (This bankruptcy case was filed on the heels of the State Court appointment of the receiver.)

29. The Committee believed that the Debtor conspired with his wife to commence what was by all appearances a sham divorce proceeding with the purpose of transferring all of his assets to his wife. Through Applicant's efforts, the Debtor's plan was thwarted – the Debtor recently discontinued the Matrimonial Proceeding. In all likelihood, the Debtor's discontinuance of the Matrimonial Proceeding was not the result of a sudden reconciliation between him and his wife, but, rather, the actions of the Committee and Applicant to undermine the true purpose of the divorce. Specifically, those actions included (i) the Committee's motion to intervene in the Matrimonial Proceeding and (ii) questioning by Committee counsel at the Debtor's 341 meeting concerning the transfer of assets to his wife and the legitimacy of the divorce proceeding.

30. Following the formation of the Committee on July 16, 2015, the Committee researched, prepared, and filed papers to intervene in the Matrimonial Proceeding for the purpose of enforcing the automatic stay of section 362 of the Bankruptcy Code, which prohibits the entry of any order determining the division of any of the Debtor's property. The Committee also sought the disclosure of the stipulation of settlement entered into between the Debtor and his wife. Applicant attended the hearing in the Matrimonial Proceeding on July 23, 2015 to consider the Committee's motion to intervene. The Court allowed the Debtor and his wife to file papers in response and for the Committee to file a reply. Applicant reviewed the Debtor's and his wife's submissions, conducted additional research, and filed further papers in support of its

motion to intervene on September 14, 2015, explaining that an ordering dividing property of the Debtor could not be entered because of the effect of the automatic stay.

31. In addition, at the initial 341 meeting of creditors in this case, Applicant asked questions of the Debtor requiring him to explain the circumstances of his divorce and the attempt to transfer assets to his wife, Haifa. At the continued section 341 Meeting of Creditors in the Debtor's bankruptcy case on August 19, 2015, the Debtor testified under oath that he and Haifa were in the midst of reconciling and specifically pointed to questions raised at the prior section 341 meeting and the Committee's motion to intervene in the Matrimonial Proceeding as one of the reasons for the reconciliation.

32. Applicant devoted significant time in connection with the section 341 meetings, including a review of the documents to pinpoint those most relevant to the 341 questioning, meeting with DSI to prepare questions and areas of inquiry, and attendance at the meetings on July 29th and August 19th. In addition to preparing for and attending the section 341 meetings in this case, Applicant also prepared for and participated in the section 341 meeting of one of the Debtor's businesses that is also in bankruptcy – Yonkers Central Avenue Snack Mart ("Yonkers Snack Mart"). It was during the Yonkers Snack Mart 341 meeting that the Debtor's father, testifying on behalf of Yonkers Snack Mart, contradicted statements made by the Debtor concerning his purported interest in Yonkers Snack Mart and also raised the possibility of undisclosed assets of the Debtor.

33. Applicant also monitored the related bankruptcy proceedings of Armonk Snack Mart and Yonkers Central Avenue Snack Mart, including attending a hearing on August 20, 2015, to monitor and assess the impact of those cases, in which the Debtor has an interest on the Debtor's estate and valuation of his assets.

34. The Debtor is also party to countless other litigations, including litigations with members of the Committee and related corporate entities. In fact, the Debtor has a long history of vexatious litigation and abusive practices that have made the task of Applicant in understanding the Debtor's stable of litigations and determining the impact upon the estate all the more difficult. Among other things, the Debtor has a history of (i) filing multiple litigations asserting the same or similar causes of action, including one filed pro se during the course of this bankruptcy case against a member of the Committee; (ii) harassing adverse parties through threatening texts and commencement of meritless litigation, such as the filing of a libel complaint based on statements made in the context of litigation; (iii) repeatedly firing and changing counsel in the middle of litigation to cause delay; and (iv) seeking countless recusals.

35. In connection with its investigation of the Debtor's assets and operations, Applicant analyzed the numerous litigations in which the Debtor is involved to gain a further understanding of the Debtor's assets. In particular, Applicant reviewed testimony provided and documents submitted in connection with the Debtor's financial condition. Applicant also reviewed a recently filed *pro se* action commenced outside of Bankruptcy Court against a member of the Committee. This led to a further review and analysis of the Debtor's past litigation tactics and documented abuse of the judicial system to harass and bully. Concerned that the Debtor would continue with his harassment of Committee members and abuse of the legal system, Applicant prepared a motion under section 105 of the Bankruptcy Code to bring the Debtor's actions to the attention of the Bankruptcy Court and request that the Debtor be required to seek leave of the Bankruptcy Court to commence any further litigation and to provide full transparency of the Debtor's activities.

36. Applicant also discussed with the Debtor's counsel the extensions of the deadline to commence an adversary proceeding objecting to the Debtor's discharge. Counsel agreed and Applicant prepared and filed a stipulation extending the deadline to object for all creditors.

37. In addition, Applicant reviewed the motions filed with the Court and advised the Committee of the relief requested and Applicant's recommended response, as well as analyzing, together with DSI, the Debtor's financial information.

### B. Communications with Committee and Creditors / Committee Meetings/Administrative Matters

38. During the First Interim Application Period, Applicant responded to the numerous communications received from creditors and their respective counsel. In addition, to ensure that the Committee was fully informed of all developments in this case, Applicant extensively consulted and communicated with the Committee's representatives. Throughout the First Interim Application Period, Applicant was in regular communication with the Committee Chairperson and each Committee member's representative(s) regarding, among other items: (a) motions pending before the Court; (b) the status of pleadings and motions being prepared by Applicant; (c) the outcome of the Matrimonial Proceeding; (d) ongoing litigations and objections to discharge; (e) overall case strategy; and (f) any other matters that may affect the Debtor's estate.

39. Throughout the duration of this chapter 11 case, Applicant has continually sought to keep the Committee members fully apprised of matters related to this case. In that regard, Applicant organized an initial Committee conference call on July 16, 2015, an in-person meeting on July 21, 2015 to discuss the Debtor's businesses, and multiple other conference calls to discuss pending matters and case strategy. Applicant prepared minutes of each of the formal Committee meetings.

40. Applicant also prepared the Bylaws by which the Committee is to conduct itself and a Rule 2019 Statement for filing with the Bankruptcy Court.

41. Applicant also prepared its retention application and that of DSI and reviewed the retention applications filed by the Debtor. Applicant analyzed the Debtor's retention applications, raised potential issues with the Committee and, at the Committee's direction, prepared and filed two statements reserving rights in connection with the payment of professional fees by third parties.

## EVALUATING APPLICANT'S SERVICES

42. Applicant submits that its request for the first interim allowance of compensation is reasonable and appropriate. The services rendered by Applicant, as highlighted above, required substantial time and effort. These efforts proved to be critical in: (a) the Debtor discontinuing the Matrimonial Proceeding and, thus, avoiding a transfer of his assets to his wife; (b) preliminarily mapping out the Debtor's business operations; (c) engaging in discovery that will assist in identifying assets available for creditors; (d) analyzing the Debtor's ongoing litigation to help assess the Debtor's valuation of his business holdings; and (e) monitoring the status of pleadings before the Bankruptcy Court so as to advise the Committee accordingly.

43. Bankruptcy Code section 331 provides for interim compensation of professionals and incorporates the substantive standards of Bankruptcy Code section 330 to govern the Court's award of such compensation. Bankruptcy Code section 330 provides that a court may award a professional employed under Bankruptcy Code section 327 "reasonable compensation for actual, necessary services rendered … and reimbursement for actual, necessary expenses." Bankruptcy Code section 330 also sets forth the criteria for the award of such compensation and reimbursement.

44. In determining the amount of reasonable compensation to be awarded, the court should consider the nature, extent, and the value of such services, taking into account all relevant factors, including:

    a.    the time spent on such services;

    b.    the rates charged for such services;

    c.    whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

    d.    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

    e.    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

45. During the First Interim Application Period, Applicant encountered a variety of challenging issues, often requiring substantial research, document review, and intervention. Applicant brought to bear legal expertise in many areas, including bankruptcy, litigation, and investigations of fraudulent activity. Applicant's attorneys have rendered advice in all of these areas with skill and dispatch.

46. Applicant respectfully submits that the services for which it seeks compensation in this Application were necessary for and beneficial to the Committee and other creditors, the Debtor's estate, and other parties in interest. Applicant also submits that the services rendered to the Committee were performed economically, effectively and efficiently and that the results obtained to date have benefited not only the Committee but all stakeholders in the Debtor's

15

chapter 11 case. In certain instances in the beginning of Applicant's involvement, when necessary to get up to speed and understand the financial condition of the Debtor, multiple attorneys participated in conference calls or meetings that involved numerous issues relevant to each attorney's expertise. Applicant further submits that the compensation requested herein is reasonable in light of the nature, extent and value of such services to the Committee and other creditors, the Debtor's estate, and other parties in interest, and the complexities and challenges presented.

47. Applicant's attorneys and paraprofessionals spent a total of 502.20 hours during the First Interim Application Period, which services have a fair market value of $356,921.00. Applicant spent its time economically and the work conducted was carefully assigned to appropriate attorneys or paraprofessionals according to the experience and level of expertise required for each particular task.

48. Applicant's hourly rates and fees charged are consistent with the market rate for comparable services. As set forth in the Cyganowski Affidavit, the hourly rates and fees charged by Applicant are the same as those generally charged to, and paid by, Applicant's other clients. Indeed, unlike fees paid by most of Applicant's clients, due to the delays inherent in the fee application process, the present value of the fees paid to Applicant by the Debtor is less than fees paid monthly by other clients.

49. In summary, the services rendered by Applicant were necessary and beneficial to the Committee and other unsecured creditors, and were consistently performed in a timely manner commensurate with the complexity, importance, novelty and nature of the issues involved. Accordingly, approval of the compensation sought herein is warranted.

## DISBURSEMENTS

50.  Applicant incurred actual and necessary out-of-pocket expenses during the First Interim Application Period, which are set forth in Exhibit E. By this Application, Applicant respectfully requests allowance of such reimbursement in full. The disbursements for which Applicant seeks reimbursement include, among others:

- a. Duplicating – Laser copies and photocopies charged at $0.10 per page. The charge per page includes a charge for maintaining the duplicating facilities and is less than that which is billed to other Otterbourg clients;

- b. Telecommunications – Long distance calls are billed at actual cost;

- c. Computer Research Charges – Otterbourg's practice is to bill clients for LEXIS research at actual cost, which does not include amortization for maintenance and equipment;

- e. Local Car Service – Otterbourg's practice is to allow attorneys, legal assistants, and secretaries to charge car service to the appropriate client after 8:00 p.m.;

- f. Delivery Services – Otterbourg's practice is to charge postal, overnight delivery and courier services at actual cost; and

- g. Working Meals - working meals in accordance with the applicable U.S. Trustee Guidelines.

See Exhibit G.

## NOTICE

51.  Applicant has provided notice of this Application to all parties that have filed a notice of appearance with the Clerk of the Court and requested notice of pleadings in this chapter 11 case.

17

## **CONCLUSION**

**WHEREFORE**, Applicant respectfully requests that this Court enter an order in the form of Exhibit H: (a) allowing Applicant's first interim compensation in an amount equal to $361,344.16; (b) awarding Applicant reimbursement of actual, necessary expenses incurred in connection with the rendition of such services in the amount of $4,423.16; (c) authorizing and directing the Debtor to pay to Applicant $289,959.96, representing: (i) 80% of fees for services rendered during the First Interim Application Period; and (ii) 100% of expenses associated with such services; and (d) such other and further relief as may be just or proper.

New York, New York
Dated: October 29, 2015

>                              OTTERBOURG P.C.
>
>                              By: */s/ Melanie L. Cyganowski*
>                                   Melanie L. Cyganowski
>                              230 Park Avenue
>                              New York, New York 10169
>                              (212) 661-9100
>                              *Attorneys for the Official Committee of*
>                              *Unsecured Creditors of Sammy El Jamal*