| | |
|---|---|
| Melanie L. Cyganowski<br>Richard G. Haddad<br>OTTERBOURG P.C.<br>230 Park Avenue<br>New York, New York 10169<br>Telephone: (212) 661-9100<br>Facsimile: (212) 682-6104 | Hearing Date:    September 14, 2016<br>                 10:00 A.M.<br><br>Objection Deadline:    September 9, 2016 |

*Counsel to the Official Committee of
Unsecured Creditors*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SAMMY ELJAMAL,<br><br>                 Debtor. | Chapter 11<br><br>Case No. 15-22872 (RDD) |

**STATEMENT OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS WITH RESPECT TO MOTION OF
THE UNITED STATES TRUSTEE FOR THE APPOINTMENT OF AN
<u>EXAMINER PURSUANT TO SECTION 1104 OF THE BANKRUPTCY CODE</u>**

The Official Committee of Unsecured Creditors (the "Committee") of Sammy Eljamal (the "Debtor"), by its undersigned counsel, files this statement with respect to the Motion of William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"), for the appointment of an examiner pursuant to section 1104(c) of title 11, United States Code [Docket No. 273] (the "Motion"), and respectfully states:

1.     The Committee does not object to and, indeed, supports the request of the United States Trustee for the appointment of an examiner. The Committee believes that the appointment of an examiner at this time is warranted and necessary in order to better investigate the Debtor's questionable actions throughout this case and end the stalemate that currently exists.

4539675.1

Given the Debtor's unwillingness to earnestly work with the Committee, combined with the tortured history between the Debtor and members of the Committee, an examiner is appropriate.

2. The Committee requests, however, that the scope of the examiner's areas of inquiry be expanded. As the Committee has stated in prior filings before this Court, it is the Committee's belief that the Debtor has been at times untruthful, concealed assets and generally sought to evade the oversight of the Court, the Committee, and the United States Trustee. Specifically, the Committee requests that any examiner appointed also be directed to review the following:

A. *False Statements Under Oath*. Examine whether the Debtor perjured himself while under oath during both the 341 meeting and his 2004 examination taken by the Committee. The Debtor made several statements on the record at each that is believed to be untrue:

    (i) During the Debtor's 2004 examination, the Debtor claimed to have no knowledge of the purchase of a gas station that *he* requested be purchased in his wife's name (under her maiden name). Upon information and belief, in early 2015, the Debtor arranged for the purchase of a gas station in Connecticut, which he made a point of purchasing under his wife's maiden name. The Committee learned of this transaction by reviewing emails *to and from the Debtor* which were produced by the Debtor's accountant. But, when confronted with this evidence during his Rule 2004 examination, the Debtor denied any knowledge of or involvement in the transaction, notwithstanding the clear documented evidence to the contrary. The Debtor did *not* list any interest in this entity in his Amended Schedules, nor is it reflected in any of his listed transfers.

(ii) At both the Section 341 meeting and the Rule 2004 examination, the Debtor made statements concerning a 2014 tax refund that the Committee believes are untrue. During the 2004 examination, the Debtor was asked about the status of a 2014 tax refund check that was an asset of the estate. The Committee had learned that the refund check was received and sent by the Debtor to the IRS for payment of the Debtor's pre-petition first quarter 2015 taxes (without first seeking authorization from the Bankruptcy Court). During the 2004 examination, the Debtor stated that he had no knowledge of receipt of the refund check or of the return of the refund to the IRS for payment of the first quarter 2015 taxes of the Debtor and his wife. The Debtor claimed that the use of the 2014 refund to pay his and his wife's 2015 taxes was done without his authorization or knowledge. It was only after the Committee's inquiry that the Debtor even reported the receipt of the refund check on his subsequent monthly operating report.

(iii) The Debtor has made conflicting statements concerning his ownership interest in Yonkers Snack Mart. At the 341 meeting, the Debtor stated that he owned half of Yonkers Snack Mart, but later amended his SOFAs, Statement of Business Interests, and tax returns for Yonkers to reflect a 100% ownership interest.

B. *Undisclosed Bank Accounts.* The Committee believes that the Debtor may be using undisclosed, non-DIP accounts. The Debtor only lists one DIP account on his monthly operating reports, but the Committee believes that the Debtor may be using other bank accounts that potentially contain cash of the Debtor and should be included in his estate.[1]

---

[1] The Committee is not referring to certain escrow accounts that have been established pursuant to stipulations entered into with the Debtor during the case.

(i) For example, with respect to the 2014 tax refund, the Debtor (subsequent to the Committee's inquiries on the topic) filed with his October monthly operating a copy of a letter, which bears the Debtor's signature, and references a payment of $61,765.85, and states that a "[c]ashier check # 8446725 dated 10/21/2015 is submitted here with." However, the Debtor did not include a copy of the cashier's check in the monthly operating report and there is no evidence of the issuance of such check on his DIP account.

(ii) The Committee also believes that the Debtor is utilizing funds during the bankruptcy case, the source of which is unknown, for various expenses and investments, including the following:

a. A private investigator to follow a member and an *ex officio* member of the Committee (described below).

b. A hotel in Connecticut that the Debtor boasted he would be purchasing.

c. A new gas station (Virginia Hillside, LLC) that, upon information and belief, the Debtor purchased during the bankruptcy case.

d. A real estate investment that, upon information and belief, the Debtor made during the bankruptcy case.

C. *Undisclosed Assets.* The Committee has received information suggesting that the Debtor may have additional assets that he did not report on his bankruptcy Schedules. In particular, the examiner should examine the following:

(i) The Debtor's potential interest in Nepperhan Yonkers Snack Mart, Inc. and Money Making Systems, Inc., both of which, based on a public documents search, list the Debtor as the CEO and have a business address of 25 Saint Charles St.,

Thornwood, NY 10594 -- which is the *same* address of Centralized Management Systems *and* the Debtor's place of business.

*(ii)* The Debtor's potential interest in a mortgage provided to 600 Main Street, LLC, which also lists as its business address: 25 Saint Charles St., Thornwood, NY 10594. Upon information and belief, this business was sold and the Debtor, or an entity owned by him, provided a mortgage in connection with the purchase of the business and the Debtor did not report the mortgage as an asset of his estate.

*(iii)* The Debtor's interest in a gas station in Mt. Pleasant, New York (Virginia Hillside, LLC), which, upon information and belief, was purchased by the Debtor during the pendency of the bankruptcy case, which also lists as its business address: 25 Saint Charles St., Thornwood, NY 10594.

D. *Relationships with Family Members and Attempts to Shield Assets From Creditors.* The examiner should investigate the transactions and relationships that the Debtor has with certain family members, notably his wife (Haifa Eljamal), his father (Musa Eljamal), his brother (Rey Mussa), and his children, for possible fraudulent transfers and collusion with the Debtor in hiding assets from creditors and bankruptcy court oversight.

(i) The Debtor's father (Musa) has made statements, in his capacity as the principal of certain of the business entities in which the Debtor also has an interest and that are also in bankruptcy, that have contradicted statements of the Debtor, only to later be amended, seemingly to match the story of the Debtor.

a. The uncertainty of the ownership interest in Yonkers Snack Mart is an example of this behavior. Initially, both the Debtor and his father represented – through filings in both this bankruptcy case and the Yonkers Snack Mart

bankruptcy case, and in their testimony at the respective 341 meetings – that they are each 50% owners of Yonkers Snack Mart. Then, for unknown reasons, the story changed the following month: on August 17, 2015, when the Debtor's father (Musa) amended Yonkers Snack Mart's Statement of Financial Affairs to state that the Debtor owns a 100% interest in Yonkers Snack Mart. Two days later -- on August 19, 2015 -- in stark contrast to the Debtor's testimony at his 341 meeting that he owned half of Yonkers Snack Mart, the Debtor similarly filed an Amended List of Business Interests to reflect that he owns a 100% interest in Yonkers Snack Mart. The Debtor even amended the Yonkers Snack Mart 2014 tax return in August 2015 to reflect that he owns a 100% interest in the entity (the original return, filed in February 2015, states that the Debtor and Musa each own 50% interests).

b. The Debtor's father (Musa) is the principal of Centralized Management Services ("CMS"). The Committee commenced an adversary proceeding against Centralized Management Services and the Debtor's father, alleging, among other things, that Centralized Management Services is the alter ego of the Debtor. Upon information and belief, several of the businesses in which the Debtor has an interest, some of which are also debtors in associated bankruptcy proceedings, pay CMS large monthly fees for undescribed and ill-defined back office support services. The Debtor then uses CMS as his personal piggy-bank to pay his expenses. The Committee's allegations should provide the framework of the examiner's proposed investigation. If the Committee's allegations are proven to be true, then Musa Eljamal, as the

        principal of CMS, has been collusive in allowing the Debtor to use CMS as his personal piggy-bank.

    c.  In addition to the Debtor's liberal use of CMS for payment of his expenses, the Debtor's father also pays certain of his expenses, including certain legal fees.  The examiner should investigate whether the funds being used are those of Musa Eljamal or actually those of the Debtor that have not been disclosed to the Bankruptcy Court.  The Committee issued a subpoena to Musa Eljamal for the production of documents and taking of testimony, but he has not complied with either request.

*(ii)*  As noted above, the Debtor has previously tried to hide and shield his assets from creditors by using his wife as a camouflage.  One example was purchasing a gas station under her maiden name.  Another was on November 24, 2014, soon after the filing of the motion for a receiver, when an action was commenced ostensibly by the Debtor's wife, Haifa Eljamal, in Westchester Supreme, Index No. 003747/2014 (the "Matrimonial Proceeding"), seeking a divorce from the Debtor.  Pre-petition creditors, as well as the Committee, believed that the Matrimonial Proceeding was commenced to hide his assets by transferring them to his wife by way of a "Stipulation of Settlement."  The Stipulation of Settlement was entered into after an order was entered appointing a state court receiver after Brent Coscia obtained a judgment against the Debtor.  It was only after (i) the Committee's intervened in the Matrimonial Proceeding to enforce the automatic stay and stop any transfer of property to the Debtor's wife, and (ii) Committee counsel questioned him at the 341 Meeting about the transfer of assets to his wife and the

legitimacy of the divorce proceeding, that the Debtor "reconciled" with his wife and the Matrimonial Proceeding was discontinued. The examiner should closely examine the assets of Mrs. Eljamal, including any recent acquisitions and any potentially fraudulent transfers made to her. The Committee issued a subpoena to Mrs. Eljamal for the production of documents and taking of testimony, but, to date, she has not complied with either request.

(iii) The possible transfer of assets by the Debtor to the Debtor's brother, Rey Mussa, that may be fraudulent transfers. One example is the transfer of a car by Rey Mussa to the Debtor pre-petition, which is not listed on the Debtor's Schedules.

(iv) The possible transfer of assets, including cash, to his children, that may be fraudulent transfers.

E. *Breach of Duty as a Debtor and Harassment of Committee Members*. The examiner should investigate the Debtor's conduct towards members of the Committee, which we believe is a breach of his duties as a debtor-in-possession. Throughout the Debtor's bankruptcy case, the Debtor has harassed members of the Committee and related parties by continually sending lewd, offensive, and sometimes just plain bothersome e-mails and text messages at all hours of the night. In addition, the Debtor hired a private investigator, while the mediation was ongoing, to follow a member (as well as his son) and *ex officio* member of the Committee by, among other things, sitting in a parked car outside the business offices of James Weil and Leon Silverman. Certain of the Debtor's inappropriate actions were previously outlined in the Committee's *Motion for an Order Directing the Debtor to Seek Court Approval Prior to Commencing New Actions and Pursue Related Claims in the Bankruptcy Court* filed on October 27, 2015 [Dkt. No. 135]

and *Omnibus Objection to the Debtor's (I) Motion for Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 Directing Production of Documents and Examination of Brent Coscia* filed on April 15, 2016 [Dkt. No. 233].

F. *Unauthorized Retention of Professionals.* The Debtor has a long history of retaining and replacing counsel to represent him in his various legal disputes. The Committee has reason to believe that during the bankruptcy case, the Debtor has continued to utilize the services of counsel that were never formally retained in the case, potentially including James Burchetta, Guy Parisi, and Aldo Vitagliano. The examiner should investigate whether the Debtor is in fact using undisclosed counsel during the bankruptcy and who is paying the fees of such counsel.

G. *Monthly Operating Reports.* The examiner should review the veracity of the Debtor's monthly operating reports, which are replete with errors, inconsistencies, and/or are intentionally misleading.

3. Should the examiner be appointed and directed to examine any or all of the foregoing issues, the Committee and its counsel are prepared to work with the examiner and provide all necessary documents and other information that it has regarding the issues to be examined.

WHEREFORE, for the reasons stated above, the Committee supports the Motion of the United States Trustee and respectfully requests that the Motion be granted and that any order approving the Motion expand the areas of inquiry as set forth herein.

Dated: New York, New York
August 26, 2016

By: */s/ Melanie L. Cyganowski*
Melanie L. Cyganowski

OTTERBOURG P.C.
230 Park Avenue
New York, New York 10169
(212) 661-9100

*Attorneys for the Official Committee of Unsecured Creditors of Sammy El Jamal*