```
 1              UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF NEW YORK
 2

 3   ------------------------------------X
                                        :  15-22872 (RDD)
 4   In re:                             :
                                        :  300 Quarropas Street
 5       SAMMY ELJAMAL,                 :  White Plains, New York
                                        :
 6                    Debtor.           :  September 14, 2016
     ------------------------------------X
 7
     THE OFFICIAL COMMITTEE OF UNSECURED  :
 8    CREDITORS OF S,                   :  16-08217 (RDD)
                                        :
 9                    v.                :
                                        :
10   CENTRALIZED MANAGEMENT SERVICES    :
      INC., et al.,                     :
11                                      :
     ------------------------------------X
12
         TRANSCRIPT OF HEARING ON APPLICATION FOR APPOINTMENT
13                    OF CHAPTER 11 EXAMINER;
       OPPOSITION TO THE APPLICATION FOR APPOINTMENT OF CHAPTER 11
14                EXAMINER (RELATED DOCUMENT 273);
                 SUPPLEMENTAL STATEMENT (RELATED DOCUMENT 273)
15   STATEMENT OF NEW YORK FUEL DISTRIBUTORS, LLC; METRO NEW YORK
        DEALER STATIONS, LLC; JMM FUELCO, LLC; AND WEIL FAMILY II
16                 LLC (RELATED DOCUMENT 273);
         OBJECTION TO MOTION RE APPOINTMENT OF EXAMINER (RELATED
17                      DOCUMENT 273);
              MOTION TO DISMISS ADVERSARY PROCEEDING;
18        OMNIBUS MOTION TO DISMISS ADVERSARY PROCEEDING;
                BEFORE THE HONORABLE ROBERT D. DRAIN
19                UNITED STATES BANKRUPTCY JUDGE

20   APPEARANCES:

21   For the Debtor:          ANNE PENACHIO, ESQ.
                              Penachio Malara, LLP
22                            235 Main Street, #610a
                              White Plains, New York 10601
23

24
                     [Appearances continue next page.]
25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

```
 1                                                          2

 2

 3      APPEARANCES CONTINUED:

 4

 5      For the Committee:        MELANIE L. CYGANOWSKI, ESQ.
                                  Otterbourg, PC
 6                                230 Park Avenue
                                  New York, New York 10169
 7
        For Musa Eljamal:         JOHN J. MORGAN, ESQ.
 8                                Barr & Morgan
                                  22 Fifth Street
 9                                Stamford, Connecticut 06905

10      For the US Trustee:       PAUL K. SCHWARTZBERG, ESQ.
                                  Office of the US Trustee
11                                201 Varick Street, Room 1006
                                  New York, New York 10014
12
        For Leon Silverman:       ROBERT RATTET, ESQ.
13                                Herrick & Feinstein LLP
                                  2 Park Avenue
14                                New York, New York 10016

15
        For New York Fuel         CARLOS CUEVAS, ESQ.
16       Distributors:            1250 Central Park Avenue
                                  Yonkers, New York 10704
17
                                  JONATHAN KRAUT, ESQ.
18                                Harfenist Kraut & Perlstein LLP
                                  2975 Westchester Avenue, Suite 415
19                                Purchase, New York 10577

20      For Centralized:          YENISEY RODRIGUEZ-McCLOSKEY, ESQ.
                                  Rodriguez-McCloskey, PLLC
21                                300 Cadman Plaza W., 12th Floor
                                  Brooklyn, New York 11201
22
23      Court Transcriber:        MARY GRECO
                                  TypeWrite Word Processing Service
24                                211 N. Milton Road
                                  Saratoga Springs, New York 12866
25
```

1  (Proceedings began at 12:11 p.m.)

2           THE COURT:  In re Eljamal.

3           MALE SPEAKER:  No, I think you're on [inaudible].

4           MR. MORGAN:  If it please the Court, I think I'll

5  stay here since [inaudible].

6           THE COURT:  That's fine.

7           MR. MORGAN:  And for the record, this is John Morgan

8  for Musa Eljamal.

9           THE COURT:  Right.  And I'm doing the main case

10  first.  The adversary proceeding will be second.

11          MS. PENACHIO:  Good morning, Your Honor.  Anne

12  Penachio on behalf of the debtor, Sammy Eljamal, who is with

13  me in the courtroom today.

14          THE COURT:  Good morning.

15          MS. CYGANOWSKI:  Melanie Cyganowski; Otterbourg PC,

16  counsel to the Committee.

17          MR. CUEVAS:  Good afternoon again, Your Honor.

18  Carlos Cuevas for New York Fuel Distributors.

19          MR. KRAUT:  Jonathan Kraut, same appearance.

20          MR. RATTET:  Robert Rattet; Herrick Feinstein for

21  Leon Silverman and [inaudible].

22          MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg for

23  the Office of the US Trustee.

24          THE COURT:  So everyone can sit down unless they're

25  speaking.  The only matter on I believe in the main case is

1  the US Trustee's motion for the appointment of an examiner

2  under 1104.  I read the parties, the many parties who've

3  weighed in on that motion.  I think I've read all their

4  pleadings and supplemental pleadings.  I think I should hear

5  from the US Trustee first.

6          MR. SCHWARTZBERG:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. SCHWARTZBERG:  Good afternoon, Your Honor.

9          THE COURT:  Good afternoon.

10          MR. SCHWARTZBERG:  I don't want to repeat what's in

11  the papers and what the counsel has said.  The only thing I

12  would like to put forth in addition is things I've had

13  conversations with counsel for the parties.  As Your Honor is

14  aware, there have been allegations against the committee,

15  allegations regarding Mr. Eljamal regarding the conduct.  I

16  thought it appropriate at this point to have an independent

17  entity come in, perhaps have the debtor -- I'm sorry in terms

18  of the committee, have the committee put its pencil down, have

19  an examiner look at their actions and determine whether an

20  examiner thinks that the committee has been acting in breach

21  of his fiduciary duty, whether Mr. Weil controls the

22  committee, and the other allegations.  I'm putting everything

23  that the committee is doing sort of aside until that

24  determination is made including the fee application so that

25  when the Court reviews them and when the parties reviewed them

1   we'd have the benefit of an examiner's look see to see if

2   there were inappropriate actions.  So really we would have the

3   examiner look at the various allegations against the debtor

4   regarding his management company, regarding whether he hired a

5   private investigator to follow certain committee members or

6   the families, and so forth.  And that way we can get a lay of

7   the land as to the actions of both sides in this matter, Your

8   Honor.  And so I thought it would be best to bring the

9   examiner motion and get a truly independent report as to the

10   propriety of what's going on in this case.

11         THE COURT:  Okay.  This is a question for everyone.

12   Can you give me a sense of the extent of the factual record

13   that currently exists that the examiner not should but would -

14   - let's assume the examiner has access to everything that

15   currently exists as known to both sides, would immediately

16   have access to, and the next question after that is how much

17   do you believe an examiner would have to develop a record in

18   addition to what is currently available?  Anyone can start.

19         MS. CYGANOWSKI:  Probably easier.  Nothing easy.

20   Melanie Cyganowski for the committee.

21         I'll limit my comments right now, Your Honor, to the

22   questions you just asked.  The committee will just at the

23   outset as we said in our papers, will turn over everything we

24   have to any examiner that may be appointed.

25         We issued several 2004s.  Ray Musa responded and

1  appeared.  We have documents from him.  We issued a 2004 to

2  Mr. Musa Jamal, Eljamal.  He did not give us one document.  He

3  did not appear for a deposition.  We issued a 2004 to Haifa

4  Eljamal.  She did not give us one document.

5            THE COURT:  That's the debtor's wife, right?

6            MS. CYGANOWSKI:  That's the wife.

7            THE COURT:  Okay.

8            MS. CYGANOWSKI:  There have been allegations, we

9  believe substantiated, but nonetheless still allegations, that

10 Mr. Eljamal is purchasing gas stations in the maiden name of

11 Heifer Eljamal, so we felt that was an important area of

12 inquiry, but she has not appeared for a deposition.  Mr. Sammy

13 Eljamal gave us some documents.  We tried to, at the request

14 of the debtor's counsel, pare down the list.  We did.  He

15 never supplemented that list.  We have received some documents

16 from the --

17           THE COURT:  I'm sorry, he never supplemented to deal

18 with the documents that you pared down to?

19           MS. CYGANOWSKI:  The additional ones.  Right.

20           THE COURT:  Okay.

21           MS. CYGANOWSKI:  He initially said we gave to big a

22 list.  We worked it down to what we thought were minimally

23 expected documents that he could turn over and those were

24 never produced.

25           We did receive documents from the accountants.

1    Those we have which we can turn over.

2              THE COURT:  The accountants for the debtor?

3              MS. CYGANOWSKI:  For the debtor.  Gray Rock I

4    believe.  We have not received any documents in connection

5    with CMS.  That was one of the reasons why we sought in the

6    complaint to get an accounting.

7              THE COURT:  Well, was there a 2004 CMS?

8              MS. CYGANOWSKI:  I do not believe we actually issued

9    one given all of the difficulty we had --

10             THE COURT:  Okay.

11             MS. CYGANOWSKI:  -- frankly the exercise in getting

12   the 2004s with --

13             THE COURT:  Well actually, I purposely tried to stay

14   away from who was at fault --

15             MS. CYGANOWSKI:  Who did what.

16             THE COURT:  -- in discovery and who wasn't.  I'm

17   just trying to figure out what record needs to be developed.

18             MS. CYGANOWSKI:  What we know.  Exactly.  What we

19   have.

20             THE COURT:  Right.

21             MS. CYGANOWSKI:  So that's what we have.

22             THE COURT:  Okay.

23             MS. CYGANOWSKI:  So I would think from my vantage

24   point that the examiner needs to explore and investigate CMS.

25   I mean without question the debtor has conceded that CMS holds

1  --

2          THE COURT:  All right.  No, I --

3          MS. CYGANOWSKI:  No, no, property of the estate.

4          THE COURT:  I understand.

5          MS. CYGANOWSKI:  So that's something that needs to

6  be --

7          THE COURT:  So and then as far as -- and maybe

8  you're not the best one to answer this, has there been any

9  discovery with respect to the claims that the debtor disputes

10  against the members of the committee?  You know, not in their

11  role as committee members, but the claims that they've

12  asserted in the bankruptcy case.

13          MS. PENACHIO:  Your Honor, I did serve 2004 exams

14  and they were objected to vehemently by the creditors

15  committee and by Mr. Coscia and by Mr. Weil on the grounds

16  that it was harassment.

17          THE COURT:  Have there been -- so the --

18          MS. PENACHIO:  There has been nothing, okay?

19          THE COURT:  Okay.  All right.

20          MS. PENACHIO:  And so I -- it is very frustrating

21  but I will respond to the committee's counsel at the

22  appropriate time regarding the documents turned over by the

23  debtor which were --

24          THE COURT:  No, again, this is not a discovery

25  conference.  I'm not doing this to deal with issues of

production or nonproduction.  I'm just trying to figure out
what an examiner would do.  You know, sometimes examiners
pretty much have the factual record and they just are an
objective -- the examiner is an objective pair of eyes to look
at that record.  More often the examiner has to develop the
record.  There's been -- I'm aware of efforts to get discovery
here so I was trying to figure out how much of that role the
examiner would have to play.

            MR. MORGAN:  If it please the court.  My name is
John Morgan.  I represent Musa Eljamal in this litigation.  I
also represented various of the entities in both the federal
litigation before Judge Eginton as well as a couple of the
cases in the State Supreme Court.  So in answer to your --
which is, by the way, only a small subset or probably half of
the pending litigation.  So with respect to those litigations,
discovery is not complete in any of them.  So that's the
claims that the creditor committee class have outside of the
scope of the bankruptcy, which is what you asked about a
little bit ago.

            THE COURT:  No, that's not only what I'm focusing
on.

            MR. MORGAN:  Very well.  Then I misunderstood.

            THE COURT:  No, I -- well, I'm sorry, I did think
that one potential issue that an examiner could examine would
be the validity of the debtor's assertions that the claims of

1  two of the committee members at least, maybe three, other than

2  Mr. Coscia, which is fixed although on appeal, are overstated

3  or should be disallowed.  And that litigation is not ongoing,

4  is it?  Because that --

5          MR. MORGAN:  Oh, it is.

6          THE COURT:  By whom?  Who's pursuing that

7  litigation?  The debtor?

8          MR. MORGAN:  Well, right now they're stayed.

9          THE COURT:  Well, that's what I'm saying.  Okay.

10         MR. MORGAN:  All right.  I'm sorry.

11         THE COURT:  When I said ongoing, I mean it's stayed.

12         MR. MORGAN:  They're not proceeding a pace.  They're

13 stayed pursuant to the bankruptcy.

14         THE COURT:  Was there discovery in those actions

15 though before the automatic stay came into effect?

16         MR. MORGAN:  In all of those cases, at least the

17 ones that I was involved in, discovery had commenced but not

18 completed.  With respect to one of the state supreme court

19 cases, with respect to one particular location, the discovery

20 consists of about two file boxes.  With respect to the federal

21 litigation, the discovery to date is about the same plus a

22 little bit more.  Again, all of those -- by way of example,

23 the federal litigation consisted of the primary claim by Mr.

24 Weil and his entities that is really about diverted funds in

25 excess of $1 million and that's what triggered this whole

cascade of litigation that have brought us here.  We have some
preliminary discovery as part and parcel of the injunction
hearing, but we have not done formal discovery with respect to
the claims proper.  And by way of example, we've produced 90
percent of our discovery to I guess the defendants.  The
defendants have not produced all of their discovery yet.
Again, we kind of stopped in the middle.  So just in terms of
the sheer volume that we're talking about, I would estimate on
my subset we're talking about three file boxes worth of
material.  Now, that does not -- that includes the accounting
records up to and including around 2013.  I would imagine Ms.
Penachio and others have kind of taken that forward since
then.  So I would imagine, I'm speculating a little bit, but
that would probably be another file box or two if that's what
you're asking, and maybe I'm misunderstanding.

        THE COURT:  No, that's fine.

        MR. MORGAN:  Okay.

        THE COURT:  And we're talking about claims against
the debtor by two of the committee members and claims that the
debtor has against -- an assertion that the debtor says those
claims were overstated.  That's what we're talking about.

        MR. MORGAN:  Correct.

        THE COURT:  Okay.

        MR. MORGAN:  In all the circumstances in which I'm
involved they are claims by either Mr. Weil personally or his

1  family's LLCs or trust, whatever.  I don't want to misstate

2  what the entities are.  Or New York Fuel's or Metro New York

3  Dealer Stations.

4          THE COURT:  Against the debtor.

5          MR. MORGAN:  All of which are the principle

6  entities.

7          THE COURT:  All right.

8          MR. MORGAN:  And Mr. Sammy Eljamal is a defendant

9  personally in each of those cases in the New York State

10 Supreme Court case.  Musa Eljamal is also a defendant in all

11 of those cases.  Various of the 50-50 entities are defendants

12 or -- there's claims and counterclaims, so they're either

13 plaintiffs or defendants depending on the way you look at

14 them.

15         THE COURT:  Okay.

16         MS. PENACHIO:  Your Honor, may I just seek

17 clarification?  If we're talking about only the claim of the

18 other committee member JMM, that is related to -- as I

19 understand it, the Croton litigation.  So that would be very

20 discrete.  So it would only be the claim --

21         THE COURT:  Well, the debtor has said in response to

22 the examiner motion that there's only about 20 claims in this

23 case and more than half filed by committee members and that

24 the debtor believes that most or all of those are

25 objectionable.

1          MS. PENACHIO:  Yes.  And I have interposed an
2    objection to basically all of them --

3          THE COURT:  Okay.

4          MS. PENACHIO:  -- on the grounds that they are
5    either duplicative or unliquidated subject to litigation or,
6    you know, the general grounds that they are just not valid.
7    Most significantly the Silverman claim, he is an ad hoc
8    member, is absolutely unsubstantiated but --

9          THE COURT:  So --

10         MS. PENACHIO:  -- I haven't done --

11         THE COURT:  -- one of the thoughts I had, since the
12   committee doesn't seem to have any interest in joining in this
13   objection, and in fact proposes a plan that pays the claims in
14   full, is that that's something an examiner should look at.
15   But if you're confident you have the facts to pursue the
16   objection, maybe the examiner doesn't need to look at it.

17         MS. PENACHIO:  I am not confident I have the facts
18   to pursue the objection at this juncture, Your Honor.

19         THE COURT:  Okay.

20         MS. PENACHIO:  Thank you.

21         THE COURT:  Okay.  Well objections since it's more
22   than one claim.

23         MS. PENACHIO:  Right.  Objections.  I mean I would
24   just --

25         THE COURT:  I mean duplicative claims, I mean that's

1  easy, duplicate claims, but it's --

2       MS. PENACHIO:  But it's --

3       THE COURT:  Okay.  I think I understand what an

4  examiner would be looking at then which is complicated.

5       MS. PENACHIO:  It is.  It's very complicated and

6  it's --

7       THE COURT:  Okay.  And it's expensive.

8       MS. PENACHIO:  Very.  And I've done a lot of the

9  work already.

10       THE COURT:  Well, that's another --

11       MS. PENACHIO:  I don't have everything that I need -

12  -

13       THE COURT:  All right.  So that's another question I

14  have.  Examiners are useful for two reasons sometimes in

15  bankruptcy cases and I commend the US Trustee for raising this

16  issue because I think something had to be done given that the

17  mediation didn't succeed.  One of the things examiners are

18  useful for is laying out the facts publicly so people can

19  settle based on those facts.  But of course there's a cost to

20  that.  The other is just laying out the facts so that there's

21  a factual record.  That's a little less useful because a lot

22  of the stuff that the examiner may get will not be

23  discoverable ultimately and may not be that useful in

24  litigation going forward.  What record did you need that you

25  didn't have?  Don't tell me about the substance of the

1  mediation, but was one of the reasons the mediation failed

2  that you didn't have a record enough to just --

3          MS. PENACHIO:  No.

4          THE COURT:  -- you know, people negotiating with

5  their hands behind their backs or blindfolds on because they

6  didn't know the facts?  No?

7          MS. PENACHIO:  Your Honor, can I update the Court?

8  I had Mr. Oxman's permission to tell the Court where I am with

9  the negotiation with him if that is acceptable.

10          THE COURT:  Well, he's representing more than one

11  party.

12          MS. PENACHIO:  He is, but I have been in extensive

13  negotiations with him since the conclusion of mediation.

14          THE COURT:  For all of --

15          MS. PENACHIO:  And his client for the first time in

16  a year I got to meet his client, Brent Coscia, and I believe

17  that that was really important to us being able to forge a

18  settlement.  We have --

19          THE COURT:  So we're talking about Mr. Coscia now,

20  not other clients of Mr. Oxman.

21          MS. PENACHIO:  Just Mr. Coscia.

22          THE COURT:  Okay.

23          MS. PENACHIO:  And it is, unfortunately, it was very

24  difficult the way the structure of this case was to settle.

25  The one creditor that I settled with, Mitch Nesheiwat from Gas

1  Land, wasn't affiliated with the Weil group and I think that's

2  why I was able to settle with him so readily.

3             THE COURT:  All right.  So --

4             MS. PENACHIO:  It's difficult to --

5             THE COURT:  -- you were going to tell me what you

6  were authorized to say by Mr. Oxman.

7             MS. PENACHIO:  Say he authorized me to tell you that

8  we were very close.  We were very close and he asked if the

9  Court would get involved.  I told him I would ask you but I --

10            THE COURT:  And this is with respect to Mr. Coscia's

11 claim?

12            MS. PENACHIO:  Yes.  And may I just --

13            THE COURT:  Which would then leave two major

14 creditors, right?  Or two major claims to deal with?

15            MS. PENACHIO:  Pretty one, Your Honor, because I

16 believe Silverman really doesn't have a claim and I've been

17 working with Mr. Rattet very -- not as closely as I would

18 like, but we have been working.

19            THE COURT:  Okay.

20            MS. PENACHIO:  So that would mean that we would have

21 Weil left and perhaps with these other creditors resolved we

22 could engage in more fruitful discussions with Mr. Weil or

23 litigate on some of the issues regarding the distributions.

24            THE COURT:  Okay.  Well that's helpful.

25            MS. PENACHIO:  Your Honor, may I just turn to my

1   client for a moment to confirm the closeness of the

2   settlement?  Do you have -- may I just -- do you have anything

3   to add?

4           MR. ELJAMAL:  I'm very flexible and I'd like to get

5   it over with.

6           MS. PENACHIO:  Okay.  Thank you, Your Honor.

7           MR. ELJAMAL:  I think he's the only situated.

8           MS. PENACHIO:  We have -- and Your Honor, I have had

9   many discussions with Mr. Oxman.  He has assured me he does

10  not take this personally, and I don't take it personally, so

11  if our pleadings seem to take a harsh stance, he's assured me

12  before I even filed them that he would not take this

13  personally.

14          MS. CYGANOWSKI:  With all due respect, Your Honor, I

15  don't want to get into a he said/she said.  I don't want to

16  get into who did what at the settlement, and nor do I want to

17  be viewed as carrying Mr. Weil's laundry in any way.  What I

18  am upset about is it's giving you one sense that isn't

19  completely what happened.  We worked for weeks, months, with

20  the mediator and without the mediator to see if we could

21  resolve.  It reached a point where debtor's counsel said that

22  the --

23          THE COURT:  I know the mediation didn't succeed.  I

24  appreciate that.

25          MS. CYGANOWSKI:  No, no, I know.  But the global

1  offer that had been presented, a global offer involving

2  everybody was close.

3        THE COURT:  I don't have -- and this is on purpose.

4  I don't want to know anything more --

5        MS. CYGANOWSKI:  And I understand that.

6        THE COURT:  -- about the mediation other than do the

7  parties feel that they need an independent third party to

8  develop more facts for settlement purposes?

9        MS. CYGANOWSKI:  For the purpose of that, no.  No.

10       THE COURT:  Okay.  That's all I really wanted to

11  know.

12       MS. CYGANOWSKI:  But I would ask to put in play the

13  concept.  We're stalled.  This case is stalled.  We all

14  acknowledge that.  We would like -- we put pencils down at the

15  request of the Court with respect to a plan.  We would like to

16  try again.  It may not be confirmable.  We believe that it

17  could be.  But at least to put it on the record, to move

18  towards a plan, see if it can be confirmed.  If we don't

19  confirm, then we'll do whatever the next step is, but at least

20  move the case.  Right now we've been in this no man's land if

21  you will.  We've been struggling with not trying to do

22  discovery.  It's a crazy place to be.  So we would at least

23  like to see if we can move forward with the plan.  It may not

24  work.  We think it will.  If it does, then at least we know

25  where it stands.  And if it doesn't, then we'll make the

1 appropriate motions for conversion or whatever is appropriate

2 at the time.

3          THE COURT:  Well, I think both sides can move

4 forward with a plan but you still have fundamental issues on

5 the claims.

6          MS. PENACHIO:  Right.  There's no voting.  There

7 will be no way to confirm a plan unless Mr. Coscia votes and I

8 will seek a designation on him.  And I think that the Court

9 will receive my papers seeking a designation very --

10         THE COURT:  I thought you were --

11         MS. PENACHIO:  I'm trying to settle with him but I

12 can't -- I never met him before last week.  It's very

13 difficult to settle with a person that didn't show up for a

14 year.  The debtor may have been late but at least he showed

15 up.

16         MS. CYGANOWSKI:  He didn't show up to you.  He

17 showed up to whatever necessary in connection with committee

18 events.  And Your Honor can not forget what Mr. Coscia's claim

19 was.

20         THE COURT:  Did he show up at the mediation?

21         MS. PENACHIO:  I'll defer to Ms. Cyganowski as to

22 that.

23         MS. CYGANOWSKI:  He was present by his counsel in

24 the mediation.

25         THE COURT:  Oh, that's a problem.

1      MS. PENACHIO:  That's the problem, Your Honor.  You

2 hit the nail on the head.

3      THE COURT:  That's a huge problem.

4      MS. PENACHIO:  As soon as I met with Mr. Coscia --

5      MS. CYGANOWSKI:  That's easy to say when -- again, I

6 don't want to get into bantering but his claim came about

7 because of the actions of Mr. Eljamal.

8      THE COURT:  I don't care.  If clients don't show up

9 at mediations, they're not going to work.  It's not going to

10 happen.

11      MS. PENACHIO:  Right.  Your Honor, we had the

12 Christian Brothers case here.  There were tort victims here.

13 They made the case get resolved.  It was very professionally

14 gratifying when a tort victim shows up.  And that's -- and I

15 think that --

16      THE COURT:  As far as --

17      MS. PENACHIO:  -- meeting with Mr. Coscia had a

18 phenomenal impact.

19      THE COURT:  Well look, it clearly -- if the parties

20 don't settle, and it may be a subset of parties who don't

21 settle, there will be significant litigation expense.  The

22 question the US Trustee's motion raises is should that expense

23 start now?  One of the reasons you appoint an examiner I think

24 doesn't, at least from what I hear, doesn't apply now because

25 people have enough information to negotiate.  So other than

1    that, I'm not sure what an examiner would be doing other than
2    getting information that the parties could in part use but in
3    part not use in subsequent litigation.
4         MR. SCHWARTZBERG:  Your Honor, I think in two senses
5    an examiner could indicate whether the committee, if it's not
6    acting appropriately, needs to be reconstituted.
7         THE COURT:  Well, I appreciate that but it's --
8         MR. SCHWARTZBERG:  And in -- I'm sorry, Your Honor.
9         THE COURT:  Go ahead.
10        MR. SCHWARTZBERG:  And in regard to the debtor's
11   action whether a Chapter 7 trustee should be warranted.  So I
12   thought in both veins the examiner would add -- or neither.
13   You know, it keeps -- you know, a committee is acting in a
14   fiduciary capabilities and that the debtor is acting
15   appropriate as well.
16        THE COURT:  But that's just a process issue.  I mean
17   I think -- you know, I'm happy to -- not happy, but I will
18   hear a motion.  If someone wants to appoint a trustee, I'll
19   hear that.  If someone wants to sanction the committee, I'll
20   hear that.  I'll hear evidence on that.  I don't think I need
21   an examiner.  I can do that.  Ultimately, what the -- this is
22   no knock on examiners.  Examiners have done great things in a
23   lot of cases.  But ultimately what the examiner says has no
24   legal significance.  It's just -- he's not a judge, or she's
25   not a judge.  Just one person's opinion.  I would still have

1   to have the hearing.  So they can be helpful, but mostly to

2   develop facts so the parties can in a streamlined way

3   negotiate.  Or if there's like a need for the public to know

4   something like in Enron or a case where there's been fraud

5   that is out there in the world, then it's important to have an

6   examiner because there's this sort of societal basis for it.

7           So I guess -- again, I don't fault you at all for

8   bringing this motion because something had to be done to get

9   the case off the dime.  And I think what it does I hope

10  concentrate everyone's mind on, just like in Candide where

11  Admiral Byng is about to be hanged, it does focus the mind, is

12  it highlights the cost of not settling which is huge for a

13  case of this size.

14          So my inclination I guess is to give the parties a

15  brief period to see if they can't settle their disputes.  And

16  it doesn't have to be global.  Settle as many as you can.

17          MS. PENACHIO:  Right.

18          THE COURT:  And then we'll have a case conference.

19  I'm not going to deny or grant the examiner motion at this

20  time.  It'll be out there.  It will be on the same date as the

21  case conference.  And we'll decide how to schedule any

22  remaining litigation and whether it will be in the context of

23  a plan or claim objections or a motion for a trustee, you

24  know, any of those things.  But I really do think that having

25  now seen what would happen if there is no settlement, people

1  should settle.  And if they can't settle, then we'll spend the

2  money but I hope it will be less money than would be spent if

3  you don't have a few weeks to see if you can settle.

4  　　　　　MR. CUEVAS:  Your Honor, you set forth the next date

5  for October the 31st, so would it be appropriate to have like a

6  45-day interval?

7  　　　　　THE COURT:  Yes.  It's a little long but I'm okay

8  with that as long as parties get going now as opposed to

9  waiting for a month.  I mean I really do think that that

10  should be it, that there shouldn't be any further delay after

11  that.  We should, as I sometimes say, have a litigation

12  festival at that point.

13  　　　　　MR. CUEVAS:  And Your Honor, that's why I'm

14  suggesting a 45-day interval.

15  　　　　　THE COURT:  Okay.  That's good.

16  　　　　　MR. MORGAN:  Your Honor, again, John Morgan for Musa

17  Eljamal.  With respect to Ms. Penachio's submission,

18  incorporating what Mr. Oxman said, I would second that there

19  would be a major benefit to having the Coscia claim excised

20  and whether a special master or special mediator, whatever

21  you're going to call it, basically have a forum to get that.

22  　　　　　THE COURT:  Well, see if --

23  　　　　　MR. MORGAN:  I'll suggest something for -- I didn't

24  mean to interrupt.  I'm sorry.

25  　　　　　THE COURT:  Go ahead.  That's all right.  I thought

1   you were done.

2        MR. MORGAN:  I don't mean to step on Anne but my

3   understanding is that there's a done deal and the lawyers are

4   wordsmithing but they can't get it done.

5        THE COURT:  Well, whatever.  Look, in all instances

6   where someone asks me to get involved in the settlement

7   context I push back and say, you know, you're capable lawyers

8   and you should be able to do it yourselves.  I guess I stand

9   ready if you can't but I don't want that to be an excuse for

10  not getting it done yourselves.  Okay?

11       MS. PENACHIO:  Your Honor, I will advise Mr. Oxman

12  accordingly.

13       THE COURT:  Okay.

14       MS. PENACHIO:  Thank you.

15       MS. CYGANOWSKI:  One other suggestion.  While the

16  former judge was unable, would Your Honor be open to asking a

17  sitting judge such as perhaps Judge Stong who has a lot of

18  experience in mediation?

19       THE COURT:  Maybe.  I mean I'd like to see where we

20  are.  I mean I get the impression that there are a couple of

21  settlements that are on the verge or maybe ones actually

22  agreed still with the gas company but --

23       MS. CYGANOWSKI:  I don't think they're that close

24  but that's not -- I'm not in it.

25       THE COURT:  That's something I would consider but I

1  just don't want to -- that's something people can raise during

2  the 45 days if they want to.  I don't want to decide it now.

3          MS. CYGANOWSKI:  Okay.

4          THE COURT:  I have great confidence that Judge Stong

5  would do a great job on this.  I'd like to give her, if she

6  would take it, as little to do as possible.

7          MR. MORGAN:  Presuming she has other work.

8          THE COURT:  Well, I mediated a case for her once

9  where the first mediation session was just deciding what we

10  were going to mediate.  So I -- but that's not her fault.

11  That was the parties' fault.  So I want to avoid that.  Okay.

12  So I'm going to adjourn the examiner motion to that date.  Is

13  it Halloween?  Is that the date?  October 31st?

14          MS. CYGANOWSKI:  The earmarked date, Your Honor, the

15  --

16          THE COURT:  Whatever that date is in October.

17          MS. CYGANOWSKI:  October 31st.

18          THE COURT:  All right.  And if people want to -- I'm

19  not encouraging you to do this, but I'm just saying if anyone

20  in the case wants to, for want of a better term, get the case

21  off of the dime by filing some other motion, and I'm not

22  saying what any other motion would be warranted, but if anyone

23  wants to do that, they should do that with enough notice so

24  that's also on for the 31st or whatever this date is.  I think

25  that Mr. Cuevas said it was the 31st.

1    MS. PENACHIO:  Your Honor, I just want to alert the

2  Court and the parties that there is a, and Mr. Kraut knows

3  this, there is a motion for summary judgment on November 4th as

4  well.

5    THE COURT:  In what?

6    MS. PENACHIO:  In this case.

7    THE COURT:  But in what matter?

8    MS. PENACHIO:  In the debtor versus New York fuel to

9  determine the extent of this --

10    THE COURT:  All right.  But I thought you were far

11  along in negotiations on that one.

12    MS. PENACHIO:  Not on that particular summary

13  judgment motion.

14    THE COURT:  All right.  Fine.

15    MS. PENACHIO:  So that's on for the 4th.

16    THE COURT:  All right.  Well, let's keep that there

17  and have the other things on the 31st of October.

18    MS. PENACHIO:  Very well, Your Honor.  Thank you.

19    THE COURT:  Summary judgment is kind of a separate

20  issue.  Hopefully maybe you can settle that too.  But I don't

21  want it to have -- I want to prepare for that separately.

22    MS. PENACHIO:  Thank you, Your Honor.

23    THE COURT:  Okay.  Does anyone have any questions on

24  any of that?  Okay.  Were the other clients involved in the

25  mediation or was it all lawyers?

1        MR. MORGAN:  Which mediation are we talking about?

2        THE COURT:  The plan mediation.

3        MR. MORGAN:  Then I'll sit down.

4        MR. RATTET:  Mr. Silverman himself participated.

5        THE COURT:  Okay.

6        MS. CYGANOWSKI:  As did Mr. Weil.

7        THE COURT:  Okay.  All right.  So I think that then

8  leaves the adversary proceeding and the motion to dismiss.  I

9  don't know what we want to do with this.  I had a basic

10  question which was raised -- I mean I had before then but it

11  was raised by a late -- not late, but a later filing.  Have I

12  granted standing on this?  Is there an order granting standing

13  to bring this --

14        MS. PENACHIO:  No, Your Honor.

15        THE COURT:   -- adversary proceeding?

16        MS. PENACHIO:  No, Your Honor.

17        THE COURT:  All right.  I mean Ms. Cyganowski,

18  that's right?

19        MS. CYGANOWSKI:  Yes.  That's correct, Your Honor.

20        THE COURT:  Okay.  So I mean I think that's a gate

21  keeping issue.

22        MS. CYGANOWSKI:  And we understand.  We were trying

23  to avoid the other skirmishes and obviously there's this one

24  here.

25        THE COURT:  Okay.  So I mean it does appear to me on

its face that the alleged grounds for veil piercing here are
general as opposed to specific to any particular creditor
which would make it -- the committee is bringing in on behalf
of all unsecured creditors so to me it falls right into the
case law that says that it's a debtor cause of action first.
One needs to have standing.

MS. CYGANOWSKI:  The difficulty is that we're not
seeking recovery.  We're seeking an accounting for --

THE COURT:  Well, you're seeking to pierce the veil
though.

MS. CYGANOWSKI:  We are for the purpose of getting
an accounting in order to --

THE COURT:  But I'm not even sure what the
accounting -- on what authority -- I guess I'm jumping ahead
and I don't particularly want to because I really think they
should be put off.

MS. CYGANOWSKI:  Okay.  We could bring a --

THE COURT:  But one of my question is what is the
basis for an accounting?  I mean it's -- if the veil is
pierced, then this entity would be the debtor and would have
to comply with all the requirements of a debtor in a
bankruptcy as if -- I'm sorry.  Mr. Eljamal would include this
entity then and therefore any of the entities' disclosures
wouldn't have to be part of his case.  It's not a corporate
accounting motion.

1          MS. CYGANOWSKI:  Correct.  We're trying to find the

2    money.  We're trying to find out where the money is flowing

3    but --

4          THE COURT:  All right.  But that's what --

5          MS. CYGANOWSKI:  But we'll do that through 2004.

6    We'll put this -- we respectfully ask that this be adjourned.

7          THE COURT:  I thought everyone had.  See, that's why

8    I asked does everyone have the information they need to

9    negotiate.

10          MS. RODRIGUEZ-McCLOSKEY:  Judge, Yenisey Rodriguez-

11    McCloskey on behalf of Centralized Management Services, Inc.

12          THE COURT:  Right.

13          MS. RODRIGUEZ-McCLOSKEY:  The committee has

14    indicated they never served the 2004 for CMS.

15          THE COURT:  Look, that's -- I know you're all --

16    you've been waiting all day and you're ready to go on this but

17    I don't want to hear it.  I mean because not that it doesn't

18    make any sense in the right context, but it just doesn't right

19    now.

20          MS. RODRIGUEZ-McCLOSKEY:  Understood, Judge.  I just

21    want to point out that we believe the jurisdictional ground,

22    as the Court indicated, is threshold --

23          THE COURT:  Well, the standing issue, yes.

24          MS. RODRIGUEZ-McCLOSKEY:  Yes.  And that that should

25    be decided before we reach the merits.

1          THE COURT:  Yes.  I think so.  I think so.  I'm

2    going to do it on the <u>St. Paul Fire</u> case, the <u>Petsco</u> case, 884

3    F.2D 688 (2d Cir. 1989) and its progeny.  And you know, this

4    is not -- I mean obviously there's a conflict here, but that's

5    not the only part of the analysis for standing.  There's also

6    a cost benefit analysis.  And you know, in some respects the

7    complaint is -- I would need to know more about cost benefit

8    than just having a complaint.  Put it that way.  I have a lot

9    of question marks in the complaint, i.e., you know, it's --

10   there are a lot of statements in there.  I appreciate that the

11   committee may want more information, but it's really kind of

12   History Channel pleading.  You know, there might be life on

13   planets out there.  Who's to say there isn't?  You know, that

14   type of pleading.  It's not that bad, but you know how the

15   History Channel works.  They say things like that all the

16   time.  Hitler may have developed UFOs.

17          So I think we should just put off the motion to

18   dismiss and focus on standing first if we're going to do it

19   really on a cost benefit analysis.  There's no statute of

20   limitations we're worried about here.  Okay.

21          All right.  So I'm going to adjourn the motion to

22   dismiss too.

23          MS. PENACHIO:  Thank you, Your Honor.

24          THE COURT:  And I think if it comes up on the 31st,

25   if we're not at the settlement phase and the committee is

still pursuing this, I'm giving you the heads up the first
thing I'm going to focus on is standing and the basis for the
cost-benefit basis.  You know, obviously, there's a conflict
issue here.  But even if there's a conflict, a debtor can say
this is not worth pursuing, this is not money well spent, you
should do this instead.  Okay.  So I'll see you then.

        And again, if you're, you know, three weeks into
this and someone feels that an objective third party, whether
it's me or another bankruptcy judge or someone would be useful
and something discrete that you could identify for that
person, you know, give me a call all of you together who are
involved in it and we'll discuss that.  But hopefully --

        MS. CYGANOWSKI:  Thank you very much, Your Honor.

        MS. PENACHIO:  Thank you, Your Honor.

        THE COURT:  Hopefully you'll make a lot of progress
at least on some of the issues.

        MS. PENACHIO:  Thank you, Your Honor.

        THE COURT:  Okay.

(Proceedings concluded at 12:51 p.m.)

                        *  *  *  *  *  *

1   I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                      Mary Greco

7   Dated:  September 22, 2016

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25