Penachio Malara, LLP
Anne Penachio, Esq.
235 Main Street
White Plains, NY 10601
(914) 946-2889
(914) 946-2882-Facsimile
apenachio@pmlawllp.com

**HEARING DATE & TIME:**
**MAY 5, 2017 AT 10:00 AM**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
In re

        SAMMY ELJAMAL,

CHAPTER 11

CASE NO.: 15-22872(RDD)

                               Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**NOTICE OF HEARING ON THE DEBTOR'S MOTION (I) FOR SANCTIONS FOR VIOLATIONS OF BANKRUPTCY RULE 2019 INCLUDING (i) THE DISALLOWANCE OF THE CLAIM OF BRENT COSCIA, (ii) THE PRECLUSION OF BRENT COSCIA FROM VOTING ON ANY PLAN OF REORGANIZATION; (iii) THE REMOVAL OF BRENT COSCIA FROM THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS; (iv) THE IMPOSITION OF COSTS AND OTHER SANCTIONS ON BRENT COSCIA AND THE OXMAN LAW GROUP PLLC IN AN AMOUNT THAT THE COURT DEEMS FAIR AND JUST; (II) IN FURTHER SUPPORT OF THE MOTION OF CREDITOR MUSA ELJAMAL TO DISQUALIFY THE OXMAN LAW GROUP PLLC AS ATTORNEY FOR THE CREDITOR BRENT COSCIA; AND (III) FOR SUCH OTHER AND FURTHER RELIEF AS MAY BE JUST AND PROPER**

    **PLEASE TAKE NOTICE THAT,** the hearing on the motion of the above-referenced

debtor (the "Debtor") (I) for sanctions for violations of Bankruptcy Rule 2019 including (i) the

disallowance of the claim of Brent Coscia ("Coscia"), (ii) the preclusion of Brent Coscia from

voting on any plan of reorganization, (iii) the removal of Brent Coscia from the Official Committee

of Unsecured Creditors, (iv) the imposition of costs and other sanctions on Brent Coscia and the

Oxman Law Group, PLLC ("Oxman") in an amount that the Court deems fair and just; (II) in

further support of the Motion of Creditor Musa Eljamal to disqualify Oxman as attorney for

creditor Coscia; and (III) for such other and further relief as may be just and proper and the

accompanying Memorandum of Law will be held before the Honorable Robert D. Drain, United

Charles L. Brieant, Jr. Federal Building and Courthouse, 300 Quarropas Street, White Plains, New York 10601, on May 5, 2017, at 10:00 a.m.

**PLEASE TAKE FURTHER NOTICE** that a copy of the motion and exhibits thereto are available on the Bankruptcy Court's website, www.nysb.uscourts.gov or from the undersigned on request.

**PLEASE TAKE FURTHER NOTICE** that, objections, if any, to the relief sought in the application must comply with applicable law and be served upon the undersigned with a copy to the Bankruptcy Judge's Chambers so that it is received at least 7 days prior to the hearing date. Unless objections are interposed, the relief sought in the application may be granted.

Dated: White Plains, New York
      March 2, 2017

                    PENACHIO MALARA, LLP
                    By: */s/ Anne Penachio*
                      ANNE PENACHIO, ESQ.
                      *Counsel to Debtor*
                      235 Main Street
                      White Plains, NY 10601
                      (914) 946-2889

PENACHIO MALARA LLP                          **HEARING DATE & TIME:**
Counsel for the Debtor                       **MAY 5, 2017 at 10:00 AM**
235 Main Street
White Plains, New York 10601
(914) 946-2889
By: Anne Penachio (A Member of the Firm)
    Joseph P. Garland (Of Counsel to the Firm)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
In re:

                              Chapter 11

       SAMMY ELJAMAL,

                              Case No. 15-22872 (RDD)

                 Debtor.
-------------------------------------------------------------------X

### AFFIRMATION OF ANNE PENACHIO IN SUPPORT OF DEBTOR'S MOTION (I) FOR SANCTIONS FOR VIOLATIONS OF BANKRUPTCY RULE 2019 INCLUDING (i) THE DISALLOWANCE OF THE CLAIM OF BRENT COSCIA, (ii) THE PRECLUSION OF BRENT COSCIA FROM VOTING ON ANY PLAN OF REORGANIZATION; (iii) THE REMOVAL OF BRENT COSCIA FROM THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS; (iv) THE IMPOSITION OF COSTS AND OTHER SANCTIONS ON BRENT COSCIA AND THE OXMAN LAW GROUP PLLC IN AN AMOUNT THAT THE COURT DEEMS FAIR AND JUST; (II) IN FURTHER SUPPORT OF THE MOTION OF CREDITOR MUSA ELJAMAL TO DISQUALIFY OXMAN LAW GROUP PLLP AS ATTORNEY FOR CREDITOR BRENT COSCIA; AND (III) FOR SUCH OTHER AND FURTHER RELIEF AS MAY BE JUST AND PROPER

ANNE PENACHIO hereby affirms under the penalties of perjury:

1.    I am a member of the Bar of the State of New York and of this Court. I am an attorney

for the debtor herein, Sammy Eljamal ("Sammy" or the "Debtor"). I make this Affirmation in

support of the Debtor's motion for sanctions (i) for violations of Bankruptcy Rule 2019; and (ii) for

fraud perpetrated in this Court by Committee Chair Brent Coscia ("Coscia"). As a consequence of

the foregoing, the Debtor seeks (i) the disallowance of Coscia's claim (ii) the preclusion of Coscia

from voting on any plan of reorganization; (iii) the removal of Coscia from the Official Committee of Unsecured Creditors (the "Committee"); (iv) the disqualification of the Oxman Law Group PLLC (the "Oxman Firm"); (v) the imposition of costs and other sanctions on Coscia and the Oxman Firm in an amount that the court deems fair and just; and (vi) for such other and further relief as may be just and proper. I also submit this Affirmation in further support of the motion of creditor Musa Eljamal to disqualify Oxman as attorney for Coscia.

2.    As discussed more fully below, on February 13, 2017, over 18 months after the Debtor's Chapter 11 filing, Coscia revealed, for the very first time, that he had entered into an agreement not to sue entities with interests adverse to the Debtor's and his Estate. Coscia's sworn declaration to this Court directly contradicts statements that he made under oath in testimony at a jury trial and that his counsel made on his behalf in this Proceeding. (Exhibit A; ¶ 27, *infra*.)[1] Coscia's material misrepresentations were designed to conceal his relationship with James Weil ("Weil"), the principal of JMM Fuelco LLC ("JMM"), and to lend credibility to the Committee. Coscia's intent was also to hide his relationship with NY Fuel Distributors, LLC ("NYFD"), Metro Dealer Stations ("Metro"), NY Fuel Holdings, LLC ("NYFH"), and related entities (collectively, the "NY Companies"). The Debtor holds a 50% interest in each of the NY Companies, yet they are controlled by Weil. The Debtor's interests in the NY Companies form the bulk of his Chapter 11 estate (the "Estate"), and amounts due to him from the NY Companies have been the subject of highly-contested litigation.

3.    In his recent Declaration, (Exhibit A), Coscia explains that he had entered into an agreement with Weil not to sue the NY Companies and its investors for the wrongs allegedly

---

[1] I attach a list of all of the exhibits to this Affirmation after the signature page.

committed against him by the Debtor in return for the advancement of his legal fees. This "covenant not to sue" had until then been concealed by Coscia and the Oxman Firm. It was only just mentioned, over a year and a half after the commencement of the case, when Coscia tried to explain why the NY Companies had been advancing his legal fees.  Coscia had previously maintained that Weil had advanced his fees in connection with his criminal case because Weil, as Coscia said in sworn trial testimony, "believed [he] was innocent of the charges." See Exhibit B at page 2, lines 16-18.  The Oxman Firm accordingly told the jury in its summation at the State Court Civil Trial that Weil paid the fees because he was a "gentleman," implying that Weil was advancing the fees as a matter of "honor". See Exhibit C at page 1, lines 4-7.

4.    The agreement "not to sue" between Coscia and the NY Companies was never mentioned to the jury in the State Court Civil Trial or this Court.  Coscia concealed the agreement until now to serve his own ends.  Obviously, Coscia wanted the jury to believe that Weil was vouching for him and paying or advancing his fees because "he was innocent" not because he had entered into an agreement not to sue the NY Companies. The foregoing misrepresentations and inconsistent statements, as well as others, and the attendant "cover up" are analyzed more fully herein.  It is submitted that Coscia's actions require his immediate removal from the Committee, the disallowance of his claim, as well as the award of monetary costs and sanctions.

5.    Coscia's well-documented and unequivocal lies regarding his relationship with Weil in the jury trial upon which his judgment is based may call into question the propriety of that judgment.

6.    The "covenant not to sue" between the NY Companies and Coscia is an important aspect of the interrelationship between the parties. The Debtor had been trying since the inception of this case to access funds that are due to him from the NY Companies. Coscia, as Committee

3

Chair, refused to support the Debtor in these efforts, to the detriment of the Debtor's Estate, and

thus to the detriment of Coscia's own interests as the Estate's largest creditor.

7.    It is well documented in this proceeding that, despite the repeated pleas of the Debtor

and other creditors and notwithstanding the creditors' interest in maximizing the size of the Estate,

the Committee has rebuffed the Debtor and the Estate in their efforts against the NY Companies

including attempts to (i) assert his 50% ownership in the NY Companies; (ii) access distributions

and damages to which he is entitled from the NY Companies; (iii) obtain documents from Coscia,

Weil, and the NY Companies; and (iv) disallow unsubstantiated and baseless claims filed against

him by the NY Companies and affiliates. In fact, the Committee, led by Coscia and his counsel,

the Oxman Firm, supported <u>Weil</u> in his summarily rejected assertion that the Debtor only held a

mere 8.627% interest in the NY Companies rather than the actual 50%.

8.    In sum, the Committee's stance in litigation against the NY Companies and Weil ran

counter to the Debtor's efforts to maximize the Estate. It is also inapposite to the traditional role

of committees in a Chapter 11 case, namely to increase assets for the benefit of creditors. I was

initially perplexed when I learned that the Committee would be supporting Weil and the NY

Companies against the interests of the Debtor and the Estate. With the revelation that Coscia had

agreed not to sue the NY Companies, the Committee's once inexplicable position with respect to

the Debtor's efforts against the NY Companies has been made clear.  Weil and Coscia have a

"deal," an undisclosed, secret deal that negatively impacted the administration of the Debtor's

estate.

9.    Coscia only revealed the existence of the purported "covenant not to sue" after the

Debtor finally gained access in late January 2017 to some of the NY Companies' financial records

and saw that they were paying Coscia's attorneys in this Proceeding. Only then did Coscia feel

4

compelled to explain why this was happening. Faced with the need to explain, Coscia and his counsel, abetted by the disinterest (or worse) of the Committee's counsel, changed the story from what he testified to and previously maintained so as to suit his, Oxman's, and Weil's, common ends.

10.    The Committee professionals, who refused to support the Debtor in his efforts against Weil and the NY Companies and opposed him in his attempts to enhance the value of the Estate, knew, or but for want of the slightest inquiry would have known, about the tangled relationship among Coscia, Weil, and the NY Companies but failed to disclose it. The Committee, in the face of an investigation by the Debtor and the Office of the United States Trustee (the "UST"), failed to divulge the relationship between and among Coscia, Weil, the NY Companies, and the Oxman Firm, who at one time or another has served and/or continues to serve as counsel to all of them. No mention whatsoever was made of the pledge by Coscia not to sue the NY Companies. Instead, the Committee distracted the UST from the issues by unfairly disparaging the Debtor.

11.    It is submitted that the Committee professionals, which include an ethics teacher, had a lapse in judgment when they turned a "blind eye" to Coscia's relationship with the NY Companies, the Oxman Firm, and Weil and failed to disclose the existence of Coscia's 'covenant not to sue." It is disappointing that the Committee professionals did not (i) fully examine or disclose the relationships in questions; and (ii) alert the undersigned, the UST and the Court of Coscia's agreement not to sue the NY Companies and Weil. It is troubling that the Committee professionals thwarted the Debtor's investigation into the matter.    Even when given the opportunity to "make things right" at the February 7, 2017 hearing, the Committee failed to act. The Committee's inaction is virtually inexplicable.    One can only hypothesize regarding its motivations.    The Committee professionals may have been influenced by Weil's vast wealth.

5

Maybe it was their personal animosity towards the Debtor. It is no secret that the Committee professionals harbor disdain for the Debtor who, frustrated by his mistreatment by Weil and the NY Companies and daunted by Weil's ability to fund endless litigation, engaged in numerous, mischievous pranks pre-petition.

12.     It is clear from the facts described herein that Coscia committed fraud on not only one but two courts – this Court and the State Court that presided over his Civil Trial.

13.     As a final introductory note, I wish to make it clear that in seeking the extraordinary relief sought herein, I act not only to protect the Debtor but also to preserve and protect the integrity of the Court and the bankruptcy process. As I indicated in my letter to the Court dated April 28, 2016, "[I] respect the rights of creditors under the Bankruptcy Code to form a committee. Committee's typically add value to a bankruptcy estate. . . . It is my respect for the Bankruptcy Code and the Committee's role that primarily motivates me." See Exhibit D. Here, Coscia and JMM, the two creditors left on the Committee, aided by Oxman and the Committee professionals, improperly manipulated the committee process. The Committee concealed (i) the existence of the "covenant not to sue," (ii) the relationships among the creditors, and (iii) the payment of fees by NYFD. Coscia, Oxman and Weil misused the rights and protections normally afforded to a committee to advance their own ends to the detriment of the Debtor and the Estate and the other creditors.

14.     Because the facts span many years and are complex, the Debtor is presenting them in a time line.

## FACTS: A TIMELINE

### I. 2011

15.    June 14, 2011: Brent Coscia is arrested by the Harrison Police Department based upon a complaint purportedly made by the Debtor.

16.    June 14, 2011: Coscia speaks with Weil on the day of the arrest. (¶ 3, Coscia Decl. (Exh. A).)

17.    June 14, 2011: At the suggestion of Weil, Coscia purportedly retains the Oxman Firm to represent him in the Criminal Matter.  Weil was and remains an Oxman Firm client. Attached as Exhibit E are five bills from the Oxman Firm,[2] (Exh. 40 in the Coscia Civil Trial), with a record of payments received, (Exh. 49). They were sent to Weil and Leon Silverman. They were not sent to Coscia even though he was Oxman's client.

(a)    The first time-entry for Marc Oxman ("MSO" in the bills) is on June 14, 2011 (3.5 hours). (Exh. E, at 10.) The Oxman Bills were admitted as Exhibit 40 at the trial in the civil case brought against the Debtor and Bryan Orser ("Orser") alleging malicious prosecution and other wrongs (the "Civil Action and the "Civil Trial"). Although he was the client, Coscia never actually received the bills and they were produced at the trial by Weil.

18.    August 10, 2011: The date on the first of the Oxman Firm's bill re "People v. Brent Coscia." It is sent, as are all of the others, to "Leon Silverman" and "James Weil." (Exh. E.)

19.    September 6, 2011: The date on the second of the Oxman Firm's bills. It and the first bill were sent to:

---

[2] The Oxman Law Group PLLP is, as relevant, a successor to Oxman Tulis Kirkpatrick Whyatt & Geiger LLP. I do not know the date on which the former came into existence and the latter disappeared. As I use it herein, the "Oxman Firm" refers to whichever of those two entities was in existence at the time of the relevant event.

Leon Silverman
James A. Weil
25 Saint Charles Street
Thornwood,, [*sic*] NY 10594

20.   <u>October 5, 2011:</u> The date on the third of the Oxman Firm's bills.

21.   <u>October 5, 2011:</u> The date on an undertaking executed by Coscia (the "October Undertaking"). It reads:

> I, Mr. Brent Coscia, agree to reimburse Mr. James A. Weil/New York Fuel Distributors for all the costs of legal fees along with expert witness fees paid on my behalf to defend me against the false criminal charges filed due to the complaint by Sammy Eljamal. The law firm of Marc Oxman has been hired and is currently set to go to trial in about 1 week. As of the date of this agreement the estimated costs are $100,000.00. By signing this agreement I understand that I will be responsible to repay this loan to Mr. Weil/New York Fuel Distributors.

<u>Exhibit F.</u>

(a)   On its face the only "agreement" in this document is Coscia's to repay Weil or NYFD <u>insofar as they paid his fees in the Criminal Matter</u>. This is not an agreement on anyone's part to answer for Coscia's obligation to the Oxman Firm.

(b)   The Undertaking does not reflect any agreement "not to sue" between Coscia and the NY Companies.

(c)   It is unknown whether the October 5 bill was sent before or after Coscia signed the Undertaking. It is unknown who prepared the Undertaking or where it was signed. While the Oxman Bill reflects Mr. Oxman having a "meeting with client" on October 4, his entry for October 5 is merely "trial preparation." (Exh. E, at page 2.)

22.   <u>October 20, 2011:</u> Criminal trial of Coscia concludes. It results in his acquittal.

23.   <u>November 2, 2011:</u> The date on the fourth of the Oxman Firm's bills. (Exh. E, at page 2.)

24.   <u>December 27, 2011</u>: Coscia files the Civil Action. He is represented by the Oxman Firm.

25.   <u>December 31, 2011</u>: The Oxman Firm credits "NY Fuel Holdings LLC" for a $50,000 payment in the *People v. Brent Coscia* matter. There is a balance of $20,763.47 still owed. (Exh. E, at page 1.)

## II. **2012**

26.   <u>January 2, 2012</u>: The date on the fifth and final of the Oxman Firm's bills. <u>See</u> Exhibit <u>E</u>. Again, it is sent to Messrs. Silverman and Weil, rather than Coscia. No activity is reported in the matter since October 28, 2011. This bill and those dated October 5 and November 2 were sent to:

> Leon Silverman
> James A Weil
> c/o Silverman Realty Group
> 237 Mamaroneck Avenue
> White Plains, NY 10605

(a)   According to the Oxman Firm's records, the final $20,763.47 owed was paid by persons unknown on February 21, 2012. (Exh. E, at 11 (Exh. 49 in Coscia Civil Trial).)

## III. **2013**

No significant activity.

## IV. **2014**

27.   <u>April 29 to May 14, 2014</u>: Jury Civil Trial of *Coscia v. El Jamal [sic] and Orser* before the Hon. Lester B. Adler in Westchester County Supreme Court. (Relevant pages attached as <u>Exhibit</u> <u>G</u>.) (The full transcript is available in the NYSCEF website as Docket No. 183 in 60236/2011 (Westchester Sup. Ct.), https://iapps.courts.state.ny.us/nyscef/Login) and, due to its length, will be provided by the undersigned on request.

(a)    During the trial, Coscia testifies at least five times that "Weil" had advanced his

fees for the Criminal Matter. <u>He never says NYFD made advances</u>. <u>He concealed the fact that</u>

<u>he entered into an agreement not to sue the NY Companies</u>. The following are relevant

passages of Coscia's testimony in the Civil Trial regarding the payment of legal fees; passages

which he has again and again referred to in this proceeding:

(i)    On page 360, (Exh. G, at 12, lines 11-18), under questioning by Mr. Oxman:

Q. Were those expenses paid by Mr. Weil?

A. Yes.

Q. Were they paid in full?

A. Yes.

Q. Why?

A. He wanted to make sure that I had a good defense because I was a
company employee and he believed I was innocent of the charges.

(ii)    On page 394, (Exh. G, at 13, lines 3-7):

Q. Finally, you testified on redirect that it's your intention to pay back Mr.
Weil.

Is it just Mr. Weil or is it Mr. Weil and Mr. Silverman?

A. Just Mr. Weil.

(iii) On page 149 (Exh. G, at 2, lines 17-20)

Q.  Who paid for them?

A.  I was basically able to borrow the money from the owner of the company, Mr.

James Weil, who I owe the money to and have to pay him back.

(b)    Coscia told the jury two other times that Weil had forwarded the fees, on transcript

pages 272-273, and 285. (Exh. G, at, 6-7, lines 24-25 and 9, lines 6-13).

(c)    During the Civil Trial, Mr. Oxman himself told the court that Weil was "the indi-

vidual who actually paid the expense." (Civil Trial Tr., at 253 (Oxman), (Exh. G, at 5, lines 4-

7).

(d)    Mr. Coscia was more than capable of distinguishing between Weil and the

Companies. Asked on cross-examination whether "you are still employed by Mr. Weil and Mr.

Silverman," he responded "I'm employed by the company." (Civil Trial Tr., at 278 (Coscia),

(Exh. G, at 8, lines 23-25).

28.    June 13, 2014: Judgment entered in favor of Coscia and against the Debtor for

$4,785,000 and against Orser for $225,260. Exhibit H.

29.    November 6, 2014: On behalf of Coscia, Oxman seeks an Order to Show Cause

appointing Coscia as the receiver of the Debtor's interest in the NY Companies with the power to

"take all actions necessary in connection with the sale of the Judgment Debtor's ownership interest

in the Judgment Debtor Companies in order to satisfy the Judgment." Exhibit I. In support of the

Order, Marc Oxman submits an affirmation. Exhibit J (without exhibits).

(a)    In the Affirmation Mr. Oxman writes "Eljamal purportedly owns 8.627% of each"

company, (¶ 18, Exh. J, at 6), which ownership is his prime asset. Taking this position, as

opposed to asserting a 50% ownership interest, is contrary to the interests of Coscia, who is

supposedly Oxman's client. However, Oxman's position would benefit his other client, Weil,

who the Debtor has and continues to litigate with regarding ownership rights.

30.    June 18, 2015: The Debtor files his Bankruptcy Petition.

31.    July 16, 2015: The Creditors' Committee is formed, with Coscia as its chair. The

other members are JMM Fuelco, LLC ("JMM") and Gas Land Petroleum, Inc. Exhibit K. (Gas

Land has since resigned.) JMM is effectively Weil, as Marc Oxman would later admit in his April 28, 2016 letter to Paul Schwartzberg. (¶ 49, *infra*.)

32.    <u>Sometime after July 16, 2015:</u> The Oxman Firm purportedly enters into a long-undisclosed agreement with either Weil or NYFD whereby one or the other would "front" Coscia's legal fees in the Bankruptcy. Coscia is not paying them.

(a)    Coscia does not reveal his agreement with NYFD and Weil until his declaration on February 13, 2017. Prior to his belated disclosure, Coscia makes conflicted representations regarding who has and who is paying his fees. While on April 15, 2016 Coscia says that Weil agreed to front his legal fees, (April 15, 2016 Coscia Rule 2004 Objection) (¶ 45, *infra*), on April 28, 2016 he says it was "NYFD," (¶ 49, *infra* (Oxman April 28 Letter)). Since that time Coscia has said it was "NYFD" and payments have been made by NYFD, including in the Oxman Firm's Rule 2019 Statement of February 10, 2017, (¶ 75, *infra*), and Coscia's own declaration on February 13, 2017, (¶ 75, *infra*, (Exh. A)).

33.    <u>August 26, 2015:</u> Otterbourg, counsel for the Committee, files the Committee's Rule 2019 Statement. While identifying Coscia as a member of the Committee, it makes no reference to how his legal fees are being paid or the inter-relationship among Oxman, Weil, and Coscia. Exhibit <u>L</u>. It makes no reference to the agreement Coscia made not to sue the NY Companies and Weil.

34.    <u>September 21, 2015:</u> The Debtor removes the action entitled *Eljamal v. Weil et al.* from State Court (the "Removed Action"). Exhibit <u>M</u>.

(a)    In the Removed Action, the Debtor seeks damages from Weil, Silverman, and the NY Companies for *inter alia*, various violations of the Operating Agreements. An issue in the Removed Action is whether the Debtor's interest in the NY Companies is 50% or only 8.627%.

The Oxman Firm is counsel in the Removed Action to Weil, Silverman, and the NY Companies and will remain so until April 21, 2016 when Harfenist Kraut & Perlstein (the "Kraut Firm") was substituted as counsel.

35.    November 2015: The parties begin mediation (the "First Mediation") under the supervision of Frank Conrad (the "First Mediator"). The First Mediation spans several months. As revealed on the record at a hearing on September 14, 2016, Coscia, the titular head of the Committee, fails to appear at any of the many First Mediation sessions.

(a)    During the First Mediation, the Debtor was ignorant of the "covenant not to sue" between Coscia and NYFD. In fact, the Debtor did not learn of the "covenant not to sue" until February 13, 2017, when it was disclosed for the very time by Coscia.

## IV.  2016

36.    March 28, 2016: The Committee files a plan (the "Committee Plan") which essentially strips the Debtor of his assets and puts Weil, Coscia, and Gas Land, litigation adversaries, in charge as "liquidating trustees." Exhibit N.

37.    On or about March 28, 2016: In light of their absence from the First Mediation, the First Mediator instructs the Debtor and the undersigned to communicate directly with Coscia and Silverman. This instruction is reiterated at various times during the month of April 2016.

38.    March 30, 2016: The Debtor files an application and proposed order calling for Coscia to be deposed and to produce documents pursuant to Rule 2004. Among the documents sought were "Any and all payments made by Weil or any entity in which Weil has or had an interest to any professionals acting on your behalf" and "All loans from Weil and/or Companies or related entities." Exhibit O.

13

39.    March 30, 2016:  The Debtor files a pre-motion letter in the Removed Action seeking summary judgment for, *inter alia*, a determination that the Debtor holds a 50% interest in the NY Companies and that Weil and Silverman deviated from the terms of the Operating Agreements in making, or not making, distributions (the "Summary Judgment Motion"). Exhibit P.

40.    On or about March 30, 2016:  The Debtor asks the Committee professionals to support the Summary Judgment Motion, a request that was thereafter reiterated periodically up until the hearing on the Summary Judgment Motion, which was held before the Court on December 6, 2016.

41.    April 6, 2016:  Melanie Cyganowski of Otterbourg writes a letter to the Court in response to the Debtor's pre-motion letter, (Exh. P), in connection with the Summary Judgment Motion. Exhibit Q.

(a)    On behalf of the Committee, Ms. Cyganowski says that while it is not a party to and had no interest in the outcome of the Removed Action, the Committee's view was that it was premature for the Court to consider the Summary Judgment Motion on the question of the size of the Debtor's interest in the various companies, i.e., whether it was 50% or 8.627%.

(i)    Notwithstanding such professed lack-of-interest or prematurity, Ms. Cyganowski volunteers that "a review of the documents appears to support the Defendants' (i.e., Weil's and the NY Companies') position" that the 8.627% figure was the correct one. (Exh. Q, at 1.) (As noted below, ¶ 65, when the Court reviewed the documents, it found that the Debtor had a 50% interest as a matter of law, and granted him summary judgment on the issue.)

42.    April 6, 2016:  I contact Paul Schwartzberg ("Schwartzberg") of the UST and express alarm and distress over Ms. Cyganowski's position which simply runs contrary to the

interest of the Debtor and his estate. UST Schwartzberg indicates, in sum and substance, that the UST will afford deference to Committee professionals. It appears from the conversation (and from subsequent communications) that the Committee professionals have maligned the Debtor to the UST.

43.   Underline April 13, 2016: The Debtor resolves the claim of Gas Land pursuant to a Settlement Agreement. Gas Land agrees to resign from the Committee. Exhibit R. Gas Land expresses frustration with the Committee process.

44.   Underline April 14, 2016: James Burchetta, Orser's counsel, writes to UST Schwartzberg, seeking to have his client replace JMM on the Committee on the ground, *inter alia*, that JMM is effectively Weil, that Weil is using JMM's position on the Committee to control it, and that Coscia is beholden to Weil because he "owes a considerable debt to NYFD and/or Weil or a related entity." Exhibit S.

45.   Underline April 15, 2016: Coscia, via the Oxman Firm, files his objection to being deposed and producing documents under Rule 2004 (the "2004 Objection"). Exhibit T.

(a)   Paragraph 22 of the 2004 Objection says that "Weil paid Coscia's legal and expert witness expenses" in the Criminal Matter. (Exh. T, at 7 at ¶ 22)

(b)   Paragraph 23 chiefly quotes from the October 5, 2011 Undertaking, i.e., that Coscia would repay any loans extended to him by "Mr. James A. Weil/New York Fuel Distributors" to pay his Criminal-Matter fees. (Exh. T, at 8 (*quoted at* ¶ 21, *supra*).)

(c)   Paragraph 24, referring to Weil having advanced Coscia's criminal fees, (Exh. T, at 8 at ¶ 24), reads:

> Weil and Coscia agreed to a somewhat similar financial agreement with respect to the legal fees that Coscia has incurred in connection with this proceeding. Legal fees were initially not billed as our firm's representation of Coscia in the State Court Action was on a contingency basis. However, after Coscia agreed to

15

serve as chair of the Committee and it became clear that our firm would need to expend significant time with respect to Committee issues, the fee arrangement changed. Coscia agreed that he would be billed on an hourly basis, but that Weil would front the money for the legal fees. Weil understood that any payments he made would ultimately be reimbursed from the proceeds of the Judgment when the civil action is finally adjudicated.

(d)    Bizarrely, given the foregoing, paragraph 31 of the 2004 Objection, Oxman attempts to explain why Coscia should not have to provide any information concerning "payments made by Weil for any professionals acting on Coscia's behalf": "Coscia testified during the State Court Action that Weil/NY Fuel advanced funds on his behalf and that he has agreed to repay Weil/NY Fuel." (Exh. T, at 9-10 ¶ 31.) Oxman's representation is incorrect. This is simply not what Coscia testified to.

(i)    As explained above, Coscia's testimony said <u>Weil</u> had advanced his fees <u>five times</u> (as his counsel also represented to the court). Coscia said nothing about NYFD advancing them. (¶ 27, *supra*).

(ii)    Paragraphs 22, 23, and 24 contradict paragraph 31's representation.

46.    <u>April 15, 2016:</u> Meanwhile, both dismayed and troubled by Ms. Cyganowski's April 6, 2016 pre-summary judgment letter, (Exh. Q), and the Committee's position with respect to the size of the Debtor's interest in the NY Companies, the Debtor responds and questions the Committee's independence. <u>Exhibit U</u>.

47.    <u>April 21, 2016:</u> The Kraut Firm is substituted as counsel for the Oxman Firm in the Removed Action, nearly seven months after the removal.

48.    <u>April 27, 2016:</u> I meet with the Committee professionals, Oxman, Weil, and Silverman to explore potential settlement. I am uncomfortable with the relationship among and alliance among the Committee, Weil, Oxman, and Silverman. Discussions fail to reach a settlement.

49.    <u>April 28, 2016:</u> Marc Oxman writes to UST Schwartzberg. He objects to Orser's attempt to have himself replace JMM on the Committee, because "[t]here is no conflict between Mr. Coscia and JMM (and its principal James A. Weil) that would in any way diminish either Committee member's ability to act independently and in the best interests of all creditors." <u>Exhibit V</u> (the "April Oxman Letter").

(a)    Notwithstanding what his firm said <u>less than two weeks earlier</u> in the 2004 Objection, (Exh. T), i.e., that Weil had advanced Coscia's fees in the Criminal Matter (as reflected in the five bills the Oxman Firm sent to Silverman and Weil (not NYFD) and that he would also "front" Coscia's fees in the bankruptcy, (Exh. E), Mr. Oxman simply says without authority, "NYFD is continuing to advance payment for Mr. Coscia's legal fees in this proceeding." (Exh. V, at 2.) It is noteworthy that this purported disclosure was buried in the April Oxman Letter, which he did not file with Court.

50.    <u>April 28, 2016:</u> On behalf of the Committee, Melanie Cyganowski of Otterbourg responds to Mr. Burchetta's letter to UST Schwartzberg. <u>Exhibit W</u>.

(a)    Ms. Cyganowski insists that "[e]ach Committee member is represented by separate counsel. As Committee counsel, we have repeatedly explained the fiduciary duties of a committee to each Committee member and his or its respective counsel, and it is well understood that the Committee is acting for the benefit of all creditors." (Exh. W, at 2 sub-heading B.) Ms. Cyganowski fails to mention let alone explain that Coscia had entered into an agreement not to sue the NY Companies.

(b)    Highlighting Otterbourg's lack of interest or disinterest in getting to the bottom of who was paying Coscia's fees, Ms. Cyganowski writes, "as noted in the letter submitted by Mr. Coscia's counsel, [(the April Oxman Letter, annexed hereto as Exhibit V),] the agreement

between Mr. Coscia and New York Fuel Distributors, LLC is public and has been known to both Orser and the Debtor for years." (Exh. W, at 2 at sub-heading B.) She also equates JMM with Weil ("Mr. Weil's company, JMM Fuelco, LLC"). (Exh. W, at 4.)

(i)    Because Otterbourg says nothing along the lines of "and we have confirmed this state of affairs," I assume now that as of April 28, 2016 Otterbourg had made no effort to confirm this state of affairs by, for example, obtaining the Oxman Firm's retainer agreement with the expected statement concerning who was advancing the money and that everyone understood to whom the Oxman Firm owed its allegiance.

(ii)    The "agreement" is merely the Undertaking annexed hereto as <u>Exhibit F</u> and referred and quoted above at paragraph 21. It was also annexed as Exhibit C to Mr. Oxman's letter. Exhibit B to that very letter, however, was some of Coscia's trial testimony, in which Coscia testified that "Weil" had advanced this fees. (The particular pages are 360 and 394, (Exh. G, at 12 and 13).) In that circumstance, how could Otterbourg vouch for the Undertaking as establishing that NYFD had agreed to advance Coscia's criminal-prosecution fees?

(iii)    How could anyone reading the statement that Coscia "agree[s] to reimburse Mr. James A. Weil/New York Fuel Distributors" not be given pause to wonder and ask whether the agreement was with Weil or with NYFD? Or notice that it, Exhibit C, insofar as it said what Mr. Oxman said it said (although it did not) was contradicted by its neighbor, Exhibit B?

(iv)    How could an "agreement," if that's what it was, to advance the costs for a criminal-prosecution defense apply to the costs of representation in a bankruptcy matter

filed nearly four years later, particularly when the agreement with respect to bankruptcy fees only was reached (supposedly) in July of 2015?

(v)    In the face of the specific allegation that there was an ongoing relationship between Coscia and Weil, who would not have gotten to the bottom of the simple question: who was paying Coscia's bills, particularly in light of New York Court Rules and Bankruptcy principles regarding third-party payment of legal fees? Only someone who did not want to know the answer because it might be uncomfortable, someone who was willing to turn a "blind eye" to it lest her sinecure be endangered.

51.    April 28, 2016: Jonathan Kraut of the Kraut Firm sends a letter to UST Schwartzberg on Weil's behalf. See Exhibit X.

(a)    As to my "inquir[i]es about an agreement between Mr. Coscia and Jim Weil or others. This question has already been answered by others," presumably referring to the April 28 letters of Mr. Oxman and Ms. Cyganowski. Thus, Mr. Kraut adopts the assertions by Mr. Oxman.

(b)    Mr. Kraut fails to disclose the "covenant not to sue" between Coscia and the NY Companies.

52.    April 28, 2016: As the Debtor's counsel, I send a letter to UST Schwartzberg. See Exhibit D (without exhibits).

(a)    In the letter, I write, "Weil apparently 'fronted' a significant portion of Coscia's legal fee and Coscia is indebted to him. The fact that Coscia owes an obligation to Weil necessarily calls into question his independence." (Exh. D, at 3.) The assertions made in my letter were based upon Coscia's 2004 Objection of two weeks earlier, paragraph 24 of which said "Weil would front the money for the legal fees," (Exh. T.)

53.    May 5, 2016: UST Schwartzberg sends a perfunctory letter to the parties denying the request of Orser and the Debtor to reconstitute the Committee. Exhibit Y.  It does not appear that UST Schwartzberg was aware of Coscia's "covenant not to sue" the NY Companies.

54.    May 18, 2016: Gas Land resigns from the Committee after settling its claim. Exhibit Z.

55.    May 18, 2016: UST Schwartzberg reappoints the Committee with only two members, JMM and Coscia. See Exhibit AA.

56.    July 13, 2016: UST Schwartzberg moves for the appointment of an Examiner under Bankruptcy Code Section 1104(c) to review, *inter alia*, (i) whether the Committee is acting in the best interests of creditors and whether it should be disbanded or reconstituted and (ii) whether Centralized Management Systems ("CMS") is a *alter ego* of the Debtor as alleged by the Committee in the CMS Action (the "Examiner Motion"). Exhibit BB.

57.    July 15, 2016: The First Mediation is terminated. Exhibit CC.

58.    September 6, 2016: The Debtor opposes the Examiner Motion. Exhibit DD. In the opposition, the Debtor questions the independence of the Committee and its motives as well as the actions of the UST which, the Debtor maintains, deviated from the rules governing committees promulgated in the UST Manual of Procedure.

59.    September 14, 2016: The Court holds a hearing on the Examiner Motion and declines to grant it.

60.    November 4, 2016: At a hearing, the Court grants the Committee's motion for a second mediation (the "Second Mediation"), a motion that the Debtor ultimately did not oppose.

61.   December 12, 2016: The parties appear at the first day of the Second Mediation before Chief Judge Morris. The Committee remains silent as to the "covenant not to sue" throughout the Second Mediation.

62.   December 13, 2016: The Committee holds a conference call at Noon. Shortly thereafter, at 12:38 PM, Lois Rosen, of the Oxman Firm, sends me an e-mail renouncing an agreement reached between the Debtor and Coscia at the Second Mediation the day before. There can be no doubt that the renunciation resulted from the conference call in which Weil presumably participated.

63.   December 15, 2016: The Committee files an Amended Plan signed by both Coscia and Weil and an Amended Disclosure Statement.

(a)   The "covenant not to sue" is not mentioned in the Disclosure Statement. Nor is the relationship among Weil, Oxman, Coscia, and the NY Companies disclosed.

(b)   The Amended Plan provides, *inter alia,* for a settlement of all litigation between the Debtor and the NY Companies, Weil, and Amsterdam for approximately $10 million, a sum to be paid solely by the NY Companies. The Amended Plan also provides for payment of patently bogus claims of the NY Companies.

64.   December 20, 2016: The Second Mediation ends. Exhibit EE.

65.   December 28, 2016: The Court enters an order granting in part the Summary Judgment Motion. Most significantly, the Debtor is declared to have a 50% interest in the NY Companies. Weil and Silverman are found to have breached the Operating Agreements with respect to making distributions to the Debtor from the NY Companies. Exhibit FF.

## V. **2017**

66.    January 18, 2017: Musa Eljamal, the Debtor's father and a creditor, moves to disqualify the Oxman Firm, citing numerous conflicts. Exhibit GG.

67.    January 19, 2017: Jonathan Kraut of the Kraut Firm, attorneys for the NY Companies, JMM, Weil, Silverman, and related entity Amsterdam 181 ("Amsterdam"), objects to my request that his clients provide retainer agreements and billing statements for attorneys paid by the NY Companies and declines to provide them to me on the ground that they are privileged. Exhibit HH. The Kraut Firm, which has repeatedly thwarted the Debtor access to information, had previously objected to discovery sought by the Debtor. Exhibit II.

68.    January 27, 2017: After months of being denied access, the Debtor is finally provided with a copy of a portion of the computer server for the NY Companies dealing with its finances.

(a)    The Debtor discovers that the legal fees incurred by the Oxman Firm, the Kraut Firm, and Carlos Cuevas in this proceeding are all being paid by the NY Companies.

(i)    Specifically, the Debtor learns that (i) the Oxman Firm has received approximately $175,000.00 from the NY Companies post-petition (at least $990,000.00 was paid in total pre-and post-petition); (ii) the Kraut Firm has received approximately $340,000.00 from the NY Companies post-petition (approximately $1 million pre- and post-petition) and (iii) Carlos Cuevas received $136,000.00 from the NY Companies post-petition.

(ii)    Notations on the server indicate that Mr. Cuevas was paid for services rendered to Coscia.

(iii)    Although the Kraut Firm recently produced what I understand to be all of the retainers that the NY Companies have with attorneys, none were produced for services by

22

the Oxman Firm or Mr. Cuevas. The purported retainer of the Kraut Firm dated October 11, 2011, although not signed by Weil or Silverman, coincidentally was drafted less than one week after Mr. Coscia signed the October Undertaking, (Exh. F, *supra at* ¶ 21). I mention this because if Weil had indeed committed NYFD to advance Coscia's fees, one would expect his appreciation for the utility (if not necessity) of having such a commitment to a lawyer memorialized in a writing.

 (iv) The Kraut Firm, purportedly on behalf of the NY Companies, refuses to provide time records and billing statements for professionals paid to the undersigned.

69. <u>January 31, 2017:</u> Coscia, through the Oxman Firm, files his opposition to the motion to have the Oxman Firm disqualified as counsel to Coscia. <u>Exhibit JJ</u>.

 (a) Although reference is made to the Criminal Matter, the civil litigation, and this Bankruptcy and to the fact that "[h]e has been continuously represented by Oxman Law since mid-2011," (Exh. JJ, at 17-18 ¶ 57), no mention is made about how the Oxman Firm's fees were and would in the future be paid.

 (b) Coscia characterized the motion to disqualify his lawyers as "unseemly," (Exh. JJ, ¶ 58), and claimed that I had personally and "repeatedly threatened, in substance, that the contentiousness of this proceeding would increase exponentially and that the Debtor would actively seek to disband the Creditors' Committee. This motion to disqualify appears to be the first step in this process," (Exh. JJ, at 19, ¶ 59).

 (i) The Oxman Firm is careful <u>not to say</u> that I "threatened" to "increase" "the contentiousness of this proceeding," because that would not be true; all I told Mr. Oxman's colleague, Lois Rosen, is, in sum and substance, that if the matter was not resolved things

would "inevitably" get more contentious going forward. It's a sentiment that I believe the Court has echoed.

(ii)    As demonstrated throughout this Proceeding, and in the documents referred to in this Affirmation, Mr. Oxman has proven that he is careful in the language that he uses and how he uses it. Thus, it is certain that when Oxman uses the term "Weil" he means Weil and when he uses "NYFD" he means NYFD.

70.    January 31, 2017:    The Committee, through Otterbourg, files its opposition to Musa Eljamal's motion to disqualify the Oxman Firm. In support of its opposition, the Committee asserts that "Mr. Coscia has selected The Oxman Law Group, PLLC to represent him in this bankruptcy case – which is no surprise, as the firm has represented Mr. Coscia throughout his five-plus-year legal battle with the Debtor." Exhibit KK at 2, ¶ 2.

(a)    The Committee makes no comment concerning how the Oxman Firm's representation of Coscia through this five-year battle was being financed.

(b)    The Committee also neglects to note let alone explain who was paying or advancing those fees although it later claims to have seen competing statements on that front. (¶ 73(a), *infra* (Counsel for Committee representing that it saw the competing, contradictory statements when they were made in April 2016)).

71.    February 1, 2017:    The Debtor files a statement related to the motion to disqualify the Oxman Firm. Among other things, the Debtor notes that "NYFD's records reveal that Oxman has received approximately $175,000.00 from NYFD since the filing of the Debtor's petition" and attaches thereto a document showing significant payments by NYFD to the Oxman Firm after the Debtor filed his Bankruptcy in June 2015. Exhibit LL at ¶ 5.

72.    February 6, 2017: The Oxman Firm replies to the Debtor's Statement, (Exh. KK),

saying it represents only Coscia in the bankruptcy and that his fees are being advanced by NYFD.

It says it disclosed this in the April Oxman Letter to Schwartzberg. Exhibit MM at 3, ¶ 5.

(a)    The Oxman Firm dismisses the suggestion that it "Conceal[ed] the fact that NYFD

is advancing funds on behalf of Coscia," saying in paragraph 5 that its April 28 Letter disclosed

that "'**NYFD advanced payment**'" for Coscia's criminal defense and that "'**NYFD is contin-**

**uing to advance payment for Mr. Coscia's legal fees in this proceeding,**'" (Exh. MM, at 3

(quoting April 28 Letter; emphasis by Oxman Firm (*supra at* ¶ 49))). (See Exhibit V (Oxman

April Letter).)

(b)    The Oxman Firm promptly contradicts itself in paragraph 6, in which it says

(accurately) that the 2004 Objection "made it clear that Weil had paid" Coscia's Criminal-

Matter fees, (Exh. MM, at 3-4, ¶ 6), and quotes paragraph 24 of the 2004 Objection that *Weil*

had agreed to front the fees for the Bankruptcy. (*Quoted supra at* ¶ 45(c).)

73.    February 7, 2017: The Court holds a hearing on the motion to disqualify the Oxman

Firm. It adjourns the motion *sine die* and gives the parties and counsel until February 10, 2017 to

file complete Rule 2019 Statements. Exhibit NN.

(a)    The Court said it was "shocked" by the revelation that NYFD had been advancing

Coscia's fees in the Bankruptcy.

> I have known for some time that his fees were paid in some way, shape, or form.
> But frankly, the payments that are at least referred to in the responsive papers are
> remarkably high to me I think for a committee that's well represented by
> experienced counsel. And I think it highlights why the disclosure is warranted. If
> some third party, not even an outside third party, but an entity in which the debtor
> owns an interest is paying the fees. That was a shocker to me. A true shocker. Did
> you know about that, Mr. Haddad? That the entity that was the subject of the
> litigation over the ownership interest was paying committee members fees?
>
> MR. HADDAD: I believe that was disclosed in –

THE COURT: Not in the quotes that were in the responsive pleadings.

MR. HADDAD: Actually, I thought it was disclosed in the responsive pleadings but I believe it was disclosed in April.

THE COURT: By the debtors, not by the responsive pleadings by any of the parties.

MR. HADDAD: No, no, Your Honor. It was disclosed by the Oxman firm in two respects back almost a year ago in the letter to Mr. Schwartzberg and also in a pleading filed in this court with respect to the 2004 application early last year. So we read that, we saw that it was disclosed. It was known, it was certainly known, and the debtor admits that payments were known to them [sic] prior to the bankruptcy but then during the bankruptcy.

THE COURT: No, I'm talking about payments by the entity that the debtor owns an interest in. There was clearly disclosure that quote Mr. Silverman was paying, or Mr. Weil was paying Mr. Coscia's fees. But –

MS. PENACHIO: It was Mr. Weil, not NYFD, the debtor's company.

MR. HADDAD: No, that's just not what the document says.

MS. ROSEN [sic][3]: Your Honor, in the letter to Mr. Schwartzberg dated April 28, 2016, the last sentence of the paragraph that Ms. Penachio was quoting from says NYFD is continuing to advance payment for Mr. Coscia's legal fees in this proceeding. So it was disclosed.

(Exh. NN, at 19, line 3, -20 (Feb. 7, 2017 Tr. at 19-20 (footnote added)).)

(b)    Wishing to have all of the various relationships out in the open,

And so I'm going to give you all a chance to make this right and make the disclosure. And it better be full and accurate because one thing I know at this point, this case isn't settling and there'll be full disclosure and if there are any inaccuracies there will be no second chance. This is your second chance to make the disclosure of all relationships of the clients that your firm represents in this case and outside of the case relating to the assets of this debtor including the details of the financial arrangements on who's being paid, who has the right to settle and the like. All right? You know, if Mr. Coscia has some sort of constraint on him on what he can do based upon – I need to know basically like a Lar Dan affidavit that he is free to act as a fiduciary your [sic]. And frankly, the fact that the committee didn't ask for that

---

[3] There appears to be a transcription error. The speaker is Lois Rosen, Mr. Oxman's colleague, not me. Indeed, the speaker refers to "Ms. Penachio" in the third-person which indicates that it was not me speaking.

is bad, B-A-D bad. All right? So that's where we're going at this point. I need to know all the facts.

(Exh. NN, at 21 (Feb. 7, 2017 Tr. at 21, lines 6-21).)

74.    <u>February 7, 2017:</u>  Carlos Cuevas, counsel to Weil and the NY Companies, is present

in Court at the February 7, 2017 hearing but does not make an appearance.

75.    <u>February 10, 2017:</u>  The Oxman Firm files its Rule 2019 Statement. <u>Exhibit OO</u>.

> 2. The Debtor has known since at least April 2014 [*sic*] that NYFD has been advancing payment for Coscia's legal fees to Oxman Law and that Coscia has agreed to repay these funds once the Debtor pays Coscia's $4,785,000 judgment (**"Judgment"**). This arrangement has allowed Coscia, a person of modest means, to select Marc Oxman (**"Oxman"**), the attorney who has represented him since 2011, when the Debtor had him arrested on false charges.

> 3. Coscia advised the Court of this fee arrangement on April 15, 2016, when he filed his Objection to the Federal Rules of Bankruptcy Procedure 2004 Motion of Sammy Eljamal Directing Examination of Brent Coscia and Production of Documents [Exh. Q hereof] (**"Coscia 2004 Objn."**, annexed without Exhibits as **"Exhibit A"**). Coscia made it clear that NYFD had paid Coscia's legal and expert witness expenses incurred in both the criminal trial (Coscia 2004 Objn. ¶¶ 22, 23) and in connection with this bankruptcy proceeding (Coscia 2004 Objn. ¶ 24).

> 4. With respect to the criminal trial, Coscia provided a written acknowledgment dated October 5, 2011 (**"Exhibit B"** [Exhibit F hereof]) in which he agrees "to reimburse Mr. James A. Weil/New York Fuel Distributors for all the costs of legal fees along with expert witness fees paid" to defend him against the false criminal charges. NYFD paid these monies to Oxman Law pursuant to this agreement. The parties have continued the same arrangement with respect to legal expenses in this bankruptcy proceeding.

(Exh. OO, at 1-2 (bold in orig.).)[4]

76.    <u>February 13, 2017:</u>  Three days after the Court's February 10, 2017 deadline, Coscia

files a declaration in support of the Oxman 2019 Statement wherein he states that (i) everyone

knew from the beginning that NYFD was advancing his legal fees and (ii) NYFD had agreed to

---

[4] Paragraph 2's "April 2014" is untethered to any factual presentation. It may be a typo for "April 2016."

do so in exchange for his agreement not to sue it for damages allegedly caused by the Debtor, an agreement Cosica claims was reached between him and Weil between the arrest and the retention of the Oxman Firm, both of which occurred on June 14, 2011. (Exh. A.)

(a)    Both of these statements directly contradict Coscia's testimony at the Civil Trial. (*See* Exh. B (*supra at* ¶ 27) and representations made to this Court.

(b)    For the first time, over 18 months after the Bankruptcy case is commenced, Coscia reveals that there is a "covenant not to sue" between he and the NY Companies. This purported agreement was concealed from the Debtor throughout the Civil Trial and this case. Coscia only revealed it in an effort to justify the payment by the NY Companies of Oxman's legal fees. (Exh. A.). Coscia's false assertion that "it had been clear from the beginning" that NYFD had been advancing his legal fees was obviously made to mislead the Court and the parties and lend credibility to the payment of his legal fees by NYFD to Oxman.

77.    February 13, 2017: The Debtor files a pleading in connection with his motion to be reinstated as manager of the NY Companies. In the statement he notes that failure of the Kraut Firm and Carlos Cuevas to file statements under Bankruptcy Rule 2019.

78.    February 17, 2017: Jonathan Kraut of the Kraut Firm responds to UST Schwartzberg's inquiry for information regarding the payments from the NY Companies to the attorneys in the bankruptcy case post-petition. See Exhibit PP at 1-2. For all intents and purposes Mr. Kraut adopts the Oxman Firm's 2019 Statement and the Declaration of Coscia, (Exh. A).

**Additional Facts**

79.    Oxman's 2019 Statement, though filed timely, does not contain copies of retainer agreements, billing statements, waivers or other documents. It makes no mention of the "covenant not to sue."

80.     Otterbourg has not filed a 2019 Statement for itself even though it claims, as noted by Richard Haddad at the February 7, 2017 hearing, that it has known since April 2016 that the NY Companies were paying the Oxman Firm's fees.

81.     The Kraut Firm has not filed a 2019 Statement despite the fact that it represents a group of creditors, namely, JMM, Weil, Silverman, the NY Companies, and Amsterdam.

82.     Carlos Cuevas has not filed a 2019 Statement despite the fact that he represents a group of creditors, namely, Weil, the NY Companies, and Amsterdam. Mr. Cuevas' fees are particularly questionable given the notations on the NY Companies' records that he performed services for Coscia.

83.     I have had and expressed serious concerns about the independence of the Committee and the relationship between Oxman, Weil and Coscia since the early stages of its existence, and have been stonewalled in my quest for information by the Committee professionals, the Kraut Firm, and the Oxman Firm.

84.     The failures of the Oxman Firm, the Kraut Firm, and Carlos Cuevas to file 2019 Statements and disclose relationships among the creditors, including the "covenant not to sue" between Coscia and the NY Companies, have impeded the administration of this Chapter 11 case and have impaired settlement negotiations. Notably, the disclosure failures impaired the First Mediation as well as the Second Mediation. Had the Debtor known that the NY Companies were paying the Oxman Firm (rather than that Weil had), he would have approached the First Mediation differently and may have demanded Coscia's presence and/or "staged" mediation.

85.     In its letter dated January 13, 2009 to the Congressional Advisory Committee on Bankruptcy Rules, the Court noted the importance of comprehensive disclosure regarding who's who in

a proceeding. (Exhibit QQ.) Such disclosure is facilitated by compliance with New York rules concerning a third party paying legal fees. Exhibit RR (New York State Bar Ass'n Ethics Op. 1000).

86.    The failure of the Oxman Firm, Otterbourg, the Kraut Firm, and Carlos Cuevas to file statements under Bankruptcy Rule 2019 is a text book example of how the failure to disclose can negatively impact the administration of a Chapter 11 case.

87.    Coscia's material misrepresentations both at the State Civil Trial and before this Court regarding his relationship with Weil, Oxman, and the NY Companies have prejudiced the Debtor and threatened the integrity of the Court and the bankruptcy process. They constitute grounds for his immediate removal from the Committee.

88.    The failure of Otterbourg to investigate the relationship among Coscia, Weil, and the Oxman Firm, and its failure to disclose that Coscia, its chair, had an "agreement not to sue" the NY Companies constitutes grounds for sanctions as deemed appropriate by the Court including its removal and/or the disallowance of its fees. I remind the Court that both Committee Counsel Cyganowski, (Exh. W), and Richard Haddad, (Exh. NN, at 19), acknowledged that they knew as early as April 2016 that NYFD was advancing the Oxman Firm. In fact, Mr. Haddad noted on the record that he saw it it in the correspondence of the Oxman Firm to the UST. Yet, despite having this knowledge, Mr. Haddad did not disclose the information to the Court, submit a 2019 Statement or, apparently, conduct further inquiry. Instead, he engaged in a second round of mediation at which Otterbourg also failed to disclose the "covenant not to sue."

89.    The Committee's positions in this Case with respect to the Debtor's interests in the NY Companies could not possibly be to enhance the Debtor's Estate or advance the interests of unsecured creditors or even of Coscia. The only reasonable basis for the Committee's positions is that Coscia and Oxman were acting in the interests of Weil and the NY Companies, with which

Coscia had a secret "covenant not to sue." The Committee was essentially acting in a manner contradictory to the Estate as reflected in its letter undermining the Summary Judgment Motion (See Exhibit Q.).

90.    The Committee and its professionals have been afforded numerous opportunities to "make this right." They have utterly failed to do so, obviously beholden to Oxman and/or Weil.

91.    The Debtor has sustained financial losses from the misrepresentations, failures to disclose, and "cover up" perpetrated by Oxman and Coscia and condoned by the Committee professionals including: (i) fees incurred by his counsel in investigating the Committee; (ii) fees incurred by the Committee; (iii) fees incurred on the First Mediation and the Second Mediation; and (iv) fees paid by the NY Companies to the Kraut Firm and Carlos Cuevas. In addition, the Debtor's time and the time and energy of counsel (as well as the Court and its staff) have been diverted from the reorganization process to "policing" the Committee and its professionals.

92.    One can consider how this case would have proceeded if the Committee supported the Debtor and the Estate in their efforts against the NY Companies instead of undermining them. If the Committee had been honest and forthright and supported the Debtor's position that he owned 50% of the NY Companies (rather than 8.627%), the Debtor may well have emerged from Chapter 11 already.

93.    It is respectfully requested that the Court fashion relief as follows: (i) remove Coscia from the Committee; (ii) reconstitute the Committee or disband it; (iii) expunge Coscia's claim or afford the Debtor the opportunity to move the State Court to set aside the Coscia Judgment under CPLR 5015 based upon his fraudulent testimony and the misrepresentations of the Oxman Firm; (iv) preclude Coscia and Weil and the NY Companies and any affiliates from voting on or participating in a plan of reorganization; (v) disqualify the Oxman Firm and direct the

disgorgement of its fees paid by the NY Companies; (vi) preclude Otterbourg from receiving any further payment from the Debtor's Estate including any holdback or accrued fees; and (vii) granting such other and further relief as is just and proper.

### The Debtor Should be Given a Chance

94.    This Court has suggested that if it disbanded the Committee, it would appoint a trustee. The Debtor opposes the appointment of a trustee over his assets. The drastic remedy of the appointment of a trustee would not be fair or just at this juncture. The Debtor, who is solvent, has been mindful of his obligations in Chapter 11, and should be given a chance to administer his case with his professionals without the constraints of a conflicted Committee. The Court gave the Oxman Firm "one last chance" to submit a 2019 Statement. This Court should similarly give the Debtor a chance to confirm a plan without the burden and expense of the appointment of a trustee.

95.    The Debtor is willing to undergo monitoring by an independent entity as well as additional reporting and any other reasonable requirement that would address the Court's concerns. I am, as are the Debtor's other professionals, committed to advancing the case. We have been hampered by the Committee, its failure to be forthright and male disclosures and the refusal of the NY Companies to provide documents. It is submitted that to strip the Debtor of autonomy at this stage would be neither just nor necessary.

96.    Counsel believes that once the Oxman Firm is removed from the case and Coscia is removed from the Committee, it will proceed in a manner that will inure to the Debtor's estate and the creditors therein.

97.    The role of Otterbourg in failing to disclose or investigate Coscia's relationship with the NY Companies and the "agreement not to sue" is troubling.  It is submitted that Otterbourg should re-evaluate its ongoing role in this case and avoid the expenses, distractions and

unpleasantries that inevitably will occur in the event that the Debtor is required to seek the appropriate relief from the Court.

98.    Moving forward, the Debtor is hopeful that he will no longer be distracted and disheartened by the improper actions of the Committee, Coscia, Weil, and the Oxman Firm, particularly in light of the Court's oft-expressed insistence concerning the integrity of the process. Counsel will not need to spend time reassuring the Debtor and creditors that the Bankruptcy system is fair and just and that the UST is unbiased.

99.    Moreover, pursuant to the Debtor's proposed plan, which he hopes to file in the upcoming weeks, an administrator will be appointed with powers to investigate the Committee and the fees paid, and report to the Inspector General of the United States Department of Justice and/or any other supervisory department or agency regarding the conduct the Committee in the case and the procedures and policies of the UST.

Dated: White Plains, New York
       March 2, 2017

                                        ANNE PENACHIO

                                        _____
                                        Penachio Malara LLP
                                        235 Main Street
                                        Suite 610
                                        White Plains, NY  10601
                                        (914) 946-2889

33