PENACHIO MALARA LLP
Counsel for the Debtor
235 Main Street
White Plains, New York  10601
(914) 946-2889
By: Anne Penachio (A Member of the Firm)
    Joseph P. Garland (Of Counsel to the Firm)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In re:

      SAMMY ELJAMAL,

                        Debtor.
------------------------------------------------------------------X

Chapter 11

Case No. 15-22872 (RDD)

**Debtor's Memorandum of Law in Support of the Debtor's Motion
(I) for Sanctions for Violations of Bankruptcy Rule 2019 including
(i) Disallowance of the  Claim of Brent Coscia, (ii) Preclusion of
Brent Coscia from Voting on Any Plan of Reorganization;
(iii) Removal of Brent Coscia from the Creditors' Committee; and
(iv) Costs and Monetary Sanctions;  (II) In further Support of the
Motion of Creditor Musa Eljamal to Disqualify Oxman Law Group
PLLP as Attorney for Creditor Brent Coscia and (III) For such
other and further relief as is Just and Proper**

## Table of Contents

Table of Contents ........................................................................................................... i

Table of Authorities ...................................................................................................... ii

INTRODUCTION ......................................................................................................... 1

SUMMARY OF FACTS ................................................................................................ 4

    I. The Payment of Brent Coscia's Legal Fees ........................................................ 7

ARGUMENT ............................................................................................................... 10

    I. Fraud on the Court ............................................................................................. 10

        1.    Coscia Perpetrated a Fraud Upon the Court and Failed to Disclose Material
              Facts ............................................................................................................ 11

        2.    The Oxman Firm Perpetrated Fraud Upon the Court ............................. 15

    II. The Oxman Firm, The Creditors' Committee, and Otterbourg Have Violated Rule
       2019 ................................................................................................................ 16

        1.    Rule 2019 ................................................................................................... 16

        2.    The Absence of a Written, and Required, Retainer Agreement ............... 22

        3.    The Creditors' Committee Violated Rule 2019 ...................................... 24

        4.    Otterbourg Violated Rule 2019 ............................................................... 26

        5.    The Appropriate Sanctions for the Rule 2019 Violations ....................... 31

    III. Sanctions under Section 105 of the Bankruptcy Code .................................... 32

        1.    The Court Should Award the Debtor Relief Pursuant to Section 105 of the
              Code ........................................................................................................... 32

CONCLUSION ............................................................................................................ 34

## Table of Authorities

**Statutes and Rules**

2011 Adv. Cmte. Note on amendment to Rule 2019 .................................................................. 17

Rule 2019, Federal Rules of Bankruptcy Procedure ............................................................ passim

U.S. Bankruptcy Code, Section 105(a), 11 U.S.C. § 105(a) ............................................... 4, 32, 33

**Cases**

*Grand Street Realty, LLC, v. McCord*, 2005 WL 2436214 (E.D.N.Y. Sept. 30, 2005) ......... 32, 33

*Grubin v. Rattet (In re Food Mgmt. Group)*, 380 B.R. 677 (Bankr. S.D.N.Y. 2008) .. 2, 10, 13, 15

*H.K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115 (6th Cir. 1976) .............. 10

*In re Baldwin-United Corp.*, 79 B.R. 321 (Bankr. S.D. Ohio 1987) ........................................... 26

*In re Bambi*, 492 B.R. 183 (Bankr. S.D.N.Y. 2013) ................................................................. 32, 33

*In re Bayou Group, LLC*, 431 B.R. 549 (Bankr. S.D.N.Y. 2010) ................................................. 26

*In re Bernard L. Madoff Investment Secs. LLC*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ............. 32

*In re CF Holding Corp.*, 145 B.R. 124 (Bankr. D. Conn. 1992) ......................................... 1, 2, 22

*In re Clinton Street Food Corp.*, 254 B.R. 523 (Bankr. S.D.N.Y. 2000) ..................................... 10

*In re FiberMark, Inc.*, 2006 WL 723495, 2006 Bankr. LEXIS 4029 (Bankr. D. Vt. Mar. 11, 2006) ................................................................................................................................. 3

*In re Granite Partners*, 219 B.R. 22 (Bankr. S.D.N.Y. 1998) ...................................................... 2

*In re GSC Group, Inc.*, 502 B.R. 673 (Bankr. S.D.N.Y. 2013) ................................................. 2, 3

*In re Lar-Dan Enterprises*, 221 B.R. 93 (Bankr. S.D.N.Y. 1998) .......................................... 1, 19

*In re Leslie Fay Companies*, 175 B.R. 525 (Bankr. S.D.N.Y. 1994) ............................................. 3

*In re Matco Elecs. Group, Inc.*, 383 B.R. 848 (Bankr. N.D.N.Y. 2008) ....................................... 2

*In re Oklahoma P.A.C. First LP*, 122 B.R. 387 (Bankr. D. Ariz. 1990) .................................. 1, 18

*In re Parklex Assocs., Inc.*, 435 B.R. 195 (Bankr. S.D.N.Y. 2010) .............................................. 21

*In re Source Enters., Inc.,* 2008 WL 850229, 2008 Bankr. LEXIS 940 (Bankr. S.D.N.Y. March 27, 2008) .................................................................................... 2

*In re Ticketplanet.com,* 313 B.R. 46 (Bankr. S.D.N.Y. 2004) ..................................... 10

*Kupferman v. Consol. Research and Mfg. Corp.,* 459 F.2d 1072 (2d Cir. 1972) ........ 10

*Law v. Siegel,* 134 S. Ct. 1188 (2014) ...................................................................... 32

*Leber-Krebs, Inc. v. Capitol Records,* 779 F.2d 895 (2d Cir. 1985) .......................... 10

*Maiman v. Spizz (In re Ampal-American Israel Corp.),* 554 B.R. 604 (S.D.N.Y. July 18, 2016) ................................................................................................................... 21

*Mickle v. Morin,* 297 F.3d 114 (2d Cir. 2002) .......................................................... 33

*S.E.C. v. Princeton Economic Int'l Ltd.,* 84 F. Supp. 2d 443 (S.D.N.Y. 2000) ........... 21

## INTRODUCTION[1]

At a hearing on February 7, 2017, the Court gave counsel a last opportunity to submit complete and accurate statements under Rule 2019 of the Bankruptcy Rules. It stated that "I'm putting you on notice" and referred to two cases, suggesting that counsel would be well served by reviewing them in formulating their statements.[2]

In *In re Oklahoma P.A.C. First LP*, the Court, in considering representation of two secured creditors when the security might be insufficient to make both whole, with no discussion of the possibility of a waiver, concluded that under the Bankruptcy Code, a firm-in-conflict can be disqualified. "The interests of these two creditors are not aligned in this adversary proceeding. They cannot be represented by the same counsel." 122 B.R. 387, 392 (Bankr. D. Ariz. 1990). The Court also applied general "ethical standards," writing:

> the Court should also play a role in ensuring that lawyers adhere to certain ethical standards. Bankruptcy Rule 2019 was designed for such a purpose. It is part of the Chapter 11 reorganization process that all matters should be done openly and subject to scrutiny, whether it is the proposal of a plan of reorganization, representation of the debtor, or representation of numerous creditors – secured or unsecured.

122 B.R. at 394.

In the second case, *In re CF Holding Corp.*, the Court held that full disclosure of an <u>attorney's</u> relationship among different interested persons required that the retainer agreement be provided.

---

[1] Documents referenced herein are annexed to the March 3, 2017 Affirmation of Anne Penachio in Support of the Motion which is referred to as <u>Penachio Aff.</u> at __.

[2] The references to these cases are on page 21 and 22 of the transcript, pages 22 and 23 of the 25 pages at Penachio Aff. Exhibit NN. The Court also made a brief reference to *In re Lar-Dan Enterprises*, 221 B.R. 93 (Bankr. S.D.N.Y. 1998) (Gallet, J.). (*Ibid*, at 21.) which is discussed it below. (*Infra* at 13-14.)

> I conclude that the disclosure underpinnings of Rule 2019 require the respondents to disclose the written basis, if any, for their representation of the listed entities. Accordingly, the respondents shall file a copy of any instrument empowering the respondents to act on behalf of the listed entities.

145 B.R. 124, 126 (Bankr. D. Conn. 1992).

In addition, on February 7, Judge Drain referred to his having submitted comments related to Rule 2019 and what became an amendment of the Rule. He wrote:

> [T]he repeal of Rule 2019 would make it much more difficult to know literally who the other side is. Thus, one may negotiate a settlement that results in the withdrawal of a pleading only to have another pleading spring up by someone who purports not to have been in the group that settled. Or one may negotiate a settlement with someone only to learn later that they were still helping to fund the law firm that was prosecuting a group pleading – or that the law firm is continuing to prosecute the pleading, ostensibly on behalf of the group, when, in fact, the group has shrunk because many of its members have settled. These are not hypothetical concerns. Each has occurred in cases before me, and reference to Rule 2019 helped to straighten out the situation and keep the parties' positions clear.

(Judge Drain Jan. 13, 2009 Letter (Penachio Aff. at Exh. QQ).)

Lastly, as Judge Chapman has written:

> A professional's duty to disclose is "self-policing." *[In re] Granite Partners*, 219 B.R. [22] at 35 [(Bankr. S.D.N.Y. 1998)] (citation omitted). Although Bankruptcy Rule 2014(a) does not expressly require a professional to supplement its initial disclosure, section 327(a) implies a duty of "continuing disclosure." *See Grubin v. Rattet (In re Food Mgmt. Group)*, 380 B.R. 677, 690 n.7 (Bankr. S.D.N.Y. 2008) (citations omitted). A professional's continuing disclosure of conflicts under Rule 2014(a) "is necessary to preserve the integrity of the bankruptcy system and to ensure that professionals remain 'conflict free.'" *Id.* The adequacy of disclosure also cannot be judged by whether other parties made inquiry. *See In re Source Enters., Inc., et al.*, 2008 WL 850229 at *8, 2008 Bankr. LEXIS 940 at *25 [(Bankr. S.D.N.Y. March 27, 2008)] (citing *In re Matco Elecs. Group, Inc.*, 383 B.R. 848, 853-54 (Bankr. N.D.N.Y. 2008) (denying fees for failure to fully disclose a conflict and noting that Rule "2014 is not intended to condone a game of cat and mouse where the professional seeking appointment provides only enough disclosure to whet the appetite of the UST . . . or [other parties], and then the burden shifts to those entities to make inquiry in an effort to expand the disclosure.")).

2

All facts that bear on the disinterestedness of a professional must be disclosed. "So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees or even disqualification." [*In re*] *Leslie Fay* [*Companies*], 175 B.R. [525] at 533 [(Bankr. S.D.N.Y. 1994)]. It is the court's decision as to what facts may be relevant to disclose; this decision "should not be left up to the professional, 'whose judgment may be clouded by the benefits of the potential employment.'" *In re FiberMark, Inc.,* 2006 WL 723495 at *8, 2006 Bankr. LEXIS 4029 at *26 (Bankr. D. Vt. Mar. 11, 2006) (citation omitted).

*In re GSC Group, Inc.*, 502 B.R. 673, 725 (Bankr. S.D.N.Y. 2013) (footnote omitted) (Chapman, J.).

On February 10, 2017, the Oxman Firm filed a 2019 Statement (the "Oxman 2019"). (Penachio Aff. at Exh. OO.) The Oxman 2019 fails to comply with Rule 2019 and is devoid of standard information required under the disclosure rule. It also contains information that contradicts not only the prior sworn testimony of its client Brent Coscia ("Coscia") but also representations that it made concerning the payment of its fees. On February 13, 2017, three days after the Court deadline, Coscia, the Oxman Firm's client and Chairman of the Official Committee of Unsecured Creditors (the "Committee"), filed a declaration in support of the Oxman 2019 (the "Coscia Declaration"). (Penachio Aff. at Exh. A). The Coscia Declaration, which was ostensibly submitted to "make things clear," contains information that is directly at odds with his earlier sworn statements. Most notably, in his declaration, Coscia reveals for the very first time, more than 18 months after the commencement of the Debtor's Chapter 11 case, that he had entered into a "covenant not to sue" NY Fuel Distributors, LLC ("NYFD"), its investors, and related entities in exchange for the advancement of his legal fees associated with his defense in a criminal trial. Coscia had previously and consistently maintained that his boss, James Weil ("Weil"), personally advanced his fees due to his "innocence" without consideration because Weil was a "gentleman."

3

Separately, in the face Coscia's multiple conflicting statements, the obligations imposed by Rule 2019, and the Court's expressed desire to have the lawyers come forward with details, the Committee counsel and other attorneys representing multiple creditors, have remained silent. Their silence is eloquent.

The Debtor submits this memo of law in support of his motion for an order imposing sanctions on Coscia, the Oxman Firm, and Otterbourg for violations of Bankruptcy Rule 2019 and 18 U.S.C. § 105(a) including (i) the disallowance of Coscia's claim, (ii) the removal of Coscia from the Creditors' Committee; (iii) the preclusion of Coscia from voting on any plan of reorganization; and (iv) costs and monetary sanctions. The Debtor also submits this memo in further Support of the Motion of Creditor Musa Eljamal to Disqualify the Oxman Firm as Attorney for Creditor Brent Coscia and for such other and further relief as is just and proper.

## SUMMARY OF FACTS

The facts are fully set forth in the accompanying Affirmation of Anne Penachio dated March 2, 2017 and the Court is respectfully referred thereto. Set forth herein is a summary.

Coscia was arrested in 2011 based upon a complaint allegedly made by the Debtor. (Penachio Aff. at ¶ 15). At the suggestion of Weil, Coscia retained the Oxman Firm to represent him. Weil was a client of the Oxman Firm and has been a longtime litigation adversary of the Debtor. (Penachio Aff. at ¶ 17). According to the story Coscia and Marc Oxman told several times until April 28, 2016, Weil individually advanced the fees Coscia owed to the Oxman Firm for representing him in the criminal case. (Penachio Aff. at ¶ 27).Coscia was ultimately acquitted of criminal charges. (Penachio Aff. at ¶ 22).

4

Following Coscia's criminal trial, according to the story maintained by Coscia,[3] the Oxman Firm next represented him on a contingent basis in the civil action against the Debtor and Bryan Orser ("Orser") in Westchester Supreme Court (the "Civil Action" or the "Civil Trial"). (Penachio Aff. at ¶ 24). The Civil Action resulted in a judgment (the "Judgment") being awarded in favor of Coscia and against the Debtor and Orser. By virtue of the Judgment, Coscia became the Debtor's largest creditor. (Penachio Aff. at ¶¶ 28, 31). Coscia was appointed to the Committee, with JMM Fuelco, LLC ("JMM") and Gas Land Petroleum, Inc. ("Gas Land"). Gas Land has since resigned from the Committee, having settled its claim against the Debtor.

Notwithstanding Coscia's appointment to the Committee, when the Oxman Firm realized that additional work would be required to represent him in the Debtor's Bankruptcy case, the terms of the Firm's representation of Coscia were allegedly changed. (Penachio Aff. at ¶ 32). According to the Oxman Firm, for work in the Bankruptcy, Coscia would be charged on an hourly basis but Weil would "front" the money as the Oxman Firm said on April 15, 2016. (Penachio Aff. at Exh. T at 8, ¶ 24) (Coscia 2004 Objection).)

On April 14, 2016, Orser, who is also a creditor of the Debtor, requested that the United states Trustee (the "UST") reconstitute the Committee. Specifically, Orser asked the UST to remove JMM on the ground that it was essentially Weil and that Weil, indirectly or otherwise, had leverage over Coscia because of outstanding loans. (Penachio Aff. at Exh. S).  At that point, the Oxman Firm undoubtedly realized that if the UST's representative, Paul Schwartzberg, discovered (or at least thought) that Weil was paying and had paid Coscia's legal fees to the Oxman Firm (who was also Weil's attorney), the Coscia-Weil alliance would be exposed and

---

[3] No retainer agreements between the Oxman Firm and Coscia, Weil, NYFD, or any other entity have been produced.

Weil, through JMM, would be removed from the Committee and Orser possibly appointed. Accordingly, in an April 28, 2016 letter to Mr. Schwartzberg, the Oxman Firm simply changed the story that had long been upheld. (Penachio Aff. at ¶ 49 and Exh. V.) Buried in a lengthy letter to Mr. Schwartzberg, Oxman, for the first time, asserted that it wasn't Weil who paid Coscia's fees, it was NYFD – the entity that has been the subject of litigation between the Debtor and Weil – an entity in which the Debtor holds a 50% interest. (Penachio Aff. ¶ 49 and Exh. V at 2).

In late January 2017, the Debtor finally received data showing that NYFD was paying (and had paid) Coscia's fees to the Oxman Firm. (Penachio Aff. at ¶ 68). The Debtor discovered that the Oxman Firm had received over $150,000.00 from NYFD since he filed his bankruptcy petition in June 2015. The Debtor brought this to the Court's attention on February 1, 2017, (Penachio Aff. at ¶ 71 and Exh. LL at ¶ 5). On February 6, 2017 the Oxman Firm responded, taking umbrage at the Debtor's assertion that it had not mislead anyone or mischaracterized anything and repeating both inconsistent stories, (i.e., that Weil was paying and that NYFD was paying), (Penachio Aff. at ¶ 72, Exh. MM at 3, ¶ 5).

There matters stood on February 7, 2017, when the parties appeared before the Court on a motion by Musa Eljamal to disqualify the Oxman Firm as Coscia's attorney based upon conflicts with others in the case, particularly with Weil and various entities that he controlled. (Penachio Aff. at ¶ 73). After considering how New York's Code of Professional Conduct addressed potential attorney-conflict issues and being told, contrary to certain case law, a conflict could be waived (although no documents expressing any waivers were provided then or since), the Court turned to the issue of how multiple representations are viewed in the bankruptcy context. (Penachio Aff. at ¶ 17 and Exh. NN). It expressed concern about the extent to which an entity in which the Debtor had a 50% interest – NYFD – was paying Coscia's legal fees. Manifestly, the

payment of fees by NYFD could infect the proceedings. The Court instructed the parties and their counsel "to make this right and make the disclosure" and imposed a "last chance" deadline of February 10, 2017 to submit a statement under Bankruptcy Rule 2019, (Penachio Aff. at Exh. NN at 19, lines 3-20).

In response, on February 10, 2017 the Oxman Firm filed its Rule 2019 Statement. (Penachio Aff. at Exh. OO.) It did not make things right. Similarly, Coscia in his declaration, submitted three days later, on February 13, 2017, did not make things right. (Penachio Aff. at Exh. A). The Oxman 2019 and the Coscia Declaration are not only materially deficient but they also raise further serious questions about the propriety of the roles of the Oxman Firm, Coscia, the Committee, and others in this individual Chapter 11 case.

## I. **The Payment of Brent Coscia's Legal Fees**

As detailed in the Penachio Aff., Coscia and the Oxman Firm consistently took the position until April 28, 2016 that Weil individually had advanced to Coscia's fees in the criminal prosecution and that he was "fronting" Coscia's legal fees in this Bankruptcy. (Penachio Aff. at ¶¶ 17-49). Oxman and Coscia had repeatedly explained under oath, in sum and substance, that Weil made the advances because (i) he knew Coscia was innocent and wanted him to have adequate representation and (ii) he was a "gentleman" and, presumably, believed that payment would be the honorable thing to do. (Penachio Aff. at ¶ 27).

On April 28, 2016, the Oxman Firm published a different story. Submerged within correspondence to the UST, Oxman said that NYFD had advanced Coscia's legal fees in his criminal case and was advancing (and would continue to advance) Coscia's bankruptcy fees. (Penachio

Aff. ¶ 49 and Exh. V). Oxman and Coscia put forward two different, opposing stories about simple, historical events <u>and one and only one could be true</u>.[4]

Things came to a head when the Debtor's counsel finally received records that showed that NYFD had in fact paid over $150,000 to the Oxman Firm after the Debtor filed his bankruptcy petition, a point at which the Oxman Firm claimed to have severed all ties with any other interested party, including NYFD, (Penachio Aff. at Exh. JJ). On February 1, 2016, the Debtor's counsel submitted the payment-information to the Court, (Penachio Aff. at Exh. LL.). On February 6, 2017 the Oxman Firm responded by, remarkably, telling the Court <u>both</u> of the opposing and mutually-exclusive stories, (Penachio Aff. at ¶ 72 and Exh. MM at 3). It filed, in short, a document that had a lie embedded within it.

In his February 6, 2017 Reply to the Debtor's January 31 Statement (filed February 1) Coscia stated, in neighboring paragraphs, both that <u>Weil</u> had advanced Coscia's fees for not only the criminal case but also for the bankruptcy, (Penachio Aff. at Exh. LL, ¶ 5), <u>and</u> that <u>NYFD</u> had paid Coscia's fees for both the criminal case and the bankruptcy, (*ibid*, ¶ 6).

The Court on February 7, 2017 expressed frustration that the answer to the simple question of whether a company in which the Debtor has a 50% interest was paying the fees of the Chair of the Committee seemed unattainable. The Court afforded the parties (and particularly their counsel) a chance "to make this right and make the disclosure" stating:

> And so I'm going to give you all a chance to make this right and make the disclosure. And it better be full and accurate because one thing I know at this point, this case isn't settling and there'll be full disclosure and if there are any inaccuracies there will be no second chance. This is your second chance to make

---

[4] In fact, in some respects neither was true; NY Fuel Holdings actually advanced most if not all of the criminal fees. (Exh. E (Oxman Firm bills).) That transaction is not reflected in NY Fuel Holdings's 2001 financial statements.

the disclosure of all relationships of the clients that your firm represents in this case and outside of the case relating to the assets of this debtor including the details of the financial arrangements on who's being paid, who has the right to settle and the like. All right? You know, if Mr. Coscia has some sort of constraint on him on what he can do based upon – I need to know basically like a Lar Dan affidavit that he is free to act as a fiduciary your [*sic*]. And frankly, the fact that the committee didn't ask for that is bad, B-A-D bad. All right? So that's where we're going at this point. I need to know all the facts.

(Penachio Aff. at Exh. NN (Feb. 7, 2017 Tr. at 21).)

The only response was the Oxman Firm's 2019, (Penachio Aff. at Exh. OO), which Coscia himself belatedly supplemented on February 13, 2017, (Penachio at Exh. A). The Committee, which was represented in Court that day by two attorneys, did not submit a 2019 on behalf of the Committee.

Neither the Debtor nor his professionals have been provided with a copy of the "covenant not to sue" between Coscia and NYFD. Although the terms are unknown, one would expect that it contains provisions which affect the relations between the parties. Indeed, this "covenant not to sue" may be in the nature of a "Mary Carter Agreement" (an agreement where some defendants to litigation settle by offering a loan to be repaid by the plaintiff from monies received from the non-settling defendants).

## ISSUES

I.      Did Coscia Commit Fraud on the Court? Yes.

II.     Did the Oxman Firm Commit Fraud on the Court? Yes.

III.    Did the Oxman Firm comply with Bankruptcy Rule 2019? No.

IV.     Did Coscia comply with Rule 2019? No.

V.      Did the Committee comply with Rule 2019? No.

VI.     What sanctions should be imposed? The Court should impose sanctions that it deems appropriate including the following: (i) The removal of Coscia from the

Committee; (ii) The disallowance of Coscia's claim; (iii) The preclusion of Coscia from voting on a Chapter 11 plan; and (iv) The award of costs and sanctions. The Oxman Firm should be disqualified from serving as counsel to Coscia and it should disgorge the fees received from NYFD. The Court should also impose appropriate sanction on the Committee and its counsel.

## ARGUMENT

### I. Fraud on the Court

As Judge Glenn explained in *Grubin v. Rattet* (*In re Food Management Group, LLC*):

> A "fraud on the court" encompasses conduct that prevents the court from fulfilling its duty of impartially deciding cases. *In re Clinton Street Food Corp.*, 254 B.R. 523, 532 (Bankr. S.D.N.Y. 2000) [Bernstein, C.J.)]. Rather than being limited to injury to an individual litigant, fraud on the court embraces "that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases presented for adjudication." *Kupferman v. Consol. Research and Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972). Successfully alleging fraud on the court requires (1) a misrepresentation to the court by the defendant; (2) a description of the impact the misrepresentation had on proceedings before the court; (3) a lack of an opportunity to discover the misrepresentation and either bring it to the court's attention or bring an appropriate corrective proceeding; and (4) the benefit the defendant derived from the misrepresentation. *In re Ticketplanet.com*, 313 B.R. 46, 64 (Bankr. S.D.N.Y. 2004) (Gropper, J.) (citing *Leber-Krebs, Inc. v. Capitol Records*, 779 F.2d 895, 899-900 (2d Cir. 1985)). An attorney's knowledge or sponsorship of misdeeds by their clients, including a client's nondisclosure of material information when appearing before a court, may be grounds for alleging fraud on the court against the attorney. *H.K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1118-19 (6th Cir. 1976) (noting that allegations regarding an attorney's knowledge and/or sponsorship of a client's inconsistent testimony at trial and failure to disclose known, material documents in discovery could constitute fraud on the court, but finding no evidence thereof on the record to support relief from judgment under Fed. R. Civ. P. 60(b)).

380 B.R. 677, 715 (Bankr. S.D.N.Y. 2008) (Glenn, J.)

1.    **Coscia Perpetrated a Fraud Upon the Court and Failed to Disclose Material Facts**

The Coscia Declaration, (Penachio Aff. at Exh. A), contains statements that materially contradict his earlier statements. On February 13, 2017, Coscia declared, "I want to make it clear that I made an agreement with New York Fuel Distributors, LLC ('NYFD') for it to advance monies to the Oxman Law Group, PLLC ('Oxman Law') for my legal fees. I did not have any agreement with Jimmy Weil individually" and "[i]t was <u>clear from the beginning</u> that my fees were being advanced by NYFD, not Jimmy [Weil] personally." (¶¶ 3, 5, Coscia Decl. (emph. added) (Penachio Aff. at Exh. A).) Coscia then explains, for the first time, that he agreed not to sue NYFD and its investors, including Weil, for injuries allegedly caused by the Debtor in return for the advancement of the fees.

The declaration presents a two-fold problem for Coscia. First, it contains at least one material misstatement. Contrary to Coscia's assertion, it was never clear that NYFD was advancing his fees. In fact, Coscia had maintained time after time under oath, that Weil individually had advanced his legal fees. Second, Coscia explained that Weil paid the fees because he, Weil, knew Coscia was "innocent" of the charges and wanted him to have adequate representation. Coscia never disclosed the fact that he and Weil had entered into an agreement whereby Coscia promised not to sue NYFD and its investors in consideration for the advancement of legal fees.

Notably, on April 30, 2014, during the Civil Trial, Coscia testified on direct examination when questioned by Mr. Oxman concerning the fees and expenses of his criminal trial. He swore:

> Q. Mr. Coscia, did you pay for these expenses personally?
>
> A. No, I personally did not.
>
> Q. Who paid for them?

11

A. I was able to basically borrow the money from the owner of the company, Mr. James Weil, who I owe the money to and have to pay him back.

(Penachio Aff..at ¶ 27 and Exh. G, at 2 lines 17-20).

Coscia testified that Weil had paid or advanced the fees four other times during the Civil Trial, including twice in testimony to which the Oxman Firm directs the Court as establishing that NYFD did. (Penachio Aff. at ¶ 28 (pages 360 and 394 are included as Exh. B to, *e.g.*, the 2004 Objection (referred to in ¶ 22 thereof)) (Exh. T)).

In his recent Declaration, speaking about the day of his arrest, Coscia addresses the reason underlying the advances by NYFD and says:

3. Knowing that Sammy [Eljamal] and Bryan [Orser]'s scheme was totally fabricated, I spoke with Jimmy [Weil], who was also a manager of NYFD. I told Jimmy that I could sue both NYFD and its investors for false arrest. I did not really want to do that though, since it was Sammy (not NYFD or its investors) who really had tried to hurt me. After some discussion, Jimmy asked whether I would agree not to sue NYFD if it would front my legal fees. He also mentioned that the Company might be obligated to represent me based upon something in the operating agreement. While I had not read the agreement, I thought he was probably right.

4. I consented to this arrangement, and agreed not to sue NYFD in exchange for the advance payment arrangement. I contacted Marc Oxman . . ..

(Penachio Aff. at Exh. A).)

On the issue of the reason for payment, Coscia's Civil Trial testimony was quite different from his declaration. At the Civil Trial, when asked by Mr. Oxman "why" Weil had paid or advanced the fees, Coscia said nothing about the "agreement not to sue." Instead he testified:

A. He [Weil] wanted to make sure that I had a good defense because I was a company employee and he believed I was innocent of the charges.

(Penachio Aff. at ¶ 27 and (Exh. G, at 12 (p. 394 of Tr.) lines 11-18).

Coscia committed perjury in the Civil Action. Instead of wanting people to think that "gentlemanly" – a term used by Mr. Oxman in his summation, (Penachio Aff. at ¶ 27 (c ) and

Exh. G at 8, lines 23-25 (Civil Trial Tr. 278, lines 23-25) – Weil advanced the fees, he now all of a sudden says it was NYFD. Instead of wanting the jury and others during the Civil Trial to believe that Weil paid the criminal fees out of the goodness of his heart because Coscia was innocent, Coscia now asserts that NYFD, Weil and its investors received consideration for the arrangement, i.e., he wouldn't sue. Incredibly, according to Coscia's new version of the story and its timing and based on the Oxman Firm's records, on June 14, 2011 (i) he was arrested, (ii) he spoke to Weil, and they agreed that NYFD would advance his legal fees if he agreed not to sue it and its investors, and (iii) the Oxman Firm was retained. The Oxman Firm was not paid anything at all until six months later on December 31, 2011, when it received a $50,000 check from NY Fuel Holdings. (Penachio Aff. at ¶¶ 17 and 25 and Exh. E (Oxman Firm bills).)

The concealment of the "covenant not to sue" NYFD and its investors is particularly troubling in this case because the Committee has refused to support the Debtor in his efforts to access funds, distribution rights, and even information from NYFD. In fact, the Committee, led by Coscia, failed to support the Debtor in his efforts to establish that he owns 50% of the NYFD. (Penachio Aff. at ¶ 41 and Exh. Q).Obviously the Committee's position was influenced by Coscia's newly revealed "covenant not to sue."

Coscia's representations constitute "fraud on the Court" under the criteria established in the *Food Management* case.

First, the misrepresentations and failure to disclose were by Coscia. Coscia either made or omitted them directly in pleadings or did so through his counsel. Coscia, who was present at many Court proceedings, was well aware of the concerns raised by the Debtor regarding the Committee's constitution and his relationship with Weil, JMM, and the Oxman Firm since the inception of the case.

Second, the misrepresentations and non-disclosures negatively impacted the proceedings before this Court. The Court and the Debtor, who was fighting over his ownership interest in the NYFD and rights to payment, were adversely affected by the concealment of the "covenant not to sue." Coscia maintained credibility with the Court (which validly scrutinized assertions made by the Debtor and others taking those assertions with "a grain of salt."). Moreover, the administration of the Debtor's Chapter 11 case was impeded. The Committee, obviously swayed by the "covenant not to sue," refused to support the Debtor in his legitimate efforts to assert his ownership and distribution rights against NYFD, Weil, and its investors. The Committee also refused to support the Debtor in his efforts to expunge the patently unsupportable claims filed against him by NYFD and related entities. Instead, the Committee proposed paying the claims in full.

Third, Coscia had ample opportunity to correct his misrepresentations and make the appropriate disclosures, either by bringing them to the Court's attention or commencing an appropriate corrective proceeding. Coscia, who was present at many hearings in the case, could have come "clean" over the course of the many contested matters where his independence was called into question. Instead, Coscia remained silent. His opposition to the Debtor's attempts to gain access to information (e.g., his opposition to the Debtor's application for discovery under Rule 2004) is particularly eloquent. Coscia opposed the Debtor's 2004 application not because the motion was frivolous or made in bad faith (as he maintained in his opposition), but because it would have exposed his lies (and possibly improper payments he, and Weil, received from NYFD) and jeopardized his (i) stature with the Court, (ii) status on the Committee; (iii) leverage over the Debtor; and (iv) prospect for an excessive settlement payment which stripped the Debtor of his appellate rights.

Fourth, Coscia derived substantial benefit from the misrepresentations in at least the following four ways: (i) NYFD continued to pay his substantial counsel fees; (ii) he was able to leverage a generous payment of $3.6 million on the Judgment proposed under the Committee's Amended Plan and avoid the prospect of reversal of his Judgment on appeal; (iii) he was able to undermine the Debtor's ability to assert his rights against NYFD, Weil, and its other investors; and (iv) he was able to maintain leverage over the Debtor in settlement negotiations including two mediations.

### 2.  The Oxman Firm Perpetrated Fraud Upon the Court

The Oxman Firm with its knowledge of Coscia's Civil Trial testimony – testimony it included as an exhibit to its 2019 Statement (Penachio Aff. at Exh. OO at Exhibit B to Exhibit C) – filed the Coscia Declaration that was completely different from its 2019 Statement in at least two material respects. The Oxman Firm's proffer of Coscia's contradictory statements throughout this case and failures to disclose are tantamount to fraud on the Court and the parties. The Oxman Firm's concealment of Coscia's "agreement not to sue" is particularly troubling.

As is well settled, "[a]n attorney's knowledge or sponsorship of misdeeds by their clients, including a client's nondisclosure of material information when appearing before a court, may be grounds for alleging fraud on the court against the attorney." *In re Food Management Group,* 380 B.R. at 715.

Here, the Oxman Firm benefited from the fraud perpetrated on the Court in several ways. First, it continued to be paid by NYFD (the company in which the Debtor holds a 50% ownership interest) during this proceeding without having to make an application to the Court. Second,

it stands to make more money more quickly by way of a contingency fee[5] if Coscia is paid under the Committee's Amended Plan (which calls for the payment of $3.6 million and strips the Debtor of his appellate rights). Third, Oxman, through his status on the Committee, is afforded the opportunity to help his other clients, Weil and Leon Silverman (another investor in NYFD and litigation adversary of the Debtor who the Oxman Firm continues to represent in non-bankruptcy matters) in acquiring the Debtor's interest in NYFD for what the Debtor believes is ridiculously low and in upholding their claims.

## II.  The Oxman Firm, The Creditors' Committee, and Otterbourg Have Violated Rule 2019

### 1.  Rule 2019

Rule 2019(a)-(d) provides:

> (a) Definitions. In this rule the following terms have the meanings indicated:
>
> (1) "Disclosable economic interest" means any claim, interest, pledge, lien, option, participation, derivative instrument, or any other right or derivative right granting the holder an economic interest that is affected by the value, acquisition, or disposition of a claim or interest.
>
> (2) "Represent" or "represents" means to take a position before the court or to solicit votes regarding the confirmation of a plan on behalf of another.
>
> (b) DISCLOSURE BY GROUPS, COMMITTEES, AND ENTITIES.
>
> (1) In a chapter 9 or 11 case, a verified statement setting forth the information specified in subdivision (c) of this rule shall be filed by every group or committee that consists of or represents, and every entity that represents, multiple creditors or equity security holders that are (A) acting in concert to advance their common interests, and (B) not composed entirely of affiliates or insiders of one another.
>
> (2) [Entities that need not feel omitted].

---

[5]  Coscia and the Oxman allegedly agreed to a contingency fee arrangement for the Civil Trial. However, no agreement evidencing the terms has been produced.

(c) INFORMATION REQUIRED. The verified statement shall include:

(1) the pertinent facts and circumstances concerning:

(A) with respect to a group or committee, other than a committee appointed under § 1102 or § 1114 of the Code, the formation of the group or committee, including the name of each entity at whose instance the group or committee was formed or for whom the group or committee has agreed to act; or

(B) with respect to an entity, the employment of the entity, including the name of each creditor or equity security holder at whose instance the employment was arranged;

(2) if not disclosed under subdivision (c)(1), with respect to an entity, and with respect to each member of a group or committee:

(A) name and address;

(B) the nature and amount of each disclosable economic interest held in relation to the debtor as of the date the entity was employed or the group or committee was formed; and

(C) with respect to each member of a group or committee that claims to represent any entity in addition to the members of the group or committee, other than a committee appointed under § 1102 or § 1114 of the Code, the date of acquisition by quarter and year of each disclosable economic interest, unless acquired more than one year before the petition was filed;

(3) if not disclosed under subdivision (c)(1) or (c)(2), with respect to each creditor or equity security holder represented by an entity, group, or committee, other than a committee appointed under § 1102 or § 1114 of the Code:

(A) name and address; and

(B) the nature and amount of each disclosable economic interest held in relation to the debtor as of the date of the statement; and

(4) a copy of the instrument, if any, authorizing the entity, group, or committee to act on behalf of creditors or equity security holders.

(d) SUPPLEMENTAL STATEMENTS. If any fact disclosed in its most recently filed statement has changed materially, an entity, group, or committee shall file a verified supplemental statement whenever it takes a position before the court or

solicits votes on the confirmation of a plan. The supplemental statement shall set
forth the material changes in the facts required by subdivision (c) to be disclosed.

Fed. R. Bankr. P. 2019(a)-(d).

Rule 2019(c)(2)(B) requires that for each member of a committee the following be dis-

closed: "the nature and amount of each disclosable economic interest held in relation to the

debtor as of the date the entity was employed or the group or committee was formed." Insofar as

there is ambiguity as to the definition of "disclosable economic interest," the Advisory Commit-

tee notes put that to rest.

> The definition of the term is intended to be sufficiently broad to cover any
> economic interest that could affect the legal and strategic positions a stakeholder
> takes in a chapter 9 or chapter 11 case. A disclosable economic interest extends
> beyond claims and interests owned by a stakeholder and includes, among other
> types of holdings, short positions, credit default swaps, and total return swaps.

2011 Adv. Cmte. Note on amendment to Rule 2019.

Rule 2019(b)(1) requires that firms that "represent" (i.e., "take a position before the court

. . . regarding the confirmation of a plan on behalf of another") "multiple creditors or equity

security holders that are (A) acting in concert to advance their common interests, and (B) not

composed entirely of affiliates or insiders of one another," file their own Rule 2019 Statements.

At the February 7 hearing, the Court explained why, with reference to the parties and

counsel in this Case:

> And it's crystal clear now, if it wasn't before, it's been crystal clear since 2007
> that it applies to attorneys. And where this is happening within the committee, and
> I'll just say this for the record because I guess I anticipate the reaction, although
> frankly one paragraph saying 2019 doesn't apply I think spoke volumes in the
> response. But it doesn't apply to committees. But we're not looking at the
> committee here. We're looking at a firm that represents members on the
> committee. And frankly, to me that's worse. It requires more disclosure because I
> rely on the committee like every bankruptcy judge does. And I have been saying
> now for several months, notwithstanding that I take everything that Mr. Eljamal
> and his father say with a huge grain of salt, that I'm concerned that this committee
> is not looking out for unsecured creditors and is looking out for the interest of Mr.

Weil. I've been front and center on that. And frankly, the one litigation that I've had in this case has borne that out. So to slack off on disclosure on something like this, you can see why I'm angry. I was relying on Mr. Coscia to be the objective person on the committee with the advice of committee counsel. And if he has some obligation to Mr. Weil, I better know about it now. And if he does frankly, there may be a sanction anyway. But if it's not properly disclosed, there's definitely going to be a sanction. Anything that affects his independent judgment on what's right here.

(Penachio Aff. at ¶ 73 and Exh. NN at 17, lines 18-25 and at 19 lines 1-7).

Early on in this Memorandum we quoted from *In re Oklahoma P.A.C. First LP.* We now return to it. There, the court concluded that Rule 2019 did not merely impose a disclosure requirement. It also had relevance to the court's ability to protect the integrity of the bankruptcy process and of the bankruptcy court itself. 122 B.R., at 393 (*quoted supra at* 1.)

Rule 2019 is, in essence, a scorecard, allowing the Court and the other parties to tell who the players are, and on which teams. One thing that the foregoing factual recitation establishes, of course, is that in some respects we still do not know who the players are, or their teams. Neither the Oxman 2019 nor the belated Coscia Declaration cleared things up.

In addition, attorneys receiving payments from third parties in Chapter 11 cases have a general duty to disclose the source and terms, especially where the client is a fiduciary, as Coscia is here. Although *In re Lar-Dan Enterprises* considered a third-party paying the fees of a *debtor* (in that case one of the debtor's principals), its factors should at least inform the appropriateness of such an arrangement for a member of a creditors' committee, which, like the debtor, acts as a fiduciary. As set forth in *Lar-Dan,*

These factors include: (1) the arrangement must be fully disclosed to the debtor/client and the third party payor/insider; (2) the debtor must expressly consent to the arrangement; (3) the third party payor/insider must retain independent legal counsel and must understand that the attorney's duty of undivided loyalty is owed exclusively to the debtor/client; (4) the factual and legal relationship among the third party payor/insider, the debtor, the respective attorneys, and their contractual arrangement concerning the fees, must be fully

disclosed to the Court at the outset of the debtor's bankruptcy representation; (5) the debtor's attorney/applicant must demonstrate and represent, to the court's satisfaction, the absence of facts which otherwise create non disinterestedness, actual conflict, or impermissible potential for a conflict of interest

221 B.R. 93, 96 (Bankr. S.D.N.Y. 1998) (Gallet, J.).

### (a) The Oxman Firm Violated Rule 2019

In its 2019 Statement, the Oxman Firm states that NYFD advanced Coscia's fees in the criminal prosecution. The Oxman Firm further stated that NYFD has and will continue to advance Coscia's fees during the Bankruptcy. The Oxman Firm represents that it "advised the Court of this fee arrangement on April 15, 2016" via Coscia's 2004 Objection, in which, the Oxman Firm now says, "Coscia made it clear that NYFD" had paid his criminal-prosecution expenses and was doing the same with this Bankruptcy. (Penachio Aff. at Ex. OO)

This is simply not true. Although the Oxman Firm cites three paragraphs of the 2004 Objection, (Penachio Aff. at Exh. T, at 7-8, ¶¶ 22, 23 and 24), "NYFD" does not appear in paragraphs 22 or 24 and only appears in paragraph 23 (with "Mr. James A. Weil") in the quotation of the October Undertaking, (Penachio Aff. at Exhibit F), which was not an agreement on NYFD's part (or Weil's for that matter) to do anything, an observation that belies the Oxman 2019 Statements fourth paragraph, as shown in paragraph ¶ 75 of the Penachio Affirmation.

We won't belabor the point. Even a cursory review of the documents will suffice. The Oxman 2019 Statement is a fabrication with respect to the disclosure it was supposed to make as to who was paying Coscia's bills.

As detailed above and in the Penachio Affirmation, the Oxman Rule 2019 Statement, (Penachio Aff. at Exh. OO), is riddled with inconsistencies and makes false and misleading statements with *scienter*. It failed to give accurate information concerning (i) Coscia's "covenant not to sue"; (ii) who had paid or advanced Coscia's fees in the defense of the criminal prose-

cution; (iii) who was advancing payments for his Bankruptcy fees. It failed to include retainer

agreements and bill; and (iv) it failed to comply with *Lar Dan*.

With respect to the obligation under *Lar Dan*, on February 7 the Court said, "I need to

know basically like a *Lar Dan* affidavit that he is free to act as a fiduciary." (Feb. 7, 2017 Tr. at

21 (Exh. NN).) Substituting "Coscia" for "the debtor" in Lar-Dan's factors:

(1)    The arrangement was not, and still is not, "fully disclosed."

(2)    There is no evidence that Coscia "expressly consented" to it.

(3)    Coscia was represented by the same counsel who represented Weil in 2011 and

thereafter until at the earliest April 21, 2016 when the Harfenist Kraut Firm was substituted as

Weil's counsel. (Penachio Aff. at ¶ 47). It is unclear who counseled Weil (of NYFD) when the

arrangement was made for fee payments after the Bankruptcy filing in June 2015.

(4)    Although an arrangement was allegedly reached in July 2015, nothing about it

was disclosed to the Court until April 15, 2016, not "at the outset" of the arrangement. (2004

Objections, (Penachio Aff. at Exh. T).)

(5)    The record is replete with evidence of a lack of disinterestedness.

A Bankruptcy Court is concerned with and entitled to know about "any interest or rela-

tionship, however slight, that would even faintly color the independence and impartial attitude

required by the Code and Bankruptcy Rules." *Maiman v. Spizz (In re Ampal-American Israel

Corp.)*, 554 B.R. 604, 618 (S.D.N.Y. July 18, 2016) (Failla, J.) (quotation marks and internal

citations omitted). Of course, notwithstanding the Court's statement that it "need[ed]" something

that addressed on each of these factors, one was not forthcoming. Neither the Oxman Firm,

Coscia, the Committee, nor counsel for NYFD addressed the *Lar Dan* factors.

Another observation regarding the Oxman 2019 Statement is in order. It says: "When one contrasts the amount of the Judgment (approximately $6 million including interest to date) with the amount of legal fees advanced so far (less than $100,000), it is difficult to credit the Debtor's concerns that Coscia is advancing Weil's interests instead of his own," (¶ 8, Oxman 2019 Statement ) (Penachio Aff. Exh. OO)). The Oxman Firm is utterly dismissive and oblivious to the fact it was the Court's concerns that it was supposed to be addressing, not the Debtor's.[6]

Finally as to the Oxman Firm, when "'lawyers who receive a conveyance under circumstances that should cause them to inquire into the reasons behind the conveyance must diligently do so.'" *In re Parklex Assocs., Inc.*, 435 B.R. 195, 211 (Bankr. S.D.N.Y. 2010) (Glenn, J.) (quoting *S.E.C. v. Princeton Economic Int'l Ltd.*, 84 F. Supp. 2d 443, 446-47 (S.D.N.Y. 2000)). Based on the understanding as described in the 2004 Objection that with the onset of the bankruptcy and Coscia's increased role as the chair of the Creditors' Committee, the Oxman Firm (and the Committee and Otterbourg) should have investigated the source of payment when it received checks from NYFD.[7]

There was no inquiry.

## 2. The Absence of a Written, and Required, Retainer Agreement

### (a) New York Court Rules Require a Written Retainer

One of the many suspicious things about all of this is that there should never be confusion about who is doing what and who is paying what. Yet, assuming that NYFD agreed that it would

---

[6] "Fronting" "less than $100,000" might not be important for someone of Mr. Oxman's means, but it surely is for "a person of modest means," as the Oxman 2019 Statements describes Coscia, (¶ 3, Oxman 2019 Statement (Exh. OO)).

[7] We have not received copies of the invoices themselves so do not know to whom they were directed. As the Debtor's counsel we have but recently learned that NYFD paid them.

pay Coscia's fees in this Bankruptcy, that agreement must be put in writing. No writing was pro-

duced by the Oxman Firm although the requirement that one be produced in the Rule 2019 was

set forth in the *Colt* case to which the Court directed counsel on Feb. 7. *In re CF Holding Corp.*,

145 B.R. at 126.[8]

### (1) There should be three written retainer-agreements but none were produced

Under New York law, there should have been at least three retention agreements between

Coscia and the Oxman Firm. The first was for handling the criminal prosecution, with another of

the Oxman Firm clients, Weil or NYFD, agreeing to advance Coscia's fees. The Oxman Firm

next agreed to represent Coscia in his civil action against the Debtor and Bryan Orser; this was

on a contingency basis, according to the Oxman Firm, (Penachio Aff. at    ¶¶ 24 and 45(c) and

Exh. T). Finally, according to the Oxman Firm, that arrangement was altered, and the Oxman

Firm agreed to handle Coscia's interests in this Bankruptcy on an hourly basis, with the payment

of fees "fronted" by Weil and the fees to be paid from the proceeds of Coscia's judgment against

the Debtor and Orser. (*Ibid.*)

None of the mandated retainer-agreements has been produced

### New York has rules when a third-party pays for another's attorney's fees

A lawyer may receive her fees from a third-party. *See* N.Y.S. Bar Ass'n Ethics Op. 1000

(March 28, 2014) (available at http://www.nysba.org/CustomTemplates/Content.aspx?id=48086

(last viewed on February 11, 2017) (Penachio Aff. at Exh. RR). Such an arrangement requires, in

---

[8] On February 23, 2017, the Kraut Firm produced copies of NYFD's retainer agreements. Although it has one dated October 11, 2011, i.e., a week after Coscia's Undertaking, (Penachio Aff. at Exh. F), with the Kraut Firm. No agreements were produced for the Oxman Firm or Carlos Cuevas, another attorney being paid by NYFD.

this case, that Coscia have given his "informed consent" to it and that the third-party be aware, in

this case, that Coscia is the client to whom the lawyer's obligations extend.

New York requires such a writing:

> an attorney who undertakes to represent a client and enters into an arrangement
> for, charges or collects any fee from a client shall provide to the client a written
> letter of engagement before commencing the representation, or within a
> reasonable time thereafter (i) if otherwise impracticable or (ii) if the scope of
> services to be provided cannot be determined at the time of the commencement of
> representation. For purposes of this rule, where an entity (such as an insurance
> carrier) engages an attorney to represent a third party, the term "client" shall mean
> the entity that engages the attorney. Where there is a significant change in the
> scope of services or the fee to be charged, an updated letter of engagement shall
> be provided to the client.

Part 1215 to Title 22 of the Official Compilations of Codes, Rules and Regulations of the State

of New York.

### 3. The Creditors' Committee Violated Rule 2019

The Creditors' Committee did file a Rule 2019 Statement early on in the case. (Exh. L.)[9]

It did not, however, supplement it as things were learned about some of its members.

In describing Coscia's "Disclosable Economic Interest" as of July 16, 2015, the Commit-

tee's 2019 said:

> Unsecured claim of no less than $4,221,549.32 arising primarily from a
> judgment entered on June 13, 2014 in the Supreme Court of the State of New
> York, County of Westchester.

(Committee 2019 Statement (Penachio Aff. at Exhibit L (Exhibit "A" thereto)).)

As the 2011 Advisory Committee noted, "Disclosable Economic Interest" "is intended to

be sufficiently broad to cover any economic interest that could affect the legal and strategic posi-

---

[9] Because of the importance of being precisely when assigning responsibility, we note that
the 2019 Statement was filed by Otterbourg but it was for the Creditor's Committee, (Exh. L
(page 1).)

tions a stakeholder takes." *Quoted supra at* 18. Who is paying Coscia's fees and the extent to which it is his co-member Weil (through JMM Fuelco) are such covered interest.

In paragraph 3 of the Committee's Rule 2019 Statement, Otterbourg says that it made no independent investigation concerning the accuracy of Coscia's (or the other Committee members') claim, that the "claim amounts . . . have been provided by the applicable Committee members and by filing this Verified Statement, the Committee makes no representations regarding the amount, allowance or priority of such claims and reserves all rights with respect thereto." (¶ 3, Committee 2019 Statement (Penachio Aff. at Exh. L).)

Whether Otterbourg should have undertaken an investigation as to the accuracy of Exhibit A to the 2019 Statement is beside the point because by April 28, 2016 it was on notice that such an investigation was in order – although instead of conducting one it simply endorsed what the Oxman Firm said. (Penachio Aff. at Exh. W (commenting on Oxman April Letter, (Exh. V)).) Worse, Ms. Cyganowski wrote that day, "as noted in the letter submitted by Mr. Coscia's counsel, the agreement between Mr. Coscia and New York Fuel Distributors, LLC is public and has been known to both Orser and the Debtor for years." (Penachio Aff. at ¶ 50(b) and Exh. W at 4)

This is worse because she says that she knew that <u>someone</u> was advancing Coscia's attorney's fees in the Bankruptcy and that that someone was (according to Mr. Oxman statement in his April 28 letter) a company in which the Debtor had an interest and Otterbourg did not then and there update the Committee's 2019 Statement to disclose that interest.

What to do about the Committee's failure on the Rule 2019 front, of course, is almost academic given that the foregoing establishes that it is, and since its inception has been, fatally compromised.

### 4. Otterbourg Violated Rule 2019

#### (a) Otterbourg Knew the NYFD was Paying Coscia's Fees and was aware of the "Covenant Not to Sue" Made by Coscia but failed to disclose it even when pressed to do so

Otterbourg did not file a Rule 2019 statement for itself *qua* attorneys for the Creditors' Committee.

Otterbourg "represents," as defined by Rule 2019(a)(2), "multiple creditors . . . that are (A) acting in concert to advance their common interests, and (B) not composed entirely of affiliates or insiders of one another," Rule 2019(b)(1). Hence it was required to file "a verified statement setting forth the information specified in subdivision (c)." *Ibid.*

Still, while it did not file the document designed to put all on notice of any possible conflicts or tensions among a group being represented, it was not silent on those same issues. On several occasions it threw its lot in with Coscia on the who-is-paying issue, *e.g.*, its April 28, 2016 letter to UST Schwartzberg, (Exh. W), and in its representations to the Court on February 7, ((Penachio Aff. at Exh. NN Feb. 7, 2017 Tr. at 19-20)). It also took a substantive position that was directly at odds with the interests of the Committee, but in the interest of Weil, when the Debtor moved for summary judgment on the percentage-ownership issue. (Apr. 6, 2016 letter to Judge Drain (Penachio Aff. at Exh. Q).)

"[E]state compensated professional," such as counsel for the Committee, who do not work to enhance the value of the Estate "are not doing their jobs." *In re Bayou Group, LLC*, 431 B.R. 549, 562 (Bankr. S.D.N.Y. 2010) (Drain, J.) (creditor may be entitled to compensation under section 503(b) as an administrative expense when it "directly led to materially enhanced bids for estate assets," (citing *In re Baldwin-United Corp.*, 79 B.R. 321, 344 (Bankr. S.D. Ohio 1987))).

Otterbourg's failure to file a Rule 2019 Statement for itself as counsel representing multiple interested parties was a violation of that Rule. It had a duty to do so. It did not. Under Otterbourg's own version of the facts, in the face of multiple inconsistent statements regarding the payment of Coscia's fees, it made no attempt to investigate, even when pressed by the undersigned.

**(1) Richard Haddad evades the Court's question about his knowledge of the payment arrangements, choosing to rely on the false statements filed by the Oxman Firm**

On February 7, the Court inquired as to what the Committee and its lawyers knew about payments that had been made by NYFD for Coscia's lawyers.

> If some third party, not even an outside third party, but an entity in which the debtor owns an interest is paying the fees. That was a shocker to me. A true shocker. Did you know about that, Mr. Haddad? That the entity that was the subject of the litigation over the ownership interest was paying committee members fees?
>
> MR. HADDAD: I believe that was disclosed in –
>
> THE COURT: Not in the quotes that were in the responsive pleadings.
>
> MR. HADDAD: Actually, I thought it was disclosed in the responsive pleadings but I believe it was disclosed in April.
>
> THE COURT: By the debtors, not by the responsive pleadings by any of the parties.
>
> MR. HADDAD: No, no, Your Honor. It was disclosed by the Oxman Firm in two respects back almost a year ago in the letter to Mr. Schwartzberg and also in a pleading filed in this court with respect to the 2004 application early last year. So we read that, we saw that it was disclosed. It was known, it was certainly known, and the debtor admits that payments were known to them [sic] prior to the bankruptcy but then during the bankruptcy.
>
> THE COURT: No, I'm talking about payments by the entity that the debtor owns an interest in. There was clearly disclosure that quote Mr. Silverman was paying, or Mr. Weil was paying Mr. Coscia's fees. But –
>
> MS. PENACHIO: It was Mr. Weil, not NYFD, the debtor's company.

MR. HADDAD: No, that's just not what the document says.

MS. [ROSEN][10]: Your Honor, in the letter to Mr. Schwartzberg dated April 28, 2016, the last sentence of the paragraph that Ms. Penachio was quoting from says NYFD is continuing to advance payment for Mr. Coscia's legal fees in this proceeding. So it was disclosed.

(Feb. 7, 2017 Tr. at 19-20 (Penachio Aff. Exh. NN) (footnote added).)

Based upon its own representation to the Court, then, Otterbourg <u>knew</u> two mutually-exclusive things concerning who was paying the fees for one of the two members of the Committee. NYFD was paying. (April Oxman Letter (Penachio Aff at Exh. V).) Weil was paying. (Penachio Aff. at Exh. T 9the 2004 Objection).) Otterbourg made no effort to determine which was true. Was Coscia beholden to Weil? Was he beholden to NYFD?

When the undersigned said during that hearing, "It was Mr. Weil, not NYFD, the debtor's company," Mr. Haddad jumped in with misplaced certainty (or perhaps misplaced loyalty), "No, that's just not what the document says," it being unclear yet again which of the two documents is "the document" to which Mr. Haddad was referring. One said "Weil." The other said "NYFD." (Penachio Aff. at ¶ 73 at Ex. NN at 19-20).

Mr. Haddad did not answer the Court's question, "Did you know about that, Mr. Haddad?" He evaded and stood with the Oxman Firm's February 6 Reply Statement, (Exh. MM) (proffering argument, to a large extent reiterated in the Oxman 2019 Statement, that NYFD's obligation to pay and actual payment was disclosed in April 2016)), for his evasion. He was simply following the Oxman Firm's lead notwithstanding his supposed, and required, independence.

---

[10] Although the transcript says "Ms. Penachio," as noted in the Penachio Affirmation, it appears that Lois Rosen of the Oxman Firm was speaking. (¶   , Penachio Aff.)

**In April 2016, Otterbourg was told two different and incompatible things by the Oxman Firm. It neglected to investigate this red flag and, perhaps worse, given the opportunity, refused to admit its error.**

The Debtor's Petition was filed on June 18, 2015 and the Committee formed, with Coscia as a member, on July 16, with Otterbourg as its counsel. (Creditors' Committee Rule 2019 Statement (Aug. 26, 2015) (Penachio Aff. at Exh. L).) Coscia, as Mr. Oxman says, is a "person of modest means." (Penachio Aff. at Exh. OO ¶ 2, Oxman 2019 St.).  Evidently, no inquiry was made as to how such a person could be paying his lawyer, particularly in light of the fact that as a member of the Committee Coscia would incur fees well above what a passive creditor would. It is obvious that no inquiry was made because had one been made Mr. Haddad would have said so on February 7.

According to Mr. Haddad, Otterbourg learned that someone else was paying Coscia's fees on about April 15, 2016, when the Oxman Firm filed Coscia's 2004 Objection, (Penachio Aff. at Exh. T), nine months after the Committee was formed. "[W]e read that, we saw that it was disclosed." What was disclosed was that at some unspecified date after the Debtor's bankruptcy filing, it was agreed that "Weil would front the money for the legal fees." (Penachio Aff. at ¶ 73 and Exh. NN at 19-20)

Then came the second document, the April 28 Oxman Letter, it said "NYFD is continuing to advance payment for Mr. Coscia's legal fees in this proceeding." (Penachio Aff. at Exh. V, at 2.) Otterbourg endorsed this statement in its own April 28 letter to Mr. Schwartzberg notwithstanding Mr. Oxman's own contradictions from the April 15 2004 Objection, with Ms. Cyganowski saying "as noted in the letter submitted by Mr. Coscia's counsel, the agreement between Mr. Coscia and New York Fuel Distributors, LLC is public and has been known to both

Orser and the Debtor for years." (Otterbourg Apr. 28, 2016 letter, at 2 (Penachio Aff. at Exh. W).)

Similarly, on February 7 of this year, when Mr. Haddad pointed the Court to both the April 15 2004 Objection and the April 28 Oxman Letter yet said it was "NYFD" that advancing Coscia's fees he was simply adopting what the Oxman Firm's position and, as Ms. Cyganowski had done earlier, deigning to make any inquiries or express any concern.

Given the opportunity to clear things up by February 10, incapable even then of making an inquiry if only to make sure of its position, Otterbourg was silent, speaking, as they say, volumes. Has no one at Otterbourg then or since picked up the phone, called Mr. Oxman, and said, "Marc, let's just clear up this confusion. Could you email us a copy of your retainer concerning your firm's representation of Brent Coscia in this Bankruptcy?" Disappointingly, no one from Otterbourg has reached out to the undersigned and said: "We want to clear things up. Thanks for highlighting the issues." [11]

There is, perhaps, some virtue in consistency. Here, Otterbourg has consistently fallen into line with the Oxman Firm and displayed a consistent lack of independence. What is surely significant, though, is that it and the manner in which various counsel have handled it reveal, at best, a cavalier approach to the truth by professionals and, at worst, a complete disregard for the integrity of the Court and its processes.

Tellingly, at a crucial moment in this Proceeding, when the Debtor sought the Court's ruling that the Debtors owned 50% of the NY Companies as a matter of law, the Committee appeared and professed its neutrality and suggested the Debtor was acting prematurely. (April 6,

---

[11] No one has contacted the undersigned or the Debtor regarding this issue,

2016 letter to Judge Drain (Penachio Aff. at Exh. Q).) Yet for reasons that on their face are

unfathomable, the Committee volunteered that if this Court should consider the issue it should

conclude that the Debtor's interest were 1/6 of what the Debtor contended – and the Court would

find – they were. (*Ibid*, at 1 (also noting that she was "at a loss to understand how it could be

decided on a motion for summary judgment").) Why would counsel advocate a position directly

at odds with its client's interest?

When one realizes that two-thirds of the Committee at the time (and 100% of it now)

were Coscia and Weil (through JMM) and that Weil had bigger fish to fry – the smaller the

Debtor's interests the larger would be his own – then and only then does it make sense why it

was so important to certain people that "Weil" no longer be treated as the gentlemanly advancer

of Coscia's fees.

Here, the "dog didn't bark," to use Holmes's phrase, because Coscia was inextricably

intertwined with Weil, and Coscia had every reason to subordinate his own interest as creditor,

and that of his fellow unsecured creditors (other than those who are effectively Weil) to the

greater interest of Weil especially given the promise by Coscia not to sue the NY Companies and

its investors (including Weil) for his injuries.

### 5. The Appropriate Sanctions for the Rule 2019 Violations

Rule 2019(e)

(e) DETERMINATION OF FAILURE TO COMPLY; SANCTIONS.

(1) On motion of any party in interest, or on its own motion, the court
may determine whether there has been a failure to comply with any provision
of this rule.

(2) If the court finds such a failure to comply, it may:

(A) refuse to permit the entity, group, or committee to be heard or to
intervene in the case;

(B) hold invalid any authority, acceptance, rejection, or objection given, procured, or received by the entity, group, or committee; or

(C) grant other appropriate relief.

In light of the foregoing, the Debtor believes that the following are appropriate sanctions for these violations:

A. The disallowance of Coscia's claim.

B. The disqualification of the Oxman Firm.

C. The removal of Coscia from the Committee based upon his fraudulent representations and non-disclosures.

D. The prohibition of any right of Coscia and JMM and NYFD to vote on a Plan of Reorganization.

E. The payment by Coscia, the Oxman Firm, and Otterbourg of fees incurred by Debtor's Counsel including time expended investigating the Committee and the relationships among Weil, Coscia, and NYFD and fees incurred during the First Mediation and Second Mediation, which were negatively impacted by the disclosure failures.

F. The grant of such other and further relief as may be just and proper.

### III. Sanctions under Section 105 of the Bankruptcy Code

#### 1. The Court Should Award the Debtor Relief Pursuant to Section 105 of the Code

The Oxman Firm, Otterbourg, and the Creditors' Firm have failed to comply with their obligations under Rule 2019. Coscia has perjured himself. As to the Rule 2019 violations, in addition to the relief provided by that rule itself, the Court may, and should, award the Debtor the attorney's fees he has been compelled to incur as a result of these violations, as permitted by section 105(a) of the Code.

Section 105(a) reads:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

"A Bankruptcy Court can only exercise its equitable powers within the confines of the Bankruptcy Code, and § 105(a) does not create substantive rights." *In re Bernard L. Madoff Investment Secs. LLC*, 515 B.R. 117, 157 (Bankr. S.D.N.Y. 2014) (Bernstein, J.). Nor does section 105(a) allow a bankruptcy court exercise its equitable powers in a way that conflicts with other aspects of the Code. *Law v. Siegel*, 134 S. Ct. 1188, 1195 (2014).

In other words, section 105(a) complements other aspects of the Code and provides the Court with the practical means of protecting the interests of those other aspects of the Code. It should apply in this situation.

At the least, Otterbourg, the Oxman Firm, and Coscia should be required to pay the Debtor's attorneys' fees incurred in having to make this motion. *See Grand Street Realty, LLC, v. McCord*, 2005 WL 2436214, at *4-7 (E.D.N.Y. Sept. 30, 2005) (Amon, J.) (after determining that such an award was available under Section 105(a), affirming award of attorney's fees by Judge Stong when a party's bad faith forced the trustee to incur otherwise-unnecessary fees).

In *In re Bambi*, Chief Judge Morris addressed a lender's conduct during a court-ordered loss-mitigation process. That process, which Judge Morris noted was characterized by this Court in Congressional testimony as being "'consistent with Congress and the federal courts' general encouragement of mediation, as well as with section 105(d) of the Bankruptcy Code, Bankruptcy Rules 7016 and 9014, and courts' inherent power to manage their own docket[s],'" 492 B.R. 183, 188 (Bankr. S.D.N.Y. 2013) (Morris, C.J.) (quoting Hearing Testimony of Hon. Robert D. Drain,

"Foreclosure Mediation Programs: Can Bankruptcy Courts Limit Homeowners and Investors Losses?," United States [Senate] Committee on the Judiciary (Feb. 1, 2011)[12]).

In *In re Bambi*, a lender (Hudson City Savings) participated in the loss-mitigation process for nearly eight months before it told the Debtors and the Court that it "did not modify loans." This, the Chief Judge concluded, showed that Hudson City "failed to participate in good faith throughout this Loss Mitigation." *Id.*, at 189. This and other conduct amounted to bad faith on the part of Hudson City. Invoking the "the bankruptcy courts' 'inherent power to supervise and control its own proceedings and to sanction counsel or a litigant for bad-faith conduct or for disobeying the court's orders,'" *id.*, at 190 (quoting *Mickle v. Morin*, 297 F.3d 114, 125 (2d Cir. 2002)), the bank was ordered to pay the attorney's fees that the debtors incurred in addressing a lost-mitigation process that proved to be illusory, and was known by Hudson City to be illusory from day 1.

Thus while a bankruptcy court's "inherent power" is, as Judge Amon observed in *Grand Street*, "expressed through 11 U.S.C. § 105(a)," 2005 WL 2436214, at *3, and such power must be tethered to some requirement of the Code, the conduct here easily passes muster.

## CONCLUSION

The Oxman 2019 Statement ends on conciliatory notes. "[I]f the Court believes that a fuller explanation is required as to any of the information presented, we stand ready to provide it." (¶ 27, Oxman 2019 St. (Penachio Aff. at Exh. T).) "[S]hould the Court determine that Coscia is in some way tainted because he is being represented by Oxman Law, we will promptly withdraw as counsel. At all times, it was our intention to represent Coscia's interests in this

---

[12] The full hearing-testimony is available at: https://www.gpo.gov/fdsys/pkg/CHRG-112shrg67389/pdf/CHRG-112shrg67389.pdf

proceeding independently, fairly and without compromise. We have worked consistently to advance his interests and no one else's." (¶ 28, *ibid.*) Alluring as paragraphs 27, 28, and 29 might seem, they do not change the twenty-six paragraphs that precede them and the misdirections and lies with which those twenty-six paragraphs are riddled.

The Court made it clear that the February 10 deadline was the last shot that the various professionals had to get it right, and they wasted their shot. For its part, the Oxman Firm repeated the demonstrably false statements about Coscia, Weil, and NYFD. (ie who paid the fee) and concealed the 'covenant not to sue." It failed to produce any of the at least three relevant retainer-agreements. (*See supra* at 23.)

As to Otterbourg, instead of giving pause when the Debtor's counsel accurately characterized what the Oxman Firm said as inaccurate and examining (or re-examining) the materials before it, as was done in these papers, it continues its misplaced reliance on the Oxman Firm.

Finally, Coscia. He submitted a declaration purportedly to back-up the statements made by his counsel yet in so doing he established in his short declaration that his sworn testimony was incorrect in two material respects, i.e., who had advanced his bills (Weil or NYFD) and why (as a matter of principle (by Weil) or as a matter of consideration (by NYFD).

For the reasons set forth herein and in the Penachio Affirmation, the relief requested should be granted.[13]

Dated: White Plains, NY
　　　　March 3, 2017

PENACHIO MALARA LLP


By: _____Anne Penachio_____
　　　　　Anne Penachio
Joseph P. Garland, Of Counsel
Counsel to the Debtor/Appellant
235 Main Street - Suite 600A
White Plains, NY 10601
(914) 946-2889
apenachio@pmlawllp.com

---

[13] The Debtor reserves his rights to challenge the appropriateness of the fact or the amount of professional fees at any future application.