Melanie L. Cyganowski
Richard G. Haddad
OTTERBOURG P.C.
230 Park Avenue
New York, New York 10169
Telephone: (212) 661-9100
Facsimile: (212) 682-6104

*Counsel to the Official Committee of
Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SAMMY ELJAMAL,<br><br>                    Debtor. | Chapter 11<br><br>Case No. 15-22872 (RDD) |

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF SAMMY ELJAMAL TO DEBTOR'S MOTION (I) FOR SANCTIONS FOR VIOLATIONS OF BANKRUPTCY RULE 2019 INCLUDING (i) THE DISALLOWANCE OF THE CLAIM OF BRENT COSCIA, (ii) THE PRECLUSION OF BRENT COSCIA FROM VOTING ON ANY PLAN OF REORGANIZATION, (iii) THE REMOVAL OF BRENT COSCIA FROM THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, (iv) THE IMPOSITION OF COSTS AND OTHER SANCTIONS ON BRENT COSCIA AND THE OXMAN LAW GROUP PLLC IN AN AMOUNT THAT THE COURT DEEMS FAIR AND JUST; (II) IN FURTHER SUPPORT OF THE MOTION OF CREDITOR MUSA ELJAMAL TO DISQUALIFY THE OXMAN LAW GROUP PLLC AS ATTORNEY FOR THE CREDITOR BRENT COSCIA; AND (III) FOR SUCH OTHER AND FURTHER RELIEF AS MAY BE JUST AND PROPER**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the above-captioned chapter 11 case of Sammy Eljamal (the "**Debtor**"), by its undersigned counsel, submits this Objection to the Debtor's Motion (I) For Sanctions for Violations of Bankruptcy Rule 2019 Including (i) the Disallowance of the Claim of Brent Coscia; (ii) the Preclusion of Brent Coscia from Voting on Any Plan of Reorganization; (iii) the Removal of Brent Coscia From the Official Committee of Unsecured Creditors; (iv) the Imposition of Costs and Other

Sanctions on Brent Coscia and the Oxman Law Group PLLC in an Amount that the Court Deems Fair and Just; (II) in Further Support of the Motion of Creditor Musa Eljamal to Disqualify the Oxman Law Group PLLC as Attorney for the Creditor Brent Coscia; and (III) for Such Other Relief as May be Just and Proper [Dkt. No. 463] (the "**Motion**"), and respectfully states as follows:

### PRELIMINARY STATEMENT

1. The Motion should be denied in its entirety because it is no more than a last ditch effort after receiving setbacks in his years-long attempt to avoid paying the legitimate claim of Mr. Brent Coscia, and is a blatant continuation of the Debtor's strategy to attack other parties-in-interest in order to avert the focus from his improper acts in the bankruptcy case. The Motion, which was filed on March 3, 2017, was filed shortly after (i) this Court's February 14, 2017 denial of the Debtor's motion seeking to sanction Mr. James Weil and Mr. Leon Silverman for allegedly violating the automatic stay and rejection of the Debtor's attempt to have this Court reinstate him as Manager of the NY Fuel Companies (defined below) and (ii) the Appellate Division, Second Department's February 21, 2017 denial of the Debtor's motion for a preference in the calendaring of his appeals from Mr. Coscia's civil judgment. This Debtor improperly and unabashedly seeks to obtain through a summary motion (without so much as an affidavit from a fact witness) that which he has been unable to obtain in six (6) years of litigation against Mr. Coscia – avoidance of the consequence of his own horrible conduct.

2. Just as the Debtor filed a false police report against Mr. Coscia after his attempt to fire Mr. Coscia[1] was stymied by the company's operating agreements (setting in motion the events that led to the judgment against him and then caused this bankruptcy case), or as the

---

[1] The Debtor's callous reference in his Disclosure Statement to Mr. Coscia as "collateral damage" is just evidence of the Debtor's lack of introspection and disconnection from reality, and further demonstrates his inability to act as a fiduciary for the benefit of his creditors [*see* Dkt. No. 505 at p. 15, Section 2.03(d)(i)].

2

Debtor sought the recusal of numerous state and federal judges following adverse decisions, the Motion is the Debtor's latest attempt to pivot the Court's attention to a collateral matter, in the hopes that he can malign and villainize every other party to this case and push through his patently unconfirmable plan (just filed this month), which is nothing more than a vehicle through which the Debtor can immunize his family, assets and entities, yet continue to force his creditors to litigate every dispute, for years on end, before this Court.  Indeed, we note that the Debtor is seeking to litigate these very same issues once again in the state court, having just sought to expand the scope of special counsel's retention to bring a CPLR 5015 collateral attack on the very same issues raised in this Motion.

3. The Motion focuses on two issues in its attack on Mr. Coscia:

   a. The fee arrangement in which NY Fuel Distributors, LLC ("**NYFD**"), an entity in which the Debtor has an interest, has agreed to advance the legal fees and expenses for Mr. Coscia, who was NYFD's employee at the time of the Debtor's attack on Mr. Coscia.  This fee arrangement has existed since 2011, and notwithstanding the Debtor's feigned recent discovery of this arrangement, the Debtor was in fact aware of its existence since at least 2014, *prior* to entry of the civil judgment against him; and

   b. The Debtor's allegation that in 2011 Mr. Coscia entered into a "covenant not to sue" NYFD, even though the statute of limitations on any claim for intentional torts expired long before this bankruptcy case was filed.

Neither issue advances the bankruptcy process; neither issue is properly the subject of a summary motion to disallow the single largest claim in this case; neither issue is supported by evidence; and neither issue should be pursued in this Court by this Debtor.  In fact, as the Office of the United States Trustee (the "**UST**") observed, this Motion just provides additional grounds for the appointment of a Chapter 11 Trustee [*see* Dkt. No. 543].

4. As the Committee predicted, the Chapter 11 Plan of Reorganization Proposed Jointly by the Debtor and Musa Eljamal and the accompanying Disclosure Statement [Dkt. Nos. 496, 499] filed earlier this month (21 months after the commencement of the bankruptcy case), proves that the Debtor's goal in this bankruptcy case was to accept all the protections afforded to him by the Bankruptcy Code, yet (i) continue to litigate all of his existing disputes and settling none; (ii) keep all of his assets; (iii) not pay his creditors – every claim is deemed disallowed – and (iv) immunize his family members and Centralized Management Services, Inc. ("**CMS**") (the entity through which most of his expenses are run, and which financials have not been disclosed via the bankruptcy process) from fraudulent-transfer and other actions. Now that the Court has set a disclosure statement hearing – which is fast approaching – the Debtor is again lashing out by accusing every party-in-interest – other than himself and his insiders – of foul play.

5. Although the Motion is primarily directed against Mr. Coscia and the Oxman Law Group, LLC (the "**Oxman Firm**"), and the Notice of Hearing does not contain any other requests for relief, buried in the Motion appear to be suggestions that the Court (i) reconstitute or disband the Committee (Affirmation of Anne Penachio (the "**Penachio Affirmation**" or "**Penachio Aff.**") [Dkt. No. 463] ¶ 93), (ii) preclude Otterbourg from receiving any further payment of fees (Penachio Aff. ¶¶ 88, 93) and (iii) direct Otterbourg to pay particular fees incurred by Debtor's counsel (Memo.[2] p. 32). Then, the Penachio Affirmation contains numerous threats, directed to the Committee, Otterbourg, and even the UST (*e.g.*, ¶ 99) suggesting further acts by the Debtor or his counsel if these entities continue doing their job. Because the Notice of Hearing does not present these other issues, and indeed the Debtor

---

[2] "Memo." or "Memorandum" shall refer to the Memorandum of Law filed in support of the Motion. [Dkt. No. 464.]

4

suggests that he may raise them at some other time, they are not properly before the Court. In any event, neither the Committee nor Otterbourg violated Rule 2019.

## FACTS AND PROCEDURAL HISTORY

6.  Instead of taking the opportunity for a fresh start in bankruptcy, the Debtor is instead using the Bankruptcy Court to rewrite history and relitigate issues that previously have been ignored by the Debtor, or raised with, and decided by, the various New York State Court justices who watched the Debtor's deceptive testimony and ruled against him.

7.  Although there is a great deal of relevant history between the Debtor and his creditors, immediately at issue here are the facts of the civil suit brought by Mr. Coscia against the Debtor and Mr. Bryan Orser in the Supreme Court of the State of New York, Westchester County. As the transcript for this trial is approximately 1,300 pages (not to mention records relating to the years of discovery and pre-trial hearings, motion practice and disputes), no party expects this Court to personally review all of these underlying documents. Rather, as in every case, this Court must rely on the representations of the parties to understand the relevant facts and issues, and the Debtor has taken advantage of this position time and time again. Here, the Debtor selectively attached portions of the civil trial transcript, apparently to deliberately misrepresent his (and that of his prior counsel's) knowledge concerning the payment by NYFD and its affiliated entities (the "**NY Fuel Companies**") of Mr. Coscia's litigation expenses. The only explanation for this selective recollection of facts previously known to the Debtor is that the Debtor is unfairly seeking to malign the Committee members and professionals to further derail this bankruptcy process.

> **A.   The Debtor Was Aware That the NY Fuel Companies Advanced Mr. Coscia's Legal Fees**

8. As evidenced by the Debtor's trial counsel's (Mr. Yovendra Mangal) own words, the Debtor knew of Mr. Coscia's fee arrangement since at least 2014. In his closing statement, Mr. Mangal advised the jury that:

> Mr. Coscia has not spent a dime to pay for his criminal defense. He has not spent a dime to bring this case before the great ladies and gentlemen of the jury here today. And we heard Mr. Weil is funding everything. **As a matter of fact, the bill that was paid for his criminal defense, Mr. El Jamal is still 50 percent owner of that company. So, I submit to you, ladies and gentlemen, Mr. El Jamal has a hand in paying Mr. Coscia's legal fees.**
> 
> * * *
> 
> In essence, Mr. Coscia knew exactly what he was doing. Cooperated with Mr. Weil, and he knew he would be here today suing Mr. El Jamal for more money, **even though Mr. El Jamal had a hand in paying his legal fees.**

*See* excerpt of May 13, 2014 trial transcript, attached as Exhibit 1, pp. 1192: 4-13 and 1193: 19-23 (emphasis added).[3] Mr. Mangal's summation was presumably based on (i) Mr. Coscia's testimony (*see* Penachio Aff. Exs. B & G); (ii) Mr. Weil's testimony[4]; and (iii) the invoices provided by the Oxman Firm, which expressly noted that payment came from the NY Fuel Companies, rather than Mr. Weil personally, (*e.g.*, trial exs. 40 & 49, attached to the Penachio

---

[3] While it is apparent from these closing statements that the Debtor clearly conflated Mr. Weil and the NY Fuel Companies (perhaps because at that time, as is the case now, Mr. Weil assets significant control over the companies, and made the unilateral decision to advance Mr. Coscia's fees from corporate funds), the Debtor cannot use his seemingly tactical lack of precision as "evidence" that he was ignorant as to the source of these funds.

[4] [Mr. Gioffre]  Q  Were you the one who ultimately gave authorization to cut the checks to pay [Oxman's legal fees]?
　　　　　　　　A  I did.
　　　　　　　　Q  And that was out of New York Fuel holdings; correct?
　　　　　　　　A  I believe they came out of New York Fuel holdings.
　　　　　　　　Q  And that company is a company in which Mr. El Jamal is also a owner of; correct?
　　　　　　　　A  Correct.
　　　　　　　　Q  So, essentially Mr. El Jamal was also paying Mr. Coscia's legal fees; correct?
　　　　　　　　A  Whatever percentage he owned of that company, he was paying that amount, correct.

*See* May 8, 2014 trial transcript, pp. 883: 21-884: 9, contained in Penachio Aff. Ex. G. *See also* Exhibit 1, May 8, 2014 trial transcript, pp. 898: 22-899: 12 (acknowledging that the NY Fuel Companies paid fees incurred by the Oxman Firm).

6

Affirmation as Ex. E) (along with any other documents or communications not publically available).

9.      Likewise, Mr. Orser's trial attorney, Mr. Bruno V. Gioffre, made the same point during his closing argument:

> Mr. Coscia has not incurred, by his own testimony, one dollar of legal expenses or costs.  **Those were paid by his employer.  By Mr. Weil.  You heard Mr. Weil say he had no problem with that bill.  He paid it.**  Now, they presented this promissory note, if you want to even call it.  It's not a promissory note.  It was a document with no notarization on it.  We don't know when it was created.  But it's our position it's a self-serving document to establish that Mr. Coscia is going to pay that back.  When is he going to pay it back?  He hasn't paid a dollar yet.  When is he planning on paying that back?  Because he's not going to pay it back.  He hasn't incurred legal or costs or expenses.
>
> * * *
>
> **Oh, in addition, you heard that it's from a company that paid these bills was a company that Mr. El Jamal was actually an owner of.  So, I think that draws into the question the whole issue of his legal defenses and his costs in terms of who it was paid by**.

*See* Exhibit 1, May 13, 2014 trial transcript, pp. 1181:8-22, 1181:24-1182:3 (emphasis added).

10.     To the extent that the Debtor *now* claims that Mr. Coscia's testimony was inconsistent with the actual state of affairs, such position is incredible.  The Debtor's trial attorney (and Mr. Orser's) *told the jury* that "Mr. El Jamal has a hand in paying Mr. Coscia's legal fees."  Mr. Coscia's testimony was clearly not confusing, misleading, or "opposing" to the facts: rather, it was clear to all parties, especially the Debtor, that the NY Fuel Companies were advancing Mr. Coscia's legal fees.

11.     Further, the Court was aware that Mr. Coscia was not paying his own fees (Penachio Aff. ¶ 73(a))[5], and, as noted above, relied on the parties to raise any concerns regarding the payment of fees, if any existed.  And, apparently, the fee arrangement was not a

---

[5] While the Penachio Affirmation includes the entirety of the Court's statement on this point, in an attempt to misrepresent Committee counsel's statement to the Court, the accompanying Memorandum crops this comment out of the quote (*see* Memo. p. 27).

7

problem for the Debtor – at least for the first 18 months of this case – made clear by the fact that the Debtor took no action to disqualify any committee member, sought no order concerning the advancement of fees by the NY Fuel Companies, and did not pursue the Rule 2004 motions filed with the Court over a year ago. In fact, despite the Oxman Firm plainly stating that "NYFD is continuing to advance payment for Mr. Coscia's legal fees in this proceeding" in the April 2016 letter to the UST (Penachio Aff. Ex. V), the Debtor took no action (because this was not new information). Only now, when the Debtor's back is against the wall, and he faces a Committee plan that accomplishes precisely what the Court suggested months ago (*i.e.*, compromise claims, settle litigations, value assets and pay creditors) did this become an "issue."

12. Moreover, the ninety-nine-paragraph Penachio Affirmation (which attaches forty-four exhibits) excludes the fact that Mr. Coscia submitted an affidavit dated September 13, 2016 to this Court [Dkt. No. 309] (and attached hereto as Exhibit 2) expressly stating that NYFD previously advanced payment for his legal fees: "As noted time and time again, I have never hidden the fact that New York Fuel Distributors advanced payment for legal and expert witness fees in the criminal trial against me." Exhibit 2, ¶ 6. In light of the Debtor's knowledge of this fee agreement since 2014, Mr. Coscia's prior affidavit, the Oxman Firm's April 2016 letter and other communications in this case, for the Debtor to claim that he did not learn that the NY Fuel Companies were paying Mr. Coscia's fees until late January 2017 (when they reviewed the companies' computer server) (Penachio Aff. ¶ 68(a)) is unbelievable.

8

**B.     The "Covenant Not to Sue" Outrage Was Constructed in a Last-Ditch Effort to Block the Committee's Plan**

13.     The Debtor's "covenant not to sue" argument is based entirely on Mr. Coscia's February 13, 2017 declaration, which stated:

> I told Jimmy [in 2011] that I could sue both NYFD and its investors for false arrest. I did not really want to do that though, since it was Sammy (not NYFD or its investors) who really had tried to hurt me. After some discussion, Jimmy asked whether I would agree not to sue NYFD if it would front my legal fees. . . . I consented to this arrangement, and agreed not to sue NYFD in exchange for the advance payment arrangement." (Penachio Aff. Ex. A, ¶¶ 3-4.)

14.     This statement is consistent with Mr. Coscia's September 13, 2016 affidavit (which was excluded from the Penachio Affirmation), the various letters submitted to the UST and previous representations made to this Court.

15.     Calling this conversation a "covenant not to sue" and claiming that there must exist a written agreement with specific "terms" and "provisions which affect the relations between the parties" (perhaps "in the nature of a 'Mary Carter Agreement'") (Memo. p. 9) does not make it so. Rather, it reflects that Mr. Coscia – who was in fact innocent of the false accusations leveled against him by the Debtor – was caught in the crossfire of the continuing dispute between the Debtor, Mr. Weil and other parties involved in the NY Fuel Companies, and Mr. Weil believed it appropriate that the NY Fuel Companies advance Mr. Coscia's resulting legal costs. There is nothing whatsoever untoward about Mr. Coscia agreeing to sue only the individuals involved in the attack against him (the Debtor and his *aide-de-camp* Bryan Orser) as opposed to NYFD.

16.     Although the Debtor now claims he will file a CPLR 5015 motion to overturn the civil judgment based on the purported covenant not to sue and fee arrangement, the State Court and the jury heard about the arrangement between Mr. Coscia, Mr. Weil, and the NY Fuel

Companies during the trial, yet still entered a nearly $5 million judgment against the Debtor. Running up more administrative costs and more collateral attacks is not justified. How much longer will the Debtor be permitted to delay the consequences of his actions against Mr. Coscia?

17.     Finally, even if, *arguendo*, the Debtor believed that Mr. Coscia may try to sue the NY Fuel Companies for the Debtor's tortious acts, the Debtor was put on notice years ago, when the statute of limitations for malicious prosecution, abuse of process and prima facie tort claims expired, that Mr. Coscia was not asserting claims against any entity other than the Debtor and Mr. Orser. *See* CPLR 215(3); *Benyo v. Sikorjak*, 50 A.D.3d 1074, 1077 (2d Dep't 2008); *Stacom v. Wunsch*, 173 A.D.2d 401, 401 (1st Dep't 1991). The time for the Debtor's false outrage expired along with those claims.

## DISCUSSION

### A.    The Debtor Is Not Entitled to Any Relief Against the Committee or Otterbourg Because The Debtor Failed to Provide Notice of Such Request

18.     In the Notice of Hearing, the Debtor requests relief with respect to sanctions solely against Mr. Coscia and the Oxman Firm. Specifically, the notice states that the Motion seeks "sanctions for violations of Bankruptcy Rule 2019 including (i) the disallowance of the claim of Brent Coscia ("Coscia"), (ii) the preclusion of Brent Coscia from voting on any plan of reorganization, (iii) the removal of Brent Coscia from the Official Committee of Unsecured Creditors, [and] (iv) the imposition of costs and other sanctions on Brent Coscia and the Oxman Law Group, PLLC ("Oxman") in an amount that the Court deems fair and just[.]" [Dkt. No. 463.]

19. However, buried in the papers supporting the Motion appears to be requests for relief against the Committee and Otterbourg:

  i. In ¶ 93(vi) of the Penachio Affirmation, there is a request that the Court "reconstitute the Committee or disband it";

  ii. In ¶ 88 of the Penachio Affirmation, Ms. Penachio suggests that "[t]he failure of Otterbourg to investigate the relationship among Coscia, Weil, and the Oxman Firm, and its failure to disclose that Coscia, its chair, had an 'agreement not to sue' the NY Companies constitutes ground for sanctions as deemed appropriate by the Court including its removal and/or the disallowance of its fees";

  iii. In ¶ 93(vi) of the Penachio Affirmation, there is a request that the Court "preclude Otterbourg from receiving any further payment from the Debtor's Estate including any holdback or accrued fees"; and

  iv. On page 32 of the Memo, the Debtor requests "[t]he payment by . . . Otterbourg of fees incurred by Debtor's Counsel . . . ."

Of course, it is unclear whether these are actually requests for relief in *this* Motion, or just simply a threat of future action, as the Penachio Affirmation also warns Otterbourg to act in a different manner to "avoid the expenses, distractions and unpleasantries that inevitably will occur *in the event* that the Debtor is required to seek the appropriate relief from the Court." (¶ 97) (emphasis added). Further, the requested relief contained in paragraph 88 does not even appear to be premised on an alleged violation of Rule 2019.

20. It is well-settled that a party cannot obtain relief if it does not provide appropriate notice of the request. "The court does not look favorably upon [the] practice" of counsel burying requests for relief in papers other than a notice of motion (or hearing), as "[w]ithout a notice of motion, both the court and opposing counsel are left to speculate as to the exact nature and scope of relief which a party is seeking." *Fox v. Board of Trustees of State Univ. of New York*, 148 F.R.D. 474, 481 n.16 (N.D.N.Y. 1993), *aff'd*, 42 F.3d 135 (2d Cir. 1994); *Berns v. EMI Music Publ'g, Inc.,* No. 95 Civ. 8130(KTD), 1999 WL 1029711, at *10 (S.D.N.Y. Nov. 12,

11

1999) (noting that "[i]f the relief is not requested by the notice of motion, then the movant does not get that relief" and rejecting application for sanctions raised only in the movant's affidavit); *Morris v. Bus. Concepts, Inc.*, No. 99 Civ. 59 (RCC), 2001 WL 1338907, *3 n.2 (S.D.N.Y. Oct. 31, 2001) (noting that even if party could demonstrate entitlement to relief, it should not be awarded "because they failed to request that relief in their notice of motion"); *see also* S.D.N.Y. Local Civil Rule 7.1(a)(1) ("Except for letter-motions . . . or as otherwise permitted by the Court, all motions shall include the following motion papers:  A notice of motion . . . which shall specify the applicable rules or statutes pursuant to which the motion is brought, and shall specify the relief sought by the motion").

21. While the Penachio Affirmation also contains another threat directed at Otterbourg – and the UST – in stating that under the Debtor's plan "an administrator will be appointed with powers to investigate the Committee and the fees paid, and report to the Inspector General of the United States Department of Justice and/or any other supervisory department or agency regarding the conduct [of] the Committee in the case and the procedures and policies of the UST" (¶ 99), the Debtor's recently-filed plan [Dkt. No. 496] does not provide for an administrator. Instead, under his plan, the Debtor would retain full control over his assets and current and potential litigation – apparently the Debtor chose to dispose with any sort of oversight of his actions.

    **B.**    **There is No Basis for Relief Against the Committee**

22. As acknowledged by the Debtor, Otterbourg filed a Rule 2019 statement on behalf of the Committee on August 26, 2015 (Motion Ex. L). Notably, the disclosure requirements for official committees differ from those of other groups, such as *ad hoc* committees, that are subject to Rule 2019. By the plain terms of Rule 2019, an *official*

12

Committee appointed by the UST pursuant to Section 1102 of the Bankruptcy Code must comply with Rule 2019(b), (c)(2)(A) & (B), (c)(4) and (d).  *See* Operating as Chapter 11 Debtor in Possession (DIP), Rutter Group Prac. Guide Bankruptcy (Nat. Ed.) Ch. 11-B ("Official creditors' committees are subject to some, but not all, of the FRBP 2019 disclosure requirements.").

23.    "Official committees are required to disclose only the name and address of each member of the committee and the nature and amount of all disclosable economic interests in the debtor as of the date the committee was formed."  Verified Statement Regarding Creditors and Equity Security Holders in Chapter 9 and Chapter 11 Cases, Bankr. Proc. Manual § 2019:1 (2017 ed.) ("Because official committees appointed under section 1102 of the Code are otherwise subject to the control of the court, the[re] are limits on the application of Rule 2019 to these committees.").  The Committee made such disclosures.  The Committee is required to disclose, for each Committee member, the economic interest that the creditor *has in the Debtor*.  *Id.* (defining "disclosable economic interest" as including "not only claims against a debtor and its equity interests but also derivatives and other rights that are 'affected by the value, acquisition or disposition of a claim or interest.'  The definition of 'claim' under the Bankruptcy Code, 11 U.S.C.A. § 101(5), is extremely broad, so disclosable economic interests would include those tied to unliquidated, contingent, unmatured or disputed claims as well as equitable remedies, if they trigger a right of payment.")  While it was known to the Debtor that Mr. Coscia's fees were being advanced by the NY Fuel Companies, this is not an economic interest that Mr. Coscia had in the Debtor that was required to have been included in the Committee's Rule 2019 statement.  Mr. Coscia's economic interest in the Debtor is the same regardless of the source of payment of his legal fees.

13

24. For all of its bluster, the Motion fails to cite any authority (*see* Memo. pp. 24-25) suggesting that Mr. Coscia's fee arrangement qualifies as the type of "disclosable economic interest" that should be listed in a Committee Rule 2019 statement, especially in light of the fact that it was a secret to no one.

25. Separately, the Debtor claims that the Committee's "position" regarding the Debtor's interest in the NY Fuel Companies "was influenced by Coscia's newly revealed 'covenant not to sue'" (Memo. pp. 13-14). The Debtor fails to logically explain how, even if Mr. Coscia did enter into an enforceable agreement not to sue the NY Fuel Companies for the same causes of action brought against the Debtor (malicious prosecution, abuse of process, prima facie tort and interference with property), such an agreement would impact litigation concerning the interpretation of an operating agreement (to which Mr. Coscia is not a party), or the treatment of claims held by entities other than the NY Fuel Companies. What is more clear is that this is simply another example of the Debtor and his counsel conflating different issues to support their specious claims against the Committee. Contrary to the Debtor's misrepresentations, the Committee's plan compromises a number of claims filed by entities associated with Mr. Weil (and disallows others in their entirety).

26. Finally, a court has no power to disband or reconstitute a committee appointed by the UST for the reasons (vaguely) outlined by the Debtor. "[T]he court's role in the committee formation process is expressly limited," and while a bankruptcy court can order the appointment of additional committees under limited circumstances, or reconstitution "if the court determines that the change is necessary to ensure adequate representation of creditors or equity security holders" (11 U.S.C. § 1102(a)(4)), "Section 1102 is silent as to this Court having power to order a committee to be disbanded, rather than reconstituted to ensure adequate representation." *See In*

14

re JNL Funding Corp., 438 B.R. 356, 361 (Bankr. E.D.N.Y. 2010); see also In re Caesars Entertainment Operating Co., Inc., 526 B.R. 265, 269 (Bankr. N.D. Ill. 2015) (noting that Section 105(a) does not provide a bankruptcy court with power to disband a committee appointed by the UST).

27.    The UST has already declined a request to reconstitute or disband the Committee. If the Court were to review the UST's decision to not reconstitute the Committee, it would have to find that the UST acted in an arbitrary or capricious manner, particularly, that it "relied on factors which Congress has not intended it to consider in appointing members to a committee." In re JNL Funding Corp., 438 B.R. at 363. It is clear that, at this critical juncture in the case (either proceeding towards confirmation of a plan or the appointment of a trustee), the Debtor has made the Motion in the hopes to obtain some tactical advantage. No legitimate purpose would be served by making, and granting, the Motion. Although the Debtor would prefer to run his voluntary Chapter 11 case without a Committee, and continue his years-long attack on his creditors in and out of this Court without Committee participation or oversight, his wish is simply not supported by the Bankruptcy Code.

    **C.**    **There is No Basis for Relief Against Otterbourg**

        ***Otterbourg Did Not Violate Rule 2019***

28.    In the Motion (Penachio Aff. ¶ 80, Memo. p. 26), the Debtor suggests that Otterbourg was required, as Committee counsel, to file a Rule 2019 statement. Otterbourg had no such obligation.

29.    As counsel to an official committee of unsecured creditors (appointed by the UST pursuant to Section 1102 of the Bankruptcy Code), Otterbourg's disclosure obligations are laid out in Section 1103 of the Bankruptcy Code and Bankruptcy Rule 2014. It is undisputed that

15

Otterbourg complied with these obligations. It is clear that the Debtor, or at the least, his bankruptcy counsel, is aware of the relevant rules surrounding committee professionals, as the Debtor did not file an objection seeking an (unnecessary) Rule 2019 statement in connection with the application to retain Otterbourg as Committee counsel, and did not make such an objection with respect to any of Otterbourg's applications for compensation.

30. The fact that the Debtor fails to cite a *single case* holding that counsel to an official committee of unsecured creditors is required to file a separate Rule 2019 statement (*see* Memo. pp. 18, 26-27) evidences that again, the Debtor and his counsel have devolved into throwing legally (and factually) baseless allegations, and hoping something sticks.

### *Response to Various Attacks on Otterbourg*

31. Finally, a brief response to some of the most inappropriate attacks made against Otterbourg in the ninety-nine-paragraph Penachio Affirmation and thirty-five-page Memorandum is warranted.

32. The Penachio Affirmation asserts that the "Committee professionals . . . knew, or but for want of the slightest inquiry would have known, about the tangled relationship among Coscia, Weil and the NY Companies but failed to disclose it" (¶ 10), "had a lapse in judgment when they turned a 'blind eye' to Coscia's relationship with the NY Companies, the Oxman Firm, and Weil and failed to disclose the existence of Coscia's 'covenant not to sue'" . . . It is troubling that the Committee professionals thwarted the Debtor's investigation into the matter" (¶ 11), and specifically as to Ms. Cyganowski, described her as and "someone who was willing to turn a 'blind eye' to it lest her sinecure be endangered" (¶ 50(v)). These are exactly the type of inappropriate, irresponsible comments and conduct that has necessitated sideshows in this case, distracting from actual resolution of the bankruptcy case, and resulting in such high

administrative fees. Although it should go without saying, Otterbourg, and particularly Ms. Cyganowski, the former U.S. Chief Bankruptcy Judge for the Eastern District of New York (and, as Ms. Penachio notes, a legal ethics professor), is aware of, and complies with, its ethical obligations.

33. The Debtor's unsubstantiated allegations are, as before, premised on the conflation of various, distinct issues, in an attempt to distract the Court at the eleventh hour. For example, the Debtor takes the fact that in April 2016, Otterbourg was aware (as was every other party) that Mr. Coscia's legal expenses were being advanced by the NY Fuel Companies, with an allegation that Otterbourg was aware of the existence of a "covenant not to sue" in late 2016 (which is false), and acted to hide this fact in advance of mediation (which is also false), supposedly in an attempt to run up fees (which, also, is false). It should also go without saying that this case is no cake walk (made apparent from the matter presently at issue), and Otterbourg, unlike the Debtor and his stable of counsel, has made every effort to settle this case via a consensual plan, failing which, a plan that achieves the laudable goals of Chapter 11 – valuation of assets, compromise and payment of claims, settlement of litigation, and a fresh start for the Debtor. Unfortunately, it appears that the Debtor prefers a life of litigation, which has resulted in dueling disclosure statements next month and a bevy of sideshows, threats and collateral attacks through this case with express promises of more to come.

34. Between the endless rhetorical questions and imagined conversations offered in the Penachio Affirmation, the Debtor ignores the fact that as Committee counsel, Otterbourg has had numerous communications with Mr. Coscia, his attorneys and the Committee at large to which the Debtor is not privy. Otterbourg has seen no indication that Mr. Coscia is conflicted from performing his fiduciary duties as a Committee member, and is satisfied that Mr. Coscia

has acted appropriately throughout this case. As experienced committee counsel, Otterbourg is not in the practice of requiring "no conflict" affidavits from its committee members (and is unaware of precedent for such treatment in the committee context). And here, as reflected in the Committee Plan, in which there is a review and a number of compromises of the Committee members' and their affiliates' claims, each member of the Committee is honoring his or its obligation of faithfully acting in the interests of the estate and an exit from Chapter 11.

35.    In addition, the Debtor laments the case that could have been settled if the Committee supported the Debtor's position regarding his ownership of the NY Fuel Companies (Penachio Aff. ¶ 92). Contrary to the Debtor's suppositions, while, in a letter written nine months after the commencement of the case, the Committee suggested that a summary judgment decision was not necessary in light of Committee's proposed resolution concerning the NY Fuel Companies (in its plan) the Committee did not involve itself in that adversary proceeding. Regardless of the Committee's position (or lack thereof) regarding ownership of the NY Fuel Companies, absent a resolution via a plan, this dispute will likely not be resolved anytime soon. The NY Fuel Companies have appealed this Court's summary judgment decision, and it is expected that absent a final resolution of the case via the plan process, whichever party is unsuccessful in the District Court will appeal that decision. Nonetheless, as the Debtor knows and as the Committee has advised this Court, the Committee has taken the position in every plan (including the current plan) and every settlement meeting and proposal that the Debtor's interest in the NY Fuel Companies is 50% (less 10% of such distributions per Exhibit E to the operating agreements) – what is not 50% is the Debtor's entitlement to the current cash flow.[6]

---

[6] In paragraph 48 of the Penachio Affirmation, Ms. Penachio mentions a settlement meeting on April 27, 2016. Contrary to Ms. Penachio's statement about her "comfort," she stated that the proposal made by the Committee and its members was "fair" and that she would get back to the Committee in a matter of days. That did not happen.

18

36. Although the Committee has tried, on multiple occasions, directly and indirectly, to facilitate a settlement of some or all of the claims, the Debtor has continued to shun compromise in favor of endless litigation, and has walked away from fully negotiated settlements [*see* Dkt. No. 495, ¶¶ 7-13].

## CONCLUSION

37. The Motion is replete with calumny – willfully false and unsubstantiated allegations against the Committee, its members, its counsel, and even the Office of the United States Trustee – while at the same time minimizing the horrific pattern of attacks on Mr. Coscia and others as "mischievous pranks pre-petition." (Penachio Aff. ¶ 11).

- Was spoofing Mr. Coscia's phone and creating a false death threat a mischievous prank?

- Was filing a false criminal complaint and having Mr. Coscia falsely arrested and prosecuted a mischievous prank?

- Was taking the Fifth Amendment when asked about the false arrest a mischievous prank?

- Was writing the number $15,000 on a piece of paper and telling Mr. Coscia that this is how much it costs to have someone killed a mischievous prank?

38. The Motion is the Debtor's most recent attempt to malign the Committee and its professionals, and derail this bankruptcy process, before the Court – as it previously indicated – hears dueling disclosure statements and learns that the Debtor's plan is patently unconfirmable (or, as suggested by the UST, appoints a chapter 11 trustee). For all of the foregoing reasons, and those contained in the other objections filed or to be filed, the Motion should be denied in its entirety.

---

While we do not intend to debate each and every false statement in the moving affirmation, the recitation of the events on December 13, 2016 and the timeline of events is false.

Dated: New York, New York
April 18, 2017

By: /s/ *Melanie L. Cyganowski*
Melanie L. Cyganowski
Richard G. Haddad
OTTERBOURG P.C.
230 Park Avenue
New York, New York 10169
(212) 661-9100
*Counsel to the Official Committee of*
*Unsecured Creditors of Sammy Eljamal*

20