PENACHIO MALARA LLP                          Hearing Date: April 25, 2017 at 10:00am
Counsel for the Debtor
235 Main Street
White Plains, New York 10601
(914) 946-2889
By: Anne Penachio (A Member of the Firm)
    Joseph P. Garland (Of Counsel to the Firm)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
In re

                                            Chapter 11

SAMMY ELJAMAL,
                                            Case No. 15-22872-RDD

                          Debtor.
-------------------------------------------------------------------X

### THE DEBTOR'S REPLY TO THE OPPOSITION OF (I) OTTERBOURG PC; (II) THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS; (III) MARC OXMAN AND THE OXMAN LAW GROUP, PLLC; AND (IV) THE UNITED STATES TRUSTEE TO HIS MOTION FOR SANCTIONS UNDER BANKRUPTCY RULE 2019

SAMMY ELJAMAL, the debtor herein (the "Debtor"), by and through his counsel,

PENACHIO MALARA LLP submits this reply to the opposition of the OFFICIAL

COMMITTEEE OF UNSECURED CREDITORS (the "Committee" and the "Cmte 2019

Obj."")) (Dkt. No. 545), the UNITED STATES TRUSTEE (the "UST") (Dkt. No. 543), and

MARC OXMAN and the OXMAN LAW GROUP, PLLC (together, "Oxman") (Dkt. No. 546),

to his motion for sanctions under Bankruptcy Rule 2019 (the "2019 Motion," (Dkt. No. 463)), and

for such other and further relief as may be appropriate:

## I. Introduction

1.      Oxman, the UST, and the Committee (collectively, the "Objectors") oppose the 2019

Motion. In support of their opposition, each of the Objectors propound some or all of the following

arguments:

(a) Rule 2019 does not apply;

(b) they have acted in good faith;

(c) the Debtor knew that NY Fuel Holdings LLC and/or related entities (collectively, the "NY Companies") were advancing legal fees incurred by his litigation adversary Brent Coscia ("Coscia");

(d) the Debtor is not acting in good faith and brought the 2019 Motion as an improper litigation tactic;

(e) the Court cannot grant certain aspects of the relief sought (*e.g.*, the removal of Coscia from the Committee); and

(f) notice afforded to the Committee was defective in that it did not fully articulate the relief sought.

2.   For the reasons set forth herein, the Objections should be overruled.

## II. The Debtor And His Counsel Have Acted In Good Faith

3.   An overarching theme of the Objections has a shoot-the-messenger quality: By formally moving with respect to issues raised by the Court regarding Rule 2019 and arising from deficiencies, as the Debtor sees them, in compliance with the Court's instructions, the Debtor is attempting to divert attention from more pressing matters.

4.   The 2019 Motion was not brought in bad faith and it was not brought to delay the resolution of the case.   It was brought because there has been a long-term failure of disclosure with respect to the particulars of the relationship between James Weil and Brent Coscia and that failure has tainted the case and in particular the Debtor's efforts to resolve it. The allegations that the Debtor has not acted in good faith and that his professionals are using ethical lapses by

litigation adversaries as an opportunity to gain an advantage in this case are false and contradicted by the indisputable documentary evidence.

**1.   The Settlement Process**

5.   First, the Debtor and his attorneys have not stymied the settlement process. This is an assertion that appears again and again in recent filings, presumably to create a rationale for the appointment of a trustee.

6.   In fact, in 2016 the Debtor, through his counsel, conveyed at least three written offers to the Committee. Written offers were conveyed on or about the following dates:  May 25, 2016, and August 12, 2016 (Note:  there is a typo on the August 12, 2016 settlement - It bears the date April 12, 2016 on the first page but on the second page, beneath the Debtor's signature, it bears the correct date of August 12, 2016.)

7.   Redacted copies of the foregoing settlement offers are annexed as Exhibit A and Exhibit B.

8.   In one, the Debtor offered three alternatives: his remaining at the NY Companies, his buying out the others' interests in the NY Companies for a particular price (or permitting those who wanted to remain members to do so), and the others buying him out for that same price plus the return of his cash investment.  See Exhibit B.  How could an offer giving other investors the option of either buying the Debtor's interest or having the Debtor buy out theirs for the same price not be considered a serious offer? The Committee never responded to the offer yet insists that the Debtor does not want to settle.  Clearly the Committees' allegations are fabricated, designed to support the appointment of a trustee.

9.   In addition, several comprehensive written offers were forwarded directly to Francis Conrad, the first mediator (in the mediation at which Coscia did not appear). One, in a format

requested by the mediator, was conveyed towards the conclusion of the first mediation. Consisting of 6 pages, it is highly detailed and contains an in depth analysis of the issues including an analysis of claims by and against the Debtor and ownership interests. See Exhibit C.

10.  The foregoing offers were conveyed in good faith and, Counsel believes, were fair and reasonable. It is noteworthy that they were conveyed before the Court granted the Debtor's motion for Summary Judgment ruling that he held a 50% interest as opposed to an 8.627% interest in the NY Companies and before the Debtor had access to the NY Companies' financials. Those offers, which were considered imminently fair when they were made, are no longer valid.

11.  The Committee failed to respond to the foregoing written offers although the Debtor repeatedly asked it to. To the best of counsel's recollection, the Committee did not make any written offers to the Debtor whatsoever. The Committee's refusal to respond or make a counter-offer has been an impediment to the mediation and settlement process.

12.  It can be reasonably inferred that the Committee's actions are the result of pervasive conflicts among its remaining two members, JMM Fuel Co. ("JMM") an entity controlled by James Weil ("Weil") and Brent Coscia ('Coscia"). Shortly after the first mediation, the Debtor reached a settlement with Gas Land Petroleum, Inc. ("Gas Land"), a former Committee member, who, at the time of the resolution, suggested that it was exasperated with the Committee.

13.  The Debtor in fact had positive settlement negotiations directly with Oxman and its client, Coscia. The negotiations between the Debtor and Coscia ultimately resulted in a deal, the terms of which were to be finalized within a day. Coscia abruptly unilaterally revoked his offer. (See Lois Rosen Email dated December 13, 2016, (Exhibit D).) The email states that Coscia no longer wished to settle with the Debtor along the lines he had agreed to.  The agreement was

4

negotiated prior to the Debtor's gaining access to records of the NY Companies and uncovering the facts that are the subject of the 2019 Motion.

14. Ms. Penachio speaks of this in paragraph 62 of her moving Affirmation. (Page 23, Dkt. No. 463.) In its Objection, the Committee writes, "While we do not intend to debate each and every false statement in the moving affirmation, the recitation of the events on December 13, 2016 and the timeline of events is false." (Committee 2019 Opp., at 19 n.6 (Dkt.No. 545).)[1] The basis for Ms. Penachio's statement is (i) she heard at least 2 people indicate that the Committee was holding a conference call on December 13 at noon and (ii) Ms. Rosen sent the email revoking Coscia's offer at 12:38 pm. Perhaps the conference call did not take place as Ms. Penachio understood. The offer-revocation certainly did. The email speaks for itself.

15. Instead of responding to the Debtor's written offers, the Committee has made attempts at "back door" negotiations. For example, the Committee apparently dispatched Mark Tulis, a former partner of Oxman, to reach out to Guy Parisi, a close friend of the Debtor and the undersigned. This type of "overture" is not unusual in hotly-contested cases. Mr. Parisi, who is submitting a separate affirmation, conferred with the Debtor and advised Mr. Tulis that the Debtor was not interested in a settlement predicated on the Debtor "selling" his entire interest in the NY Companies. Although Mr. Parisi indicated that the Debtor would be interested in alternate proposals, none has been forthcoming.

---

[1] The existence of this email undermines a key argument made by the Committee in its support of the UST's motion for the appointment of a trustee. The Committee points to *the Debtor's* supposed "reneging" on a deal that he had reached with Coscia in December as a key proof the Debtor refuses to negotiate which is a key argument for it assertion that a trustee is warranted, (¶ 8, Committee Joinder to UST Motion, (Dkt. No. 495)).

16. It is preposterous that the Committee would assert that the Debtor is not interested in resolution. The Debtor is not interested in his interests in the NY Companies being taken over by Weil for a fraction of their value – something Weil and Coscia have being trying to achieve since Coscia's motion for the appointment of a receiver in State Court where Coscia argued (although it was against his personal interest as a creditor) that the Debtor only held an 8.627% interest in the entities (an anti-creditor position that the Committee would later support in this case). But he also submitted a proposal to the Committee in which he agreed to sell his interests in the NY Companies for the same price, plus a return of what he put into them, that he offered to buy out the others' interests. In the face of the written offer annexed as <u>Exhibit B</u>, signed by the Debtor, how could the Committee possibly assert that the Debtor has not been amenable to resolving this case?

## 2.  **The Committee And Oxman Misled The Debtor And Hindered  The Debtor's Efforts To Gain Information**

17. The essence of this motion concerns the inadequate disclosures in this case. During the early stages of the proceeding, the Debtor and counsel were troubled by many of the actions (and the inactions) of the Committee and sensed that something was wrong. For example, the Committee did not respond to the Debtor's settlement offers. It adopted positions that ran contrary to the interests of the Debtor's estate (most notably its *advocating* that the Debtor only owned 8.627% of the NY Companies and its acceptance of the validity of patently-defective claims of the NY Companies).  It would not ever consider the Debtor's valid objections to the unsubstantiated claims of the NY Companies.

18. The Debtor's successful negotiations with Gas Land heightened concerns that negotiations with the Committee would be futile.  Gas Land had been represented by Oxman but, in the context of the Chapter 11 case, Gas Land has retained Genova & Malin as its counsel.  Tom Genova, rather than Oxman, negotiated the Gas Land settlement with the undersigned.

19. In April 2016, the Debtor sought discovery from Coscia regarding his relationship with the NY Companies, Weil and others through Bankruptcy Rule 2004. Oxman objected to the Debtor's 2004 application, indicating in its objection that Weil was advancing the fees. See Exhibit E (See ¶ 22). The Committee supported the objection, further hindering the Debtor's ability to obtain information.

20. Counsel took Oxman and the Committee at their words and accepted that Weil individually was advancing Coscia's fees and did not immediately pursue discovery. The Debtor focused on other issues in the case including the Summary Judgment motion, the second mediation, access to the NY Companies' records and working on a plan (which was filed on April 4, 2017, (Dkt. No. 496)).

21. The assertion by Oxman and the Committee that the Debtor was on "notice" that the NY Companies were paying Coscia's fees is false. The fact that there was evidence at the civil trial, some of which the Debtor pointed to in this 2019 Motion, or that there was a statement buried in Oxman's letter to the UST in April 2016 that NYFD and not Weil himself was advancing Coscia's fees (See Exhibit F) does not constitute "notice." Nor does it excuse a failure to be complete and accurate in formal disclosure documents that are filed in this Court, documents that are meant to simply provide no more than the facts as to the relationships among the members of formal and *ad hoc* groups in a case.

22. The Committee takes exception to the Debtor's counsel's characterization of its counsel as having turned a blind-eye to the subject. (¶ 32, Cmte 2019 Obj.) That characterization follows from the fact as set forth in perhaps excessive detail in the 2019 Motion that when in April 2016 (and the Committee adds further evidence from September 2016, (*infra*, 9, n.2)) the Committee knew or should have known that either Weil or NYFD, not both, were advancing

Coscia's legal fees, "who would have not gotten to the bottom of the simple question: who was paying Coscia's bills . . .?" (¶ 50(v), Penachio 2019 Aff., (Dkt.No. 463).) Its defense of its reliance on Coscia, although not its own apparent inaction -- presumably it would have pointed to its own action had there been any -- is that having met and spoken with Coscia it sufficed that "Otterbourg has seen no indication that Mr. Coscia is conflicted from performing his fiduciary duties as a Committee member," (¶ 34, Cmte 2019 Obj.), is not compelling.

23.    Oxman could have cleared up the inconsistencies in April 2016. The Committee could have conducted an inquiry. At the very least, they could have consented to the Debtor's application for a 2004 examination in April 2016.   They chose not to. For this reason, it is difficult to accept Oxman's position that he acted in good faith. In fact, the Committee continues to obstruct the Debtor's efforts to obtain information from Coscia and recently objected to the Debtor's amended 2004 application.

### 3.    The Court's Comments Regarding Bankruptcy Rule 2019

24.    The 2019 Motion was not something conjured up by the Debtor to delay the case for a litigation- or tactical-advantage. It was the Court that brought it to a head at the February 7, 2017 Hearing.

25.    By way of background, on January 18, 2017, Musa Eljamal ("Musa"), through his counsel. Morgan & Barr, moved to disqualify Oxman as counsel to Coscia and others. (Dkt. No. 426) (the "Disqualification Motion"). The Debtor submitted a statement in support of the Disqualification Motion and mentioned the failure of Oxman and others to comply with Rule 2019 as a basis for disqualification (Dkt. No. 445). Oxman and the Committee objected to the Disqualification Motion. In connection with its objection, Oxman said that a 2019 statement was not required (Dkt. No.  448).

26. At the hearing on February 7, 2017, the Court suggested that Rule 2019 was applicable and afforded "all" (not just Oxman) one last chance to make things right by getting into compliance with Rule 2019 by February 10, 2017. The Court cited two cases and its letter to Congress.

27. On February 10, 2017, Oxman, which was uncertain whether it was actually required to do so by the Rule, was alone in filing a 2019 Statement. (The "Oxman 2019," (Dkt. No. 453).)

28. As is detailed in the 2019 Motion papers, the Oxman 2019 was deficient in several respects including with respect to the issue of who was advancing Coscia's legal fees and retainer statements.

29. Things changed markedly on February 13, 2017 though, when Coscia himself filed his Declaration in support of the Oxman 2019. (The "Coscia Declaration," (Dkt. No. 454).) In it Coscia not only contradicted his prior statements concerning the payment of his fees,[2] but also revealed for the first time that he and Weil had a deal whereby Coscia would refrain from suing the NY Companies and its investors in exchange for the advancement of his legal fees. This agreement has been referred to as the "Covenant Not to Sue."

30. The Covenant Not to Sue was further described by counsel for the NY Companies, Harfenist Kraut Perlstein (the "Kraut firm") in a letter dated February 17, 2017 to Paul Schwartzberg of the UST in response to the latter's inquiry concerning under what authority the NY Companies was paying Oxman's fees. (Exhibit G.) Mr. Kraut explained that there was

---

[2] The Committee observes that Coscia actually contradicted his five statements under oath at his civil trial against the Debtor and Bryan Orser in a September 13, 2016 Declaration filed in this case, (¶ 6, Exh. 2, Committee 2019 Obj. (Dkt. No. 545-2).) It does not explain why it did not react to that Declaration by investigating how it could be squared with the statement in his 2004 Objection of five months before that Weil (and thus not NYFD) was advancing his fees, if it did not.

consideration for the payments because Coscia agreed not to sue the NY Companies in exchange for the advancement of his legal fees.

31. The Covenant Not to Sue is a "disclosable economic interest" that should have been disclosed under Rule 2019 at the outset of the case. It was not. The Debtor, through counsel, has researched the impact of the Covenant Not to Sue on Coscia's Judgment. Counsel believes that the Covenant Not to Sue may result in Coscia's Judgment being vacated under NY CPLR 5015 or significantly reduced. As special counsel Ken Stenger explained in his affirmation in support of his retention, (Exhibit H), a component of damages was for injury to Coscia's reputation. At the Civil Trial, numerous misrepresentations were made regarding the payment of Coscia's fees. Essentially, the jury was told that Weil individually was paying the fees because Coscia was an innocent grandfather (putting money aside for college savings) and a fine worker of modest means. This of course, bolstered Coscia's claim to the jury that his reputation was damaged by the Debtor's conduct.

32. In fact, Coscia's legal fees were being advanced because he had agreed not to sue the NY Companies and its investors, including Weil, who was portrayed as a "gentleman" in jury summation by Coscia's counsel.

33. It is submitted that the story presented to the jury is much better for Coscia than the facts stated in the Coscia Declaration – namely, he threatened to sue Weil, the NY Companies, its investors and the Harrison Police Dept. and agreed only to sue Sammy. In exchange for his agreement not to sue, the NY Companies agreed only to advance his legal fees.

34. As also detailed in his 2019 Motion papers, based upon the Court's statements on February 7, 2017, the Debtor believed that the Court at least thought it important that the issue of

who represented whom and, more immediately, who was paying for whom be addressed promptly. The Court had, after all, given the parties three days to file their 2019 Statements.

35. Given the inadequacy of the Oxman 2019 and the lack of 2019 Statements (or in the case of the Committee itself an amended one), the Debtor felt that it was important to move the Court for relief. Contrary to the assertions of the Committee and Oxman, the Debtor did not conjure up the 2019 Motion as a mechanism to obtain leverage over Oxman or anyone else. The Debtor, through counsel, listened to the Court, reviewed the law and acted in a manner that was appropriate under the circumstances. The Debtor's goal is not to harm attorneys who may have made good faith errors but to obtain answers to serious questions.

36. The Committee evidently dismisses the issues raised under Rule 2019 as unimportant. It insists that the Debtor wasted his time addressing the 2019 issues raised by the Court instead of finalizing his reorganization plan. See Exhibit I. As explained in the Debtor's motion to have his plan deemed timely filed, (Dkt. No. 535), the Debtor understood (and still understands) the deadline for filing his plan was early April, which is when he filed his plan and disclosure statement.

**4.    Continued Non-Compliance with Rule 2019**

37. The Committee's lack of appreciation for the significance of Rule 2019 has evidently "rubbed off" on other parties. The Debtor in reviewing certain of the NY Companies' books and records, discovered that not only were the entities paying Oxman, they were also paying the legal fees incurred by the Kraut Firm and Carlos Cuevas. In addition, he learned that Weil was individually being paid $8,500.00 per month by Connecticut Dealer Stations, LLC, a creditor in this case and a company owned by the Debtor and Silverman.

38. It is noteworthy that the following professionals have not filed 2019 statements although they represent "groups of creditors":

(i) the Kraut Firm – representing JMM Fuelco, Amsterdam, Weil, Leon Silverman and the NY Companies;

(ii) Carlos Cuevas – representing Amsterdam and the NY Companies;

(iii) Otterbourg – representing the Committee;

(iv) Herrick Feinstein – representing Silverman, Connecticut Dealer Stations, LLC, Wholesale Fuels of Connecticut, LLC and Wilton Motiva, LLC.

39. In addition, no individual party but Coscia has filed a 2019 Statement.

40. The Debtor has not yet moved for affirmative relief against the foregoing (other than Otterbourg). Rather, he has sought relief under the Plan including negative inferences and the denial of a vote. Manifestly, if the Debtor's motive was to use ethical lapses as a tactical advantage, he would have moved against the foregoing as well as Coscia and Oxman.

**5. <u>Good Faith of the Committee and Oxman Is Questionable</u>**

41. Otterbourg and Oxman insist that they have acted in good faith. Several factors cut against their "good faith" argument including:

(a) Why did Oxman and the Committee hinder the Debtor's efforts to obtain information via Rule 2004 regarding the relationship between Coscia, Weil and the NY Companies in April 2016 by filing objections (Dkt. Nos. 233 and 234) that suggested that the efforts were disingenuous and that contained or was supported by inaccurate information (i.e., that Weil was advancing Oxman's fees)?

(b)  Why did the Committee object to the Debtor's second 2004 application (filed in March 2017 as Dkt. No. 465) wherein the Debtor seeks information regarding the relationship among Weil, the NY Companies and Coscia (Dkt. No. 487 )?

(c)  Why didn't the Committee amend or supplement its generic 2019 Statement, which was filed at the outset of the case, in April 2016 when Coscia submitted conflicting statements regarding the payment of his legal fees? The Debtor is not taking issue with the adequacy of the original Committee 2019 Statement at this time, (Dkt. No. 71). (*See* ¶ 34, Cmte 2019 Obj.). What matters is why the Committee did not amend the Statement when it learned in late April 2016 that there were two, contradictory stories as to the relationship between Coscia and JMM or in September 2016 when Coscia submitted his pleading in support of an Examiner.

(d)  Why didn't Oxman or the Committee "disclose" the economic relationship between Coscia, Oxman and the NY Companies, entities which are the subject of hotly contested litigation pending before this Court?

(e)  Why did Oxman refuse to produce documents requested by the undersigned in January 2017? (See Exhibit J)

(f)  Why has the Debtor been denied access to the entire server and correspondence files of the NY Companies – records which may shed some light on the matters at hand?

(g)  Why have Oxman and the Committee accused the Debtor of conjuring up the 2019 Motion to gain a litigation advantage when it was the Court itself that raised the issue, with some vehemence?

42.  This was a not motion that counsel wanted to make.  However, there are too many unanswered questions that mandated that something be done, including the following:

13

(a)  Why did Coscia conceal the "Covenant Not to Sue" from Oxman?  It is submitted that this type of agreement is something a litigant would ordinarily share with his counsel.

(b)  Assuming Coscia did not disclose its existence to Oxman, would not Oxman, as a seasoned attorney, have become suspicious when Coscia elected not to sue the Harrison Police Department?

(c)  Was it reasonable for Oxman to believe that Weil, a ruthless businessman who was also Oxman's client, was paying Coscia's fees simply because he was a "gentleman?"

(d)  Was a Form 1099 issued to Oxman or Coscia regarding the legal fee payment?

(e)  Although it is possible that the "Covenant Not to Sue" was not contained in a writing, it is unlikely that the agreement was only oral especially given the fact that Coscia's October 2011 "promise to repay" was contained in a writing. See Exhibit K. Manifestly, if Weil, a shrewd businessman, sought fit to document Coscia's repayment obligation, it strains common sense that he would not document his own release.

(f)  Why wasn't the agreement revealed in the April 2016 correspondence to the UST from Oxman and the Kraut Firm?  Notably, the Kraut Firm omits this fact from its letter to the UST sent on April 28, 2016. (See Exhibit L).  However, that fact is prominent in the Kraut Firm's February 17, 2017 letter to Mr. Schwartzberg, (Exhibit G).  Although this Motion does not seek relief as to the Kraut Firm, largely because it at least makes no secret as to its loyalties,[3] it is worth noting that the Firm appears to be familiar with the terms of the Covenant Not to Sue, as acknowledged in its February 17, 2017 letter to Mr. Schwartzberg.  Why did the Kraut

---

[3] The extent of possibilities improprieties with respect to the Kraut Firm's representation of both NY Companies and Weil are or will be the subject of claims asserted by the Debtor against Weil.

Firm remain silent in April 2016 and why did it fail to file a 2019 Statement – even after the 2019 Motion was made?

(g)   Although it is possible that the Oxman firm, which was paid over $1.2 million by the NY Companies did not have a written retainer agreement with the entities or Weil, individually, or Silverman, Gas Land or any of the other parties he represented, the absence of written agreements raises questions. This is especially so given the mandates under New York law concerning disclosures that are required to clients when a third party is paying its fees.

(h)   Why have the Committee and Oxman sought to deflect attention from their ethical lapses by making improper accusations against the Debtor and his counsel especially in the wake of the record of the February 7, 2017 hearing which counsel took very seriously?

(i)   Why hasn't Oxman supplemented his 2019 Statement with additional information, including information that the Debtor received in early March 2017 regarding the agreement between his clients, Gas Land and creditors Robert Porpora, Porpora Realty, Inc. and Robert Porpora Realty, Inc. (the 'Porpora Entities") which required Gas Land and the Porpora Entities to cooperate with each other (or act in concert) and provided for the payment by Gas Land of legal fees incurred by the Porpora Entities. (See Exhibit M.) This "fee paying and cooperating agreement" was only discovered after Gas Land hired new counsel in early 2017 and commenced a proceeding against the Porpora Entities and the document happened to have been filed in that State proceeding which counsel discovered on the state Court electronica filing system. Counsel reached out to the Committee's counsel concerning knowledge of this agreement, (Exhibit N), but it has yet to respond. The "fee paying and cooperation agreement" could well have impacted the First Mediation in which Gas Land participated. It most certainly

impacted litigation in the chapter 11 proceeding of *Armonk Snack Mart, Inc.*, an entity which the Debtor holds a 50% interest.

(j)   Why hasn't Oxman explained why his retainer with Coscia, which was just recently produced, (Dkt. No. 546-2), reflects a loan from Weil individually to Coscia, a statement that was contrary to the assertions in his April 2016 letter to Mr. Schwartzberg wherein he claimed the NY Companies were paying his fee?   The retainer should have been readily accessible as NY State rules require it to be filed with the Office of Court Administration ('OCA").   Presumably, even if the retainer agreement could not be located in Oxman's files, it was readily accessible through OCA.   Oxman could have obtained a copy by simply making a phone call to OCA. The failure of Oxman to produce the agreement and the fact that it contained information that was contrary to statements made by Oxman in the this case, (ie that Coscia was indebted to Weil, rather than the NY Companies) suggests that perhaps the failure to produce the retainer was not an omission made in "good faith."

(k)   Why hasn't Connecticut Dealer Stations, LLC (an entity controlled by Silverman that the Debtor claims an ownership interest in, and which Oxman also represents or represented) filed a 2019 Statement to reveal that it is paying Weil $8,500.00 per month as a "consulting fee" filed a 2019 Statement?

(l)   If Oxman is truly acting in good faith, why doesn't he support the removal of Coscia, who made misrepresentations to him and others, from the Committee under the circumstances. Why does he continue to support a former client who was not forthright and honest with him and misled two Courts?

If Oxman is truly acting in good faith, why doesn't he alert the State Court to the newly discovered misrepresentations made by Coscia at the trial?  Misrepresentations that are based upon facts that,

according to Oxman, were concealed from him by Coscia. Oxman may well have an independent duty to alert the State Court tribunal to misrepresentations made at the trial under New York's Judiciary Law and other applicable ethical rules including ABA Rule 3.3 which provides in pertinent part, that a " A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to **correct a false statement of material fact or law previously made** to the tribunal by the lawyer (emphasis added).

43. Neither the Committee, Otterbourg, nor Oxman appear to appreciate the significance of the concealment or Coscia and Weil of the Covenant Not to Sue and the damage that the concealment of that agreement has inflicted upon the Debtor in this proceeding and the State Court. While the undersigned is willing to afford Oxman, the Committee and Otterbourg the benefit of the doubt with respect to the "good faith" issue, there are still facts that do not add up as noted above.

44. If the Committee and Oxman are really acting in "good faith," they would undertake to assist the Debtor and the Court in getting to the bottom of everything and cooperate with the Debtor's pending 2004 application rather than accusing the undersigned of seeking to gain a litigation advantage. Instead, they point the finger at the Debtor and his counsel and continue to make accusations that are simply false (for example, the patently false statement that the Debtor is not interested in resolution).

45. It is submitted that if the Committee was acting in good faith, it would not have made ambiguous "settlement overtures" to Mr. Parisi through a third party but would have responded in writing to one of four written proposals made by the Debtor. It can only be reasonably inferred but the "overture" to Mr. Parisi was nothing but a ruse designed by the Committee to support the appointment of a trustee.

46. The Committee is moving forward with a Plan even though there is no urgency about this case (i.e., no employees are about to lose their jobs, there is no risk of irreparable injury to anyone). The only likely reasons that the Committee is moving forward with "urgency" are so that (i) Coscia, who repeatedly made false statements, can avoid the outcome of the pending appeal – he opposed the Debtor's motion for its expedited treatment – and a motion to vacate his judgment under CPLR 5015 based upon his fraud and (ii) Weil and Silverman can reap more benefits from the NY Companies and the entities that Silverman controls.  In this regard, it has been alleged that Weil and Silverman have plans to sell the companies for far more than the $9.4 million offered to the Debtor under the Committee Plan. Because the Debtor has been denied access to all records of the NY Companies, he has no way of verifying whether this is the case.

47. In sum, the Committee, Otterbourg and Oxman are not acting in a manner consistent with someone acting in "good faith."

48. Moreover, it is unclear from Oxman's pleadings whether he has completely resigned as Coscia's counsel or if his assertion that his no longer Coscia's counsel is qualified. Oxman should advise whether he will only withdraw as counsel for Coscia in this case or in all matters. Oxman should clarify the scope of all of his current and reasonably anticipated future involvement with Coscia, Silverman, Weil, the NY Companies, Gas Land and anyone else involved in this case whether before this Court or otherwise.

49. Based upon Coscia's misrepresentations and Oxman's disclosure failures, the Debtor was forced to expend substantial funds in both this case and before the State Court. Had the Covenant Not to Sue been disclosed at the trial in State Court, the Debtor may not have even had to file for Chapter 11 relief. Had Oxman, Coscia and the Committee acted appropriately at the outset of the case, or at the very latest in April 2016 when the conflicting versions appeared in this

18

case or even in September 2016 when Coscia submitted his pleading in support of the appointment of an Examiner, the Debtor would have not been required to expend his time, effort and substantial funds in investigating this matter. They deceived the Debtor and the Court, even if unwittingly, by falsely stating that *Weil* had advanced Coscia's legal fees. They obstructed the Debtor in his efforts to investigate by objecting to his first 2004 application and obstructing his quest to obtain information.   Most significantly, was the failure of Coscia and Weil to disclose the secret agreement between them - the Covenant Not to Sue – which was not only concealed from the Debtor, the Court  and the UST but apparently hidden even from Oxman.

50.  Uncovering fraud and ethical lapses is not how counsel wants to spend her time. However, someone had to act, especially in light of the Court's comments on the record at the February 7, 2017 hearing. Counsel did that which was necessary to protect the Debtor. Rather, than recognizing this, the Committee, Oxman and Otterbourg improperly imply that the 2019 Motion was undertaken in bad faith. Rather than acknowledging that the Debtor was forced to proceed, they criticize the Debtor and, by association, his counsel. The mischaracterization of the 2019 Motion is simply not reflective of what a person who is acting in "good faith" would do.

51.  Finally, it is submitted that it may not be "good faith" for Oxman, Coscia and the Committee to insist on a total "pass" for their transgressions. It is submitted that a "pass" may be unfair under the circumstances but that is for the Court to ultimately decide. It is submitted that some sanction, whether monetary or preclusion from participation in the case, should be imposed.

**6.   Rule 2019 Applies To The Committee**

52.  As the Committee correctly points out, the Debtor cited no cases on its attorneys' obligation to file its own Rule 2019 Statement. (¶ 30, Cmte 2019 Obj.) This, it continues, "evidences that again, the Debtor and his counsel have devolved into throwing legally (and

factually) baseless allegations, and hoping something sticks." (*Ibid.*) For want of any cases (either way), the Debtor was relegated to relying on Rule 2019 itself for its argument that the Committee's attorneys were obligated to file a 2019 Statement. It is submitted that the express terms of Rule 2019 require a statement.

53. While the Committee writes, "Otterbourg's disclosure obligations are laid out in Section 1103 of the Bankruptcy Code and Bankruptcy Rule 2014," (¶ 29, Cmte 2019 Obj.), the former is silent on any "disclosure obligations" and the latter merely makes a general statement of disclosure obligations for certain retained-retained professionals. Indeed, insofar as Rule 2019 made exceptions to its applicability for official committees, it mentions them (and they only apply to the committee itself, not to its counsel).

54. Perhaps the Debtor has waived this objection, as the Committee suggests. Perhaps his statement that Otterbourg was required to file a 2019 statement will prove "baseless." The Debtor believed, and believes, it appropriate that the issue be raised at this point given the express language of Rule 2019 and the concerns expressed by the Court on February 7.

### III. Removal of Coscia from the Committee Is an Appropriate Remedy

55. Removal of Coscia is tantamount to reconstitution of the Committee. The Court has the authority to reconstitute a Committee under section 1103.

56. One would assume that the UST, faced with violations of 2019 and material misrepresentations by Coscia, would voluntarily suspend him from participating in this case as a Committee member. Instead, it appears to support Coscia, who has committed a fraud upon this Court and its Office.

57. One would also assume that Coscia, if he was indeed, acting in good faith, in the face of not being forthright with Oxman and misleading two Courts and the UST, would resign from

the Committee voluntarily. That type of action would be in "good faith" especially since Coscia now has separate counsel, Marc S. Goldberg. One would assume that Oxman, who has a contingency fee agreement with Coscia, would support the foregoing. Instead, Coscia and presumably Oxman, want Coscia to continue to act with Weil as a "group" with the "group" counsel paid for by the Debtor – who by the way, is indirectly, as the 50% shareholder of the NY Companies, paying the fees of the Kraut Firm and the Cuevas Firm and, until recently, the Oxman Firm. The foregoing fees are being paid in addition to his own counsel and the Committee professionals.

58. The Debtor understands that the UST has policies in place which require that it oppose the relief sought by the Debtor (i.e. the removal of Coscia). The UST believes that a Trustee should explore issues presented under Rule 2019. The Debtor will be vehemently opposing the motion of the UST for the appointment of a Trustee. The UST advocates for the appointment of a Trustee primarily based upon the perception that there is an "inability to get anything done" in the case. The Debtor maintains that there is no basis for the appointment of a trustee in fact or law. The Debtor will address the UST's motion on May 5, 2017, the return date of the UST's motion.

59. The Debtor and counsel are disappointed that the UST has not taken a more active role in supporting the valid concerns raised by the Debtor regarding the Committee. Counsel understands that the UST has policies in place that it feels constrained to follow. After reviewing the UST policies and procedures handbook, a multitude of cases, treatises and the Court Examiner's report in the *Fibmark* case, Counsel believes that the current UST policies with regard to the appointment of official committees may be flawed, especially in light of the amendments to Rule 2019. Counsel has explored whether it is possible or appropriate to advocate for a change in UST procedures. Challenging government procedures and policies is a practice that has

21

historically been an impetus for positive change and has advanced the interests of those relying on services or dealing with government agencies.   Counsel's issues with the policies of the UST are not and should not be construed as anything more than a valid request for a re-evaluation of procedures that may be outdated.

## IV.  **NOTICE**

60.  The Committee argues that the notice of the 2019 Motion is deficient and the Motion should be denied on that basis. The notice complies with applicable rules and was reasonably calculated to afford the Committee with adequate notice. Notwithstanding should the Court find that notice is defective with respect to the sanctions sought, the Debtor requests that, in the event that the Court finds that the Committee or Otterbourg, or both, violated Rule 2019, a hearing on sanctions be scheduled at a later date.[4]

---

[4] Rule 2019(e)(1) permits a court to take action "on its own motion."

## V. <u>CONCLUSION</u>

61. The Debtor respectfully requests that the Court overrule the opposition interposed to the 2019 Motion and grant such other and further relief as is just and proper.


Dated: White Plains, New York
       April 19, 2017

                                    PENACHIO MALARA LLP


                                    By: /s/ Anne Penachio
                                    Anne Penachio
                                    Joseph P. Garland, of counsel to the Firm
                                    Counsel to Debtor
                                    235 Main Street
                                    White Plains, NY 10601
                                    (914) 946-2889